**2014-1193**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

CRADLE IP, LLC,

*Plaintiff-Appellant,*

*v.*

TEXAS INSTRUMENTS, INC.,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE IN CASE NO. 11-CV-01254, HONORABLE JUDGE SUE L. ROBINSON.

## (CORRECTED) BRIEF OF PLAINTIFF-APPELLANT CRADLE IP, LLC

CHARLES W. SABER
SALVATORE P. TAMBURO
**DICKSTEIN SHAPIRO LLP**
1825 Eye Street NW
Washington, DC 20006
Telephone: (202) 420-2200
Facsimile: (202) 420-2201

*Attorneys for Plaintiff-Appellant*

December 19, 2014

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Cradle IP, LLC _____ v. Texas Instruments, Inc. _____

No. 14-1193

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellant, Cradle IP, LLC ____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Cradle IP, LLC _____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A _____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Cradle Technologies _____

4.  ☐   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Novak Druce Connolly Bove + Quigg - Chad S. C. Stover (no longer with firm), Paul E. Crawford, Thatcher A. Rahmeier
Dickstein Shapiro LLP - Charles W. Saber, Frank C. Cimino, Jeffey K. Sherwood, Jonathan L. Falkler, Leslie A. Lee
Mark C. Hageman (no longer with firm), Robert G. Gingher, Salvatore P. Tamburo, Steven T. Skelley, Gianni Minutoli (no longer with firm)

_Jan 17, 2014_
Date

_____
Signature of counsel

_CHARLES W. SABER_
Printed name of counsel

Please Note: All questions must be answered

cc: _____

124

# TABLE OF CONTENTS

I. STATEMENT OF RELATED CASES....................................................1

II. JURISDICTIONAL STATEMENT....................................................2

III. STATEMENT OF ISSUES ON APPEAL ........................................3

IV. STATEMENT OF THE CASE SETTING OUT FACTS RELEVANT
TO THE ISSUES ................................................................................4

    A.    Introduction ................................................................................4

    B.    Development of Cradle's Technology ........................................6

    C.    Cradle's '049 patent ..................................................................8

    D.    TI's Products Infringing The '049 patent.................................11

    E.    The '259 patent........................................................................12

    F.    TI's Products Infringing The '259 patent.................................13

    G.    Summary Judgment And *Markman* Before The District Court.........14

    H.    Subsequent District Court Proceedings...................................19

V. SUMMARY OF THE ARGUMENT .................................................20

VI. ARGUMENT.................................................................................23

    A.    Standard Of Review ................................................................23

    B.    The District Court Improperly Granted Summary Judgment Of
Non-Infringement Of The '049 patent ....................................23

        1.    The District Court Effectively And Improperly
Converted Apparatus Claims 1-3 Into Method Claims ............23

    C.    The District Court's Claim Constructions For The '049 patent
Are In Error ............................................................................32

        1.    The Law Of Claim Construction.................................32

        2.    The "System Bus" Limitations ....................................34

        3.    "Any Processor Requesting Access To The Shared
Resource" ....................................................................41

        4.    "The Shared Resource Is Available/Unavailable For
Access"........................................................................43

        5.    "The Shared Resource Has Just Been Made Available

For Access" ................................................................................ 45

      6.   "Cell" .......................................................................................... 46

D.    The District Court Improperly Granted Summary Judgment of Non-Infringement of the '259 patent ..................................................... 48

E.    The District Court's Claim Construction For The '295 Patent Is In Error ............................................................................................... 58

VII. CONCLUSION ............................................................................................. 62

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<span style="font-variant:small-caps">ASES</span>

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)............................................................22, 51, 56

*Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.,*
555 F.3d 984 (Fed. Cir. 2009) ............................................28

*Bayer AG v. Biovail Corp.,*
279 F.3d 1340 (Fed. Cir. 2002) ..........................................32

*Beedle v. Bennett,*
122 U.S. 71 (1887)..............................................................48, 50

*Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.,*
55 F.3d 615 (Fed. Cir. 1995) ..............................................48, 50, 51

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.,*
873 F. Supp. 2d 1192 (N.D. Cal. 2012)..............................29, 30

*Convolve, Inc. v. Compaq Computer Corp.,*
527 F. App'x 910 (Fed. Cir. 2013) ......................................48, 53, 54

*Dealertrack, Inc. v. Huber,*
674 F.3d 1315 (Fed. Cir. 2012) ..........................................43

*Finjan, Inc. v. Secure Computing Corp.,*
626 F.3d 1197 (Fed. Cir. 2010) ..........................................passim

*Frolow v. Wilson Sporting Goods Co.,*
710 F.3d 1303 (Fed. Cir. 2013) ..........................................22

*Helmsderfer v. Bobrick Washroom Equip., Inc.,*
527 F.3d 1379 (Fed. Cir. 2008) ..........................................34

*Hilgraeve Corp. v. Symantec Corp.,*
265 F.3d 1336 (Fed. Cir. 2001) ..........................................28

*In re Kollar*,
    286 F.3d 1326 (Fed. Cir. 2002) ........................................................22

*Intel Corp. v. U.S. Int'l Trade Comm'n*,
    946 F.2d 821 (Fed. Cir. 1991) ...................................................23, 28

*Joy Techs., Inc. v. Flakt, Inc.*,
    6 F.3d 770 (Fed. Cir. 1993) .............................................................23

*Kara Tech. Inc. v. Stamps.com Inc.*,
    582 F.3d 1341 (Fed. Cir. 2009) ........................................................41

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ...................................................32, 41

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
    109 U.S.P.Q.2D 1969,
    2014 U.S. App. LEXIS 3176 (Fed. Cir. Feb. 21, 2014) ....................22

*Lucent Techs., Inc. v. Gateway, Inc.*,
    525 F.3d 1200 (Fed. Cir. 2008) ........................................................37

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ....................................29, 48, 53, 54

*Markman v. Westview Instruments, Inc.*
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)...............13, 14, 31, 33

*Moleculon Research Corp. v. CBS, Inc.*,
    793 F.2d 1261 (Fed. Cir. 1986) ............................................48, 53, 54

*MySpace, Inc. v. GraphOn Corp.*,
    672 F.3d 1250 (Fed. Cir. 2012) ........................................................37

*Nicini v. Morra*,
    212 F.3d 798 (3d Cir. 2000) (*en banc*) ...........................................22

*NTP, Inc. v. Research In Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005) .................................................23, 27

*Pall Corp. v. Micron Separations, Inc.*,
    66 F.3d 1211 (Fed. Cir. 1995) .........................................................33

*Pfizer Inc. v. Ranbaxy Labs., Ltd.*,
   457 F.3d 1284 (Fed. Cir. 2006) ..........................................................46

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ...................................................passim

*Powell v. Home Depot U.S.A., Inc.*,
   663 F.3d 1221 (Fed. Cir. 2011) ..........................................................37

*Praxair, Inc. v. ATMI, Inc.*,
   543 F.3d 1306 (Fed. Cir. 2008) ..........................................................37

*Primos, Inc. v. Hunter's Specialties, Inc.*,
   451 F.3d 841 (Fed. Cir. 2006) ............................................................34

*Saffran v. Johnson & Johnson*,
   712 F.3d 549 (Fed. Cir. 2013) ............................................................37

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002) ....................................................32, 41

*Tex. Digital Sys., Inc. v. Telegenix, Inc.*,
   308 F.3d 1193 (Fed. Cir. 2002), *cert. denied*,
   538 U.S. 1058 (2003).............................................................31, 32, 41

*Toebelman v. Missouri-Kansas Pipe Line Co.*,
   130 F.2d 1016 (3d. Cir. 1942) ............................................................28

*Toshiba Corp. v. Imation Corp.*,
   681 F.3d 1358 (Fed. Cir. 2012) ....................................48, 50, 51, 54

*Vitrionics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) .....................................................passim

## STATUTES

28 U.S.C. § 1295 .....................................................................................1

28 U.S.C. §§ 1331 and 1338(a)...............................................................1

35 U.S.C. § 271(b) .................................................................................53

**RULES**

Fed. R. Civ. P. 56(a)..............................................................................................22

# I.  STATEMENT OF RELATED CASES

Appellant states that there has been no other appeal in or from this same civil action that was previously before this or any other appellate court.  Appellant is also unaware of any case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## II.  <u>JURISDICTIONAL STATEMENT</u>

This action arises under the Patent Laws of the United States, title 35, United States Code.  The District Court had subject matter jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331 and 1338(a).  On December 3, 2013, the United States District Court for the District of Delaware entered a final judgment of non-infringement against Plaintiff-Appellant Cradle IP, LLC ("Cradle") and in favor of Defendant-Appellee Texas Instruments, Inc. ("TI").  JA00047-48.[1]  Cradle timely filed a notice of appeal on December 31, 2013.  This Court has jurisdiction under 28 U.S.C. § 1295.

---

[1] "JA" means Joint Appendix.

## III.  STATEMENT OF ISSUES ON APPEAL

1.     Whether the district court erred in granting summary judgment of non-infringement of the '049 patent apparatus claims where it required the apparatus claims to perform the steps of the method claims?

2.     Whether the district court erred in granted summary judgment of all asserted claims of the '049 patent where it resolved factual issues as to whether the accused product had been used in the infringing mode?

3.     Whether the district court erred in its claim constructions of the terms of the '049 patent where it did not discuss the ordinary meaning of the claim terms, limited the claims to preferred embodiments and/or construed a claim term to eliminate a preferred embodiment?

4.     Whether the district court erred in granted summary judgment of non-infringement of the '259 method claims for the accused OMAP 4 products where it improperly resolved factual issues as to use of the accused products in an infringing manner?

5.     Whether the district court erred in its construction of "idle memory transfer controller" in the '259 patent where it ignored the words of the claim and added limitations from preferred embodiments of the specification?

## IV.  STATEMENT OF THE CASE SETTING OUT FACTS RELEVANT TO THE ISSUES

### A.    Introduction

In December 2011, Cradle IP, LLC ("Cradle") brought suit against Texas Instruments, Inc. ("TI") alleging infringement of three of its patents: U.S. Patent Nos. 6,974,049 ("the '049 patent") (JA00049-56), 6,708,259 ("the '259 patent") (JA00057-67) and 6,647,450 ("the '450 patent"). JA00068-74. Only the '049 and '259 patents are involved in this appeal. These patents cover new and improved silicon chips with multiple processors arising from Cradle's work developing a new chip. The '049 patent has apparatus claims covering aspects of the chip as well as method claims covering the use of the chip. The '259 patent has method claims only. Cradle accuses TI of direct and indirect infringement through the manufacture, sale and use of certain of its silicon chips.

On November 20, 2013, the district court issued an opinion granting-in-part TI's motions for summary judgment and issuing its claim construction rulings for all patents. JA0001-44. For the '049 patent, the court granted summary judgment of non-infringement. More specifically, for the apparatus claims, the court ruled that showing the accused chip was configured to infringe was not enough. Cradle also had to show that certain software was installed so that the chip could actually perform certain steps when in use. This was error because, as explained below, the

-4-

court misread the patent claims, effectively and inappropriately transforming the apparatus claims into method claims. The court then compounded that error in finding that Cradle had not submitted sufficient evidence (for all claims) of use of the chip with the proper software installed. But in doing so, the court improperly engaged in fact-finding, rather than just examining whether there was a genuine issue of material fact for trial.

The Court also granted-in-part summary judgment of non-infringement of the '259 patent. Since this patent had only method claims, it was appropriate to consider the evidence of actual use of the accused chips. But once again, the court improperly engaged in fact-finding when it found that Cradle did not submit evidence that the accused chips were used in ways that infringe the asserted claims. In fact, Cradle submitted evidence of four different ways in which use of the accused products infringed, including evidence from TI's own technical documents. As all inferences must be drawn in favor of the non-moving party, here too, the question should have gone to the jury.

The Court also issued its claim construction rulings on a variety of disputed claim terms. Universally, the court did not start with the words of the claim, as this Court has instructed, nor did it even consider the ordinary meaning of the words. Instead, the court relied on additional limitations, including specific examples from preferred embodiments in the specification, and imported those examples into the

claims. It did so even though there was nothing in the words of the claim or the words of the specification that would require such actions. This approach to claim construction permeated the court's order and violates this Court's admonition that, absent compelling evidence, it is error to limit claims to preferred embodiments or to import limitations from the specification into the claims.

As a result of the court's order, this case was scheduled to go to trial on infringement of the '259 patent as it related to one of TI's accused products. The parties, however, stipulated to non-infringement of that patent based on the construction of "idle memory transfer controller" issued by the district court; a construction being appealed herein. Thus, on December 3, 2013, a final judgment was entered dismissing Cradle's claims and TI's counterclaims. JA00047-48.

## B.  **Development of Cradle's Technology**

The technology embodied in the patents-in-suit was developed in the late 1990s as a part of Cradle's project to develop a unique and improved silicon chip.[2] In the 1990s, as computer processing needs were expanding, chip manufacturers were constantly seeking to improve the speed and performance of the silicon chips that run computers. The industry thinking at the time was to improve chip

---

[2] The chips were developed by Cradle Technologies, Inc., the company that exited the chip manufacture market. It is still in existence today (selling other products), and its intellectual property is owned by its sister company Cradle IP, LLC. The two companies are referred to collectively as "Cradle."

performance by making a faster and more efficient single processor on the chip. JA04177.

Cradle had a very different idea, one that the industry thought would not work. Cradle's engineers believed that a multi-processor system on a chip ("SoC") could be developed where the simultaneous work of the various processors would help improve data processing efficiency and be more economical to produce. In the chips of the 1990s, custom changes needed for a given customer's specific applications required changes to the hardware design of the chip; something that was both expensive and time consuming. It was the brainchild of Cradle that, in a multicore SoC design, customer changes could be implemented directly by the customer on a "stock" chip. Since the chips could be standardized, without the need for different custom hardware designs, and costly dies and tools required to manufacture them, the chips were much less expensive to manufacture and more versatile. JA01156-57; JA00550; JA01153; JA05474-75.

Designing such a new idea was no easy task. Among other things, entirely new chip architecture needed to be developed, and the multiple processors needed to work together efficiently and faster to meet customers' ever increasing computer needs. To achieve its goal, Cradle raised approximately $100 million. Cradle eventually developed a chip that was so well received it earned the 2005 Electronic

Design News ("EDN") Innovation Award for processors, beating its much larger rivals, including a chip from Appellee TI. JA05474-75; JA01160-63.

As a result of the various aspects of its work, Cradle was awarded 18 U.S. Patents, including the patents-in-suit. JA00562-64. Cradle ultimately was unable to compete with the much larger chip manufacturers established in the market and subsequently exited the chip manufacture market, although it still manufactures and sells other products today. JA00984. Subsequent to Cradle's exit from the marketplace, chip manufacturers (including TI) have adopted Cradle's vision. JA05474-75.

## C.    Cradle's '049 patent

One of the many issues in a multi-processor system is developing an efficient way for the multiple processors to obtain access to the same "shared" resource (such as a memory). The '049 patent provides such a solution. In the prior art, as explained in the '049 patent specification, processors could seek access to a shared resource by reading a "semaphore," which essentially is a flag that indicates whether or not the shared resource is available. When the value read from the semaphore indicates the shared resource is available, the processor is free to use the shared resource without interference by other processors. When the processor accesses the shared resource, the semaphore flag is changed to indicate

that the shared resource is no longer available to other processors that check the semaphore thereafter.  JA00053, 1:50-62.

When the semaphore indicates the shared resource is not available, a processor wanting access would have to repeatedly check the semaphore to learn when the shared resource becomes available, a process known as polling.  This polling creates significant inefficiencies in the system, as the processor has to continually check the semaphore to see if the shared resource has become available, when it could otherwise be performing other functions.  JA00053, 2:9-16; JA04177-78.

The '049 patent solves the prior art problem with a more sophisticated semaphore system that, among other things, sends waiting processors an interrupt signal when the shared resource is available. Thus, in place of the constant "polling" by the waiting processor, the interrupt signal lets the waiting processor (which can be performing other tasks) know that the shared resource is now available, making the patented system far more efficient.  JA04179.

As shown in annotated Fig. 2 below, a preferred embodiment of the invention, the patented solution has two basic hardware components – a "semaphore cell" and an "interrupt generation circuit."  *See also, e.g.,* JA00055-56, 6:50-7:33.



FIG._2

When one of the multiple processors wants to use a shared resource, it checks the "semaphore cell" for the shared resource to see if it is available. If so, the processor knows it can gain access to the shared resource. To let other processors (which may also want to use the shared resource) know that the shared resource is not available, the "semaphore cell" changes states (by switching the semaphore cell to a second state)[3] to indicate that the resource is "unavailable." JA00054, 3:7-24.[4]

---

[3] A state is essentially an on/off switch (a '0' or a '1') to indicate yes or no to a question. In the claims, the semaphore cell in the first state indicates that the shared resource is available; the second state indicates that it is not available. JA00055-56, 6:50-7:33.

[4] A processor completes the checking (reading of) and updating (writing to) the semaphore in "one bus transaction." JA00053, 1:36-40; 55-58. Both the checking

The interrupt generation circuit sends an "interrupt" signal to a processor that wants access to the shared resource when it becomes available. It has three components. The first is the "semaphore interrupt cell." This component monitors when the shared resource becomes available and changes states (to the fourth state) when the shared resource becomes available. JA00054, 3:57-4:21. The second component is the "semaphore interrupt enable cell" which indicates whether a processor needs the shared resource (no for the fifth state, yes for the sixth state). JA00054, 3:57-4:26. The third component is the "logic gates," which send an "interrupt signal" to waiting processor(s). JA00054, 3:57-4:38. When the shared resource becomes available, an "interrupt signal" is sent over the system bus to one or more waiting processors (by a direct line from the logic gates to the processors in the preferred embodiment) to indicate that the shared resource is now available for access. JA00054, 3:57-4:38. Claim 1, for example, is an apparatus claim that includes all of these components. JA00055-56, 6:50-7:33.

## D.    TI's Products Infringing The '049 patent

TI's multicore digital signal processing ("DSP") chips are accused of infringing claims 1-3 (apparatus) and claim 6 (method) of the '049 patent. Just like

---

and updating must be done together in one bus transaction so that no other processor can check the semaphore between the time that the processor has checked the semaphore and the time that the semaphore is updated. In other

the '049 patent claims, the accused devices also avoid the problems of the prior art through a system designed to send interrupt signals to processors waiting to use a shared resource. JA04186-87, 4194-97; JA02277; JA02310; JA02279; JA02244-45; JA02384, 2392, 2403. And just like the '049 patent claims, TI's DSP chips have the same components. They have a semaphore cell that can be checked (read) to see if the shared resource is available and when the waiting processor obtains access, it changes the state of the semaphore (writes) to indicate that the shared resource is no longer available. JA04185-87, 4194. TI's chips also have an "interrupt generation circuit," including each of the claimed components described above that are designed to have the requisite states and the capability to perform the same functions of each component (changing states when the shared resource has become available, states indicating whether or not the processor is waiting for a shared resource, and generating an interrupt signal to waiting processor(s) when the shared resource becomes available). JA04186-87, 4194-97; JA02277; JA02310; JA02279; JA02244-45; JA02384, 2392, 2403.

## E.    The '259 patent

The '259 patent, another of the patents that arose from Cradle's development work, is also designed to make the chip work more efficiently. The '259 patent

---

words, the invention provides serialized access to the semaphore. JA00053, 1:42-45.

covers a method of "activating," that is, waking up, an idle "memory transfer controller" ("MTC") so that the MTC can execute instructions. JA00057, Abstract. An MTC is the aspect of the computer chip that actually executes instructions and moves data between different parts of the computer. JA00116.

In the '259 patent, an "external agent" (such as one of the processors or any other part of the computer system that can give an instruction) starts the process by sending a "writing" that is recorded in a hardware register. As a result of this "writing," an idle MTC is activated so that it can execute instructions. JA00064, 1:59-2:5. That is, the idle MTC has "woken up" so that, as the claims require, it can execute instructions. The computer works more efficiently because the MTCs can remain idle until required and an idled MTC can be activated by a writing when required to perform an assigned task. JA00064, 1:32-38.[5]

## F.    **TI's Products Infringing The '259 patent**

Claims 1-3, 10 and 11 of the '259 patent are asserted against TI's OMAP chips that are used in such popular devices as cell phones and eReaders sold by a

---

[5] *See, e.g.,* claim 1 (JA00066, 6:8-17) which states:
1. In a semiconductor chip, a method of waking up an idle memory transfer controller in response to an event from an external source, said method comprising: a) writing to at least one hardware register of a memory transfer engine including a plurality of memory transfer controllers, said writing performed by an external agent; and b) activating an idle memory transfer controller so that it can execute instructions, said activation enabled by the writing step.

wide variety of companies. JA04821-29; JA04198-99. Just as claimed in the '259 patent, the OMAP chips have an "external agent" (such as a processor) that writes to a hardware register. As a result, the writing activates an idle MTC so that it can execute instructions. JA04225-27; JA04268-70; JA01751; JA01899; JA01945; JA01620; JA01957; JA01879; JA01882; JA01919-21, 1926-28; JA01883; JA01926; JA01881; JA01761; JA01847; JA01950; JA01954; JA01841; JA01843-44; JA01850; JA01938; JA01962, 68, 69, 79, 83-86, 95-97, 2005.

For purposes of this appeal, there are two relevant versions of TI's OMAP products. The first is the OMAP 3 products. The second includes TI's OMAP 4 and subsequent OMAP 5 chips, as well as TI's accused Centaurus and Netra products. The second version is referred to collectively as "OMAP 4" since differences between these products are not relevant for Cradle's appeal.

## G.    Summary Judgment And *Markman* Before The District Court

After the close of discovery, the district court held a joint hearing on the summary judgment and *Markman* issues and issued a single opinion. TI moved for summary judgment of non-infringement of the '049 and '259 patents on several grounds. With respect to the '049 patent, TI argued (among other things) that even though there is no mention of software in the apparatus claims, there was a requirement that the appropriate software be installed on the accused chips so that the hardware semaphore system actually performed the claimed steps. TI further

argued that there was not sufficient evidence that the appropriate software was installed. TI made this argument by pointing out that the apparatus claims included language that the computer chip was "configured to" operate in a certain way. JA01223-30.

In response, Cradle explained that TI's argument, in essence, converted the apparatus claims into method claims. While TI's argument applied to the method claims (which, by its terms, required the user to actually perform the claimed steps), the apparatus claims only describe the capabilities of the chips themselves and do not require any steps actually be performed. The claims do not cover a computer program nor do they mention software in any way. Cradle also explained that even if TI's legal argument was correct that software was required to infringe the apparatus claims (and as it applied to the asserted method claim), there still was sufficient evidence of use of the requisite software to defeat summary judgment. JA01276-281.

The district court sided with TI. It, however, performed almost no analysis of the "configured to" issue and misstated the nature of the claims (which make no reference to software). Its analysis boiled down to a single incorrect sentence, stating, "[b]ecause the apparatus claims require the 'software [to] be configured in a particular way to infringe,' infringement does not occur merely because the

apparatus was capable of operating in an infringing fashion. *See Finjan,* 626 F.3d at 1204-05." JA00025.

After creating a legal requirement that the apparatus claims include installed software, the court then considered whether there was sufficient evidence of actual use. Since this was only a liability question, and not damages, the only issue was whether there was *any* evidence of use, and not the extent of that use.[6] But instead of judging whether there was a genuine dispute on this finite issue, the court improperly engaged in fact-finding. The court acknowledged that Cradle submitted "exhibits that suggest direct infringement," JA00027, recognizing that Cradle presented evidence of a specific TI demonstration of the infringing system. *Id.* The court, however, ignored the parties' dispute as to the nature of the evidence. *See infra* at 29-30. Rather, it simply concluded (with little analysis) that Cradle's evidence was not "sufficient to raise a genuine issue of material fact as to infringement." JA00027.

Turning to the '259 patent, the district court granted summary judgment with respect to TI's OMAP 4 products. Since this patent contained only method claims, it was appropriate to consider whether those products were used in an infringing manner. Even though Cradle presented four different examples showing that the

---

[6] The court had previously bifurcated liability from damages and had stayed damages discovery.

accused chips were used in a way that allows an idle MTC to be activated to execute instructions, JA01292-94, the district court ruled that Cradle had only shown that the products were "capable" of infringement.  JA00031-33.

In two of Cradle's examples, there was evidence that the required functionality was hardwired into the MTCs themselves (the "EMIF" and the "DMM") so that these MTCs are automatically "activated" when the chips are used.  Thus, infringement of the method claims occurred when the millions of chips were sold and used.  *See infra* at 50-53.  That is far more than "capable" of infringement.[7]

Cradle's other two examples were dependent on the settings that are chosen, typically by TI's customers.  For one of the examples, the district court dismissed the evidence that TI strongly recommends use of the infringing setting (called "autoidle") as mere capability (JA00032), even though this Court has held that such evidence is sufficient evidence of actual use.  For the other example, the district court agreed that Cradle presented source code evidence that a TI customer had the operative setting (called "smart idle" by the parties).  The court ruled that this evidence only showed "capability" to infringe because Cradle also had to show that the customer had disabled a second feature (called "static dependency").  The

---

[7] And while there may be a factual dispute about the design of the products, resolution of that issue should not be decided on summary judgment.

court, however, did not even discuss the vigorous factual debate as to whether that second feature was present. JA00031-32. *See infra* at 53-57.

TI also moved for summary judgment for its OMAP 3 products on a variety of other grounds. JA01249-50. The district court denied this aspect of TI's motion as well as its invalidity motions. JA00027-28, 33-34, 42-44.

The district court also decided the claim construction issues for the '049 and '259 patents. JA00020-24, 28-29. Almost universally, the court limited the claims to the preferred embodiments disclosed in the specifications. For example, one of the terms subject to construction in the '259 patent was "idle memory transfer controller" ("idle MTC"). The claim construction dispute revolved around what it meant to be "idle." As it relates to an idle MTC, the claim language merely requires "activating an idle memory transfer controller so that it can execute instructions." Notwithstanding this straightforward claim language, the district court construed the term as "'a memory transfer controller that is not ready to execute instructions because its clock is stopped, *i.e.,* the run bit is set to '0', and either the wake-up bit or the External WakeUp (XW) bit is set to '1.'" JA00029.

The claim language says nothing about clocks, run or wake-up bits or setting 0s or 1s. Nonetheless, the district court came to this result by copying, almost verbatim, a portion of the specification describing a preferred embodiment.

JA00029; JA00065, 4:47-50; 5:47-48.  This same flawed approach governed the vast majority of the court's claim construction rulings.

**H.    Subsequent District Court Proceedings**

Upon issuance of the lower court's opinion, the case was slated for trial on TI's OMAP 3 products only (for the '259 patent).  The parties, however, stipulated there was no infringement of the '259 patent under the court's construction of idle MTC.  Thus, on December 3, 2013, the court entered final judgment dismissing all of Cradle's claims and TI's counterclaims.  JA00047-48.

# V.  SUMMARY OF THE ARGUMENT

The district court's grant of summary judgment of non-infringement of the '049 patent was in error.  These apparatus claims, like all such claims, cover a tangible item, not a series of acts or steps like a method claim. Rather than examining whether the architecture of the accused TI chips met the claims, the district court imposed a legal requirement that software must be added to the chips so they can actually perform the steps in the claim.  By doing so, the district court effectively transformed the apparatus claims into method claims.

Software is nowhere mentioned in the apparatus claims, either explicitly or implicitly; it simply is not the thing claimed.  What is claimed is a hardware semaphore system having a semaphore cell and an interrupt generation circuit. TI's accused chip architecture, which discloses these two parts, remains the same no matter what software is later added so that the chip can actually perform the method steps.

Even if the district court's requirement that software be added were correct, there was a factual dispute whether the accused chips were used with the appropriate software.  Among other things, Cradle presented evidence of a TI workshop where the participants used the accused chip with the requisite software. It was inappropriate for the district court to resolve this factual dispute on summary judgment.

The district court also erred in granting (in part) summary judgment of non-infringement of the '259 patent. Since the '259 patent has method claims only, proof that there was use of the claimed method is required. The court's determination that Cradle's evidence only showed a "capacity" to infringe, however, was not correct. Cradle presented four examples where the accused products were used in an infringing manner. In two of the examples, the requisite functionality was hardwired into the accused chip so that infringement occurred when the millions of accused chips were sold and used. In the other two examples, Cradle presented appropriate evidence that the accused products were in the proper settings so that infringement occurred when the chips were used. It was improper for the district court to resolve any factual issues surrounding this evidence on summary judgment.

The district court's claim constructions on the '049 patent and the '259 patent were in error. This Court has consistently held that preferred embodiments should not be imported into the claims absent compelling evidence that the patentee intended to so limit the claims. For both patents, the district court almost universally violated this principle. It routinely ignored the plain meaning of the claim language and instead looked only to the preferred embodiments in the specification and imported limitations from those embodiments into the claims. The few remaining constructions were also in error because the district court either

construed the claim so that it would not cover a preferred embodiment (something that is rarely, if ever, correct) or downplayed and misinterpreted the teachings from the intrinsic evidence (the specification and the prosecution history) where the patentee had explained the nature of its invention.

# VI.  ARGUMENT

## A.     Standard Of Review

This Court reviews the grant of summary judgment under the law of the regional circuit, here the Third Circuit.  *Frolow v. Wilson Sporting Goods Co.,* 710 F.3d 1303, 1308 (Fed. Cir. 2013).  The Third Circuit reviews the grant of summary judgment *de novo*.  *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000) (*en banc*). Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  At the summary judgment stage, credit is given to all of the nonmovant's evidence and all justifiable inferences are drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This Court always reviews *de novo* any of a lower court's claim constructions.  *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.,* 109 U.S.P.Q.2D 1969, 1970, 2014 U.S. App. LEXIS 3176 (Fed. Cir. Feb. 21, 2014).

## B.     The District Court Improperly Granted Summary Judgment Of Non-Infringement Of The '049 patent

### 1.     The District Court Effectively And Improperly Converted Apparatus Claims 1-3 Into Method Claims

The '049 patent has both apparatus and method claims.  An apparatus claim covers a tangible item, not a series of acts or steps, as does a method claim.  *In re Kollar*, 286 F.3d 1326 (Fed. Cir. 2002).  That is why the use of a patented

apparatus is fundamentally different from the use of a patented method or process. *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005). This Court has explained that sale of an apparatus that is merely capable of performing the steps is not enough to establish infringement of a *method* claim. *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 774-75 (Fed. Cir. 1993) (emphasis added). Apparatus claims, however, typically require only the capability to perform a function, not actual performance. *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991). Use of an apparatus only requires that the infringing device be "put into service." *NTP*, 418 F.3d at 1317.

Notwithstanding the difference between apparatus and method claims, the district court effectively merged these two different types of claims by imposing a requirement that the apparatus claims include software that actually performs the claimed steps.[8]

---

[8] TI's chips are designed so that they can operate in the "direct" mode, the "indirect mode" or a "combined" mode. In all situations, the chips themselves are designed the same way, that is, they are designed so they can operate in any of these modes. JA04185-87; JA02275; JA02310; JA02277; JA02279; JA02244; JA02311; JA02155-66; JA02012; JA02323; JA02381; JA02325; JA02384; JA02245; JA02392; JA06015; JA06037; JA02275. The addition of the appropriate software is what permits the chip to actually operate in these modes. Infringement of the method claims occur when software is added so that the chip actually operates in the combined mode (or direct and indirect modes together). JA04197-98; JA02310; JA02154; JA02407-08; JA02459-61.

In reaching its legal conclusion that software must be installed, the district court stated that "the asserted apparatus claims require the claimed semaphore circuit to be **configured** so that each semaphore is mapped to or corresponds to a particular shared resource, such that reading a semaphore cell indicates whether a particular shared resource is available for access. (See '049 patent, 6:54-65)." JA00025, emphasis in original.  Relying on *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204-05 (Fed. Cir. 2010), the court then held that because, in its view, "the apparatus claims required the 'software [to] be configured in a particular way to infringe,'" mere capability to perform the function was not enough to prove infringement.  Rather, Cradle "must provide evidence of the software installed on the chip (apparatus) used in combined mode." JA00025.  The district court then analyzed the evidence of this factual issue and concluded that Cradle had not made the requisite showing.  JA00024-26.

The district court's analysis is incorrect for three separate reasons.  First, it misconstrued the apparatus claims.  Second, its analysis of the law was incorrect.  Finally, even if everything else was correct, it improperly engaged in fact finding because there is a factual dispute as to whether TI itself used the software in the infringing mode.

### a.     The District Court Misconstrued The Apparatus Claims

The apparatus claims cover a hardware semaphore system on a computer chip. That system has two relevant parts – a semaphore cell and an interrupt generation circuit. *See, e.g.*, JA00055-56, 6:50–7:33. While the system must be configured so that it is capable of doing a variety of things, the claim, like most apparatus claims, does not require that the apparatus actually do anything.

There is no limitation anywhere in the apparatus claims requiring software of any sort. Software is never directly identified in the claims. Nor is it indirectly in the apparatus claims. These claims are not directed to a computer program where it would be implicit that software is the "thing" claimed. By contrast, the "thing" here is a system on a chip. The system itself (whether it is a system in the claimed invention or TI's infringing system) is designed the same way (that is, its "configuration" is the same) regardless of what software is later added. Cradle's expert's description of the design of TI's accused chips, from TI's technical documents, is the same regardless of what software is later added. JA04185-197; JA02311; JA02155-66; JA02012; JA02323; JA02381; JA02325; JA02384; JA02245; JA02392; JA06015; JA06037; JA02275; JA02310; JA02277; JA02279; JA02244. The district court's analysis ignores this basic understanding of the claimed invention and led it to the wrong conclusion.

The best that could be said of the court's analysis is that it was importing limitations from the specification into the claims, something, as Cradle shows below, the court consistently and improperly did throughout its claim construction analysis. Of course, it comes as no surprise that the specification discusses the role of software in the operation of the invention. JA00055, 6:28-37. After all, the patent includes both apparatus claims and method claims. Thus, it would be surprising if the specification did not discuss the role of software. But any such discussion does not provide a reason effectively to convert an apparatus claim into a method claim.[9]

### b.    The District Court's Legal Analysis Was In Error

Without further analysis, the district court justified its ruling apparently because it believed that the *Finjan* case provides an overarching principle that where a claim requires that the apparatus be "configured in a particular way," infringement does not occur merely because the apparatus was capable of

---

[9] As explained above, the apparatus claims do not require software. But even if the court's requirement that software be added to the claim were correct, its reasoning for requiring the software does not matter for the words of the claim. The district court's assertion that the apparatus claims require that each semaphore is mapped to a particular shared resource (JA00025) is incorrect. The claim has no one-to-one mapping. Rather, the claims only state that the "hardware semaphore circuit . . . is configured to monitor shared resources" (JA00055, 6:50-56); they make no reference to a "particular" shared resource.

operating in an infringing fashion. JA00025. This Court, however, has not established any such rule in *Finjan* or any other case.

In *Finjan*, this Court rejected virtually the same argument advanced by TI below and adopted by the district court. In that case, the defendant argued, as TI did here, that the system claims could not be infringed unless the software was active. *Finjan*, 626 F.3d at 1203-04. This Court disagreed, explaining that while such reasoning applies to a method claim which requires performance of the claimed steps, the claims at issue in *Finjan* "are 'system' and 'storage medium' claims, which do not require the performance of any method steps." *Finjan*, 626 F.3d at 1204, citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005). The same distinction applies here.

This Court went on to discuss the specific claim language to ascertain whether there was any reason to conclude that software must be "active" or enabled" to meet the claim limitations. Even though the *Finjan* claims included "software components," including the requirement that "program code" be stored, this Court still rejected the argument that software must be active. *Id*. at 1204-05.

Here, the apparatus claims are far less tied to any software requirement. The apparatus claims say nothing about software at all. The '049 patent claims just say that the chip is "configured" to monitor shared resources or "configured" to be in

certain states. Undoubtedly, the chip is configured in such a manner regardless of which software is ultimately installed. It has to be because the configuration of the infringing chip does not change. Thus, this case falls into the oft-cited holding that a device infringes an apparatus claim as long as it is capable of satisfying the claim limitations, even though it may also be capable of noninfringing modes of operation. *Id*. at 1204; *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 994 (Fed. Cir. 2009); *Hilgraeve Corp. v. Symantec Corp*., 265 F.3d 1336, 1343 (Fed. Cir. 2001); *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991).

### c.    <u>Even If There Is A Software Requirement, The District Court Improperly Resolved A Fact Dispute</u>

As explained above, the district court granted summary judgment, ruling that Cradle had not shown evidence that TI or its customers had used the appropriate software. JA00025-27. On summary judgment, it is only the role of the district court to ascertain whether there is a genuine dispute of material fact, not to resolve it. *Toebelman v. Missouri-Kansas Pipe Line Co.,* 130 F.2d 1016, 1018 (3d. Cir. 1942) ("Upon a motion for a summary judgment it is no part of the court's function to decide issues of fact but solely to determine whether there is an issue of fact to be tried. All doubts as to the existence of a genuine issue as to a material fact must

be resolved against the party moving for a summary judgment"). In this case, the district court improperly engaged in the latter.

For example, while the district court noted that Cradle submitted a PowerPoint presentation where TI demonstrated the use of its chip in the infringing mode (JA00027), it did not otherwise discuss this presentation. The evidence showed that TI conducted a customer workshop in the United States that included instruction on, and actual use of, the semaphore peripheral in the infringing mode in chips as part of the evaluation process. JA02791-96; JA02776-80. When asked if the attendees used the hardware semaphore "in each of the three modes" (direct indirect and the infringing combined mode), the TI employee who conducted the workshop unambiguously responded "Yes." JA02795. In fact, the attendees ran "100 cycles on each of the three modes." JA02795.

Beyond this actual use, TI also recommends use of the semaphore module in the infringing combined mode. JA02154; JA02310; JA02455-60, 2473-74; JA02407-08. This Court has explained that such circumstantial evidence also supports a showing of use. *See Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1308 (Fed. Cir. 2009).

Cradle recognizes that TI disputes this evidence. That is Cradle's point. The evidence is in dispute and it is improper to resolve it on summary judgment.

The facts here are similar to those facing the district court in *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192 (N.D. Cal. 2012). In that case, like here, the defendant argued that apparatus claims required actual operation because the claims included words like "configured to," "adapted to" or "executable." *Id*. at 1203, 1209. The district court expressed skepticism about such arguments because these were not method claims. *Id*. at 1200-01. It did not have to resolve that issue, however, because plaintiff had submitted evidence that the infringing mode was listed in its guide and that defendants' demonstrated or tested its products. Thus, the court was able to conclude that even if actual use was required, "it was reasonable to conclude that [defendant] tested whether the [accused device] could be configured in JA mode, and therefore actually configured it to operate in HA mode." *Id*. at 1206; *see also id*. at 1202, 1204, 1208, 1210.

Similarly here, Cradle presented evidence that TI recommends use in the infringing combined mode, held a product demonstration where customers used the chips in the infringing mode and worked together with its customers to implement the infringing combined mode. *Supra* at 30. That is more than enough to create a factual dispute even if apparatus claims 1-3 require the installation of the software allowing the system to actually operate in the infringing combined mode. And for

the same reasons, there is a factual issue precluding summary judgment on method claim 6. [10]

## C. The District Court's Claim Constructions For The '049 patent Are In Error

In its Opinion, the district court also ruled on the various claim construction issues briefed by the parties. As shown below, many of these, often issued with little or no analysis, were in error.[11]

### 1. The Law Of Claim Construction

Interpreting the proper meaning and scope of patent claims is a question of law exclusively for the court. *See Markman v. Westview Instruments, Inc.* 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

The words of a claim are generally given their ordinary and customary meaning that the term would have meant to a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). First, one looks at the words of the claims. *Vitronics Corp. v.*

---

[10] Below, TI made much of the fact that Cradle issued subpoenas to a couple of TI customers in an effort to bolster the record, something that the district court noted in its opinion. JA00026. Since the district court had bifurcated liability from damages and stayed discovery on damages, there has been no discovery on the extent to which the products are actually used. At this liability juncture, Cradle is only required to show some use (for the method claim, and for the apparatus claims as well if the district court's legal analysis is correct).

*Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Thus, there is a "heavy presumption" that claim terms bear their ordinary meaning, as understood by persons skilled in the relevant art. *Tex. Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1202 (Fed. Cir. 2002) (internal quotation marks and citations omitted) (alterations in original), *cert. denied*, 538 U.S. 1058 (2003).

The Federal Circuit has repeatedly held that a disputed claim term cannot be viewed in a vacuum, but rather must be interpreted in the context of the entire patent, including the specification. *Phillips,* 415 F.3d at 1313. In doing so, however, the Federal Circuit has confirmed that the claims typically should *not* be limited to the preferred embodiment. *Phillips*, 415 F.3d at 1323; *Bayer AG v. Biovail Corp.*, 279 F.3d 1340, 1348 (Fed. Cir. 2002). If "the meaning of the words themselves would not have been understood by persons of skill in the art to be limited only to the examples or embodiments described in the specification, reading the words in such a confined way would mandate the wrong result and would violate our proscription of not reading limitations from the specification into the claims." *Tex. Digital Sys.*, 308 F.3d at 1205; *see also Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1326 (Fed. Cir. 2002) ("limitations from the specification are not to be read into the claims"); *see also Liebel-Flarsheim Co. v.*

---

[11] TI moved for summary judgment on several grounds, many of which were based

*Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (holding that claims should not be limited to even a single embodiment or example in the specification, "unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction'").

On the other hand, a construction that does not cover the preferred embodiments is rarely, if ever, correct. *Vitronics*, 90 F.3d at 1583.

Extrinsic evidence may be used if needed to assist in determining the meaning or scope of technical terms in the claims, but may not be used to vary or contradict the terms of the claims. *Id.* at 1583 (quoting *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995)); *Markman*, 52 F.3d at 981.

## 2.    The "System Bus" Limitations

The district court construed the term "a system bus that allows only one bus transaction in any one clock cycle" to mean "a signal path shared by all devices that are connected to the path and used for transactions among them, in which only one device has use of the path for the entire transaction." JA00020-21. The court then separately construed the term "one bus transaction" to mean "a transaction in which only one device has use of the system bus for the entire duration of the

---

on its proffered claim constructions discussed below.

transaction." *Id*.  The court's one-page analysis discussed the two constructions together.

These constructions raise two separate issues.  The first is whether all devices connected to the signal path must share the path.  The second issue is whether only one device has use of the path (or the system bus) for the entire transaction.  Both aspects of the court's constructions are in error.

### a.    <u>Whether all devices connected to the signal path must share the path</u>

This Court has repeatedly held that a construction that does not cover the preferred embodiment "is rarely, if ever, correct."  *Vitronics*, 90 F.3d at 1583 (a construction that excludes a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support"); see *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) ("we[] should not normally interpret a claim term to exclude a preferred embodiment"); *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("Our case law generally counsels against interpreting a claim term in a way that excludes the preferred embodiment from the scope of the invention.")

The district court's construction violates this basic principle.  Claim 6 requires that the interrupt signal be sent to the processor over the system bus.  JA00056, 8:63-65 ("generating a semaphore interrupt signal for the respective first

and second processor and transmitting said interrupt signal thereto over said system bus").  As shown in annotated Fig. 2 below, the interrupt signal is sent from the logic gates (*e.g.,* 267, 277) to the respective processors over a signal line (281, 291) that connects each logic gate to a processor.  This is the only way disclosed in the patent for sending an interrupt signal to the processors.  JA00054, 3:39-42, 53-56.  Thus, these signal lines (281, 291) must be part of the claimed "system bus."



However, contrary to the district court's construction, only the logic gates and the processors (and not *all* the other components) are connected to signal path 281 or 291.  Thus, under the court's construction, which requires that *all* devices connected to the system bus share the signal path, *these separate lines* would *not* be part of the system bus.  But the claim tells us that these lines *are* part of the system bus.  The district court's construction cannot be correct because it excludes

this preferred embodiment of transmitting the interrupt signal over the system bus. *Vitronics,* 90 F.3d at 1583.

Although this issue was fully briefed below, the district court ignored it. Instead, the court's analysis constitutes a single sentence asserting "[t]hat the system bus is a shared path between the processors, the shared resource, and semaphore circuit is supported by the specification. ('049 patent, 2:66-3:6)." The cited portion of the specification, however, only identifies various aspects of Figure 2, nothing more, nothing less. It says nothing about sharing a path and certainly does not state, imply or in any way assert that all devices connected to the system bus share a path. That sentence does nothing to support the court's construction.

### b. Whether only one device has use of the path (or system bus) for the entire transaction

This aspect of the district court's construction essentially downplayed the specification, misinterpreted the prosecution history and ignored the well-known understanding of a bus. When the proper analysis is applied, the district court's construction should be rejected.

Cradle contended that this "one transaction" claim language meant that there must be serialized (one at a time) access to the semaphore cell. JA00989, 992-994. In rejecting Cradle's construction, the district court tried to minimize the

specification by stating that Cradle's specification evidence on "one bus transaction" appears only in the background discussion of the invention. JA00021. That is improper.

This background discussion is a basic description of how the invention is solving problems of the prior art. Such discussion is an important aspect of the specification because it is where the patentee is best informing the world the real scope of its invention. The Federal Circuit recognizes this, and often cites to the background in deciding claim construction issues. *See e.g., Saffran v. Johnson & Johnson,* 712 F.3d 549, 567 (Fed. Cir. 2013); *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250 (Fed. Cir. 2012); *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1230 (Fed. Cir. 2011); *Praxair, Inc. v. ATMI, Inc.,* 543 F.3d 1306, 1324 (Fed. Cir. 2008); *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200 (Fed. Cir. 2008). While, of course, the review of the specification must always include the entirety of the specification, it is error to deemphasize the background discussion as the district court did here.

A review of the specification reveals that it strongly supports Cradle's position, and is directly contrary to the court's (and TI's) position. As the district court acknowledged, the specification discussion of "one bus transaction" explains that the reason for having "one bus transaction" was to ensure that only one processor at a time could have access to the semaphore cell (serialized access).

JA00053, 1:36-42.  The specification explains that "[w]ithout this guarantee by design, a race condition may occur.  A race condition occurs when at least two processors have access to a shared resource at the same time."  JA00053, 1:42-45.  Any such condition could lead to unpredictable results.  For example, one processor might read from a memory while another is writing to it, thereby corrupting the data read.

As the district court acknowledged, this provision is the only discussion about "one bus transaction" in the specification.  JA00021.  Nowhere in the specification does it say that only one device can have access to the signal path for the entirely of the transaction.  It only says that access to the semaphore cell is one at a time, as Cradle showed.

It is not surprising that the specification does not say that only one device can have access to the signal path.  Any such statement would have been inconsistent with the ordinary meaning of the word "bus," which is defined as "[o]ne or more conductors used for transmitting signals or power from one or more sources to one or more destinations."  JA00569.  This understanding of the term "bus" places no restriction on the number of transactions allowed on the bus at any one time.  One of ordinary skill in the art understands that many operations may occur on a bus between devices connected to the bus at any given time.  Indeed,

experts for both Cradle and TI agreed with these basic propositions about a bus. JA01111; JA01076-77, 1088-97.

Rather than considering Cradle's description of "one bus transaction" from the specification, or its plain meaning, the court instead looked to the prosecution history to support its construction. Contrary to the court's discussion, however, the prosecution history, like the specification, decidedly supports Cradle's position, not the court's (or TI's).

It is correct that this "one bus transaction" language was added to the claim in response to a rejection based on the Wenniger reference. In Wenniger, more than one processor could have access to the semaphore cell because the interaction with the semaphore cell required separate read and write transactions. JA00738-39. The patentee distinguished its invention from Wenniger by explaining that in the '049 patent invention, "[t]he system bus . . . *effectively serializes access to the semaphore from multiple contenders*." *Id.* (emphasis added). This, of course, is exactly what is explained in the specification and is why Cradle's proposed construction, that the system bus provides serialized access to the semaphore cell, is the correct one.

While the district court cited to the correct part of the prosecution history (where the patentee explained that its invention provided serialized access to the semaphore), it never explained how this aspect of the prosecution history supports

its position that only one device has use of the bus for the entirety of the transaction.  It could not provide any explanation because it is nowhere in the prosecution history.  Rather, as explained above, the prosecution history supports Cradle's position.

In short, this Court should reject the district court's construction of these terms and adopt Cradle's construction that it is "[a] bus that provides serialized access to the semaphore."

### 3.    <u>**"Any Processor Requesting Access To The Shared Resource"**</u>

The claim construction issue here is whether all processors waiting to use a shared resource must be sent an interrupt signal, as the district court ruled, or whether one or some waiting processors are sent an interrupt signal, as Cradle urged.

Claim construction begins with the words of the claim itself.  *Vitronics,* 90 F.3d at 1582.  That basic rule should have led to adoption of Cradle's proposal for a simple reason.  The plain English word "any" has a simple meaning: "one or some discriminately of whatever kind."  JA00587.[12]  As this Court has instructed, where, as here, the ordinary meaning of claim language is readily apparent, "claim

---

[12] Eleven of the twelve definitions contained in this dictionary show that any means "one or some."

construction . . . involves little more than the application of the widely accepted meaning of the commonly used words." *Phillips*, 415 F.3d at 1314.

The district court's seven-line analysis improperly skips over that step entirely and instead cites only to a single line of the specification discussing a preferred embodiment of the invention.  JA00022.  This Court has reminded us over and over again that it is typically improper to limit the claims to the disclosure of a preferred embodiment.  *Phillips*, 415 F.3d at 1324-25 (claim term was not limited to structure disclosed in the preferred embodiments, because the specification did not require the structure to be so limited); *see also Tex. Digital Sys.*, 308 F.3d at 1205*; Teleflex,* 299 F.3d at 1326*; Liebel-Flarshein,* 358 F.3d at 906*; Kara Tech. Inc. v. Stamps.com Inc.,* 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims").

The district court's analysis violates this rule.  The cited sentence of the specification shows that in a preferred embodiment, an interrupt signal is sent to all waiting processors when the shared resource becomes available.[13]  But the district court did not even attempt to show why the claim term "any" should be altered to

---

[13] The portion of the specification cited by the district court does not include the word "all," nor is that term used anywhere in the specification when describing how the interrupt generation circuit sends interrupts to the processors.

mean "all" to support its view that the claim should be limited to this preferred embodiment.

As explained above (*supra* at 8-11), an essential point of the invention is to send an interrupt signal to a processor that wants access to a shared resource, rather than the inefficient method of requiring a processor to continually "poll" to see if it is available. Thus, for the purpose of the invention, it makes no difference at all whether the interrupt signal is sent to all the processors waiting to access the shared resource at the same time or to just some of them. What is important, and the essence of the invention, is that the waiting processors eventually are sent the interrupt signal.

Had the patentee wanted the claim scope to be limited to "all" processors receiving the interrupt signal at the same time, the claim could have been drafted to read that the interrupt generation circuit is "configured to generate a semaphore interrupt signal to *all* processors requesting access to the shared resource," but it did not. The choice to use the word "any" should be respected, and this Court should adopt Cradle's proposed construction of this term to mean "one or some processors requesting access to the shared resource."

### 4. "The Shared Resource Is Available/Unavailable For Access"

The district court construed the term "the shared resource is available for access" to mean "the shared resource is not in use by a processor and corresponds

to a semaphore content of '0.'" JA00022. Conversely, the district court construed the term "the shared resource is unavailable for access" to mean "a shared resource is in use by a processor and corresponds to a semaphore content of '1.'" JA00022. As with many of the district court's constructions, these constructions are improper because they again limit the claim to the preferred embodiment.

In deciding this issue, the district court admittedly relied on an "illustration of the operation of the digital system" from the specification. JA00023. That is improper because the specification merely contains an *illustration* of how the preferred embodiment works. The claims are not limited to that one single illustration, even if it is the only illustration. *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1322 (Fed. Cir. 2012) (citing *Phillips,* 415 F.3d 1303).

Because it again used this improper technique, the district court added into its constructions a requirement that the semaphore be set to "0" when the shared resource is available and to "1" when it is not.[14] Those requirements, of course, are *not* in the claim language. The claim merely requires that the shared resource is "available" or "unavailable" for access, simple words that need no construction.

Once again, the district court offered no reason to import this limitation from the specification. Nor can there be any such reason. Whether a state is identified

as a "1" or a "0" is nothing more than a choice by the programmer. Whether the content of the semaphore is a '1' or a '0' makes no difference. As Cradle's expert explained, this is a convention that can easily be changed through logic. JA03217. The choice of a "1" or a "0" has nothing to do with this invention which, as it relates to this limitation, is merely that the semaphore be in one state when the shared resource is available and the other state when it is not. Thus, the district court's importation of a "1" and a "0" from the specification should be rejected, and this Court should adopt Cradle's proposal that these terms need no construction.[15]

### 5.     "The Shared Resource Has Just Been Made Available For Access"

The district court construed this term as "the shared resource is no longer in use and has been released when a processor changes the content of the hardware semaphore cell to a '0.'" JA00023. The issue here is essentially the same as the previous claim terms. "Just been made available for access" is a plain and ordinary

---

[14] Notably, neither party proposed a construction that referenced the "0" or "1" content of the semaphore. JA00119.

[15] The district court also construed the word "available" to mean that the shared resource is not in use by a processor and "not available" to mean that the shared resource is in use by a processor. JA00022. Neither party asked for this construction. While these words need no construction, this aspect of the court's construction is consistent with the ordinary meaning of the words "available" and

term with a plain and ordinary meaning. JA00997-98. For the same reasons discussed above, the district court's importation of the requirement that the content of the semaphore cell be a "0" is an improper importation of a limitation of a preferred embodiment into claims that are not so limited. *See supra* at 43-45.

### 6.   "Cell"

The district court construed this term to mean "a portion of one register capable of storing a value." JA00024. As with most of the other terms that the district court construed, cell is a simple term that has a simple meaning. It is "an elementary unit of storage; for example, binary cell decimal cell" (JA00570-71) or as another technical dictionary put it, "an elementary unit of storage for date (bit) or power (battery)." JA00582. These simple concepts (a cell is something that stores a value) are encompassed in Cradle's proposed construction that a cell is a memory capable of storing a value. JA00998-99.

Because the court did not start with the words of the claim, as it should have, its five-line analysis ignores this simple understanding of the term. Instead, it followed its same pattern of jumping immediately to an example from the preferred embodiment where the cells are part of a register. JA00024. But the

---

"not available." JA00588 (dictionary definition of available is "ready for immediate use"). This further supports that Cradle's position is correct.

court never explained why it was proper to limit the language of claim 1, which contains no such limitation, to a preferred embodiment. There is no reason.

The language of the specification that the district court references does not support adding the limitation to the claim. The specification itself says that having cells in a register is only an illustration of the invention. JA00054, 3:7-9 ("The hardware semaphore register 220 includes, *illustratively*, three hardware semaphore cells.") (emphasis added); JA00054, 3:25-26 ("The semaphore interrupt register 230 includes, *illustratively*, three semaphore interrupt cells.") (emphasis added); JA00054, 3:43-45 ("Similarly, the semaphore interrupt enable register 250 includes, *illustratively*, three semaphore interrupt enable cells.") (emphasis added). This language leaves no doubt that the description of the various cells is illustrative and not limiting. Thus, there is no evidence to suggest that the patentee "intends for the claims and the embodiments in the specification to be strictly coextensive." *Pfizer Inc. v. Ranbaxy Labs., Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1323).

The doctrine of claim differentiation further undercuts the district court's claim construction. As the Federal Circuit stated in *Phillips*, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claims." *Phillips*, 415 F.3d at 1314-15. Here, the term "cell" appears in independent claim 1 without

-47-

reference to a "register." In dependent claim 2, however, there is a requirement for a register. JA00056, 7:34-40 (The "semaphore cell, the semaphore interrupt cell and the first and second semaphore interrupt enable cells are cells of corresponding registers."). The district court's adopted construction eliminates this difference between independent claim 1 and dependent claim 2. This is all the more reason that the district court's construction is incorrect and Cradle's proposed construction should be adopted.

**D.** **The District Court Improperly Granted Summary Judgment of Non-Infringement of the '259 patent**

The district court's grant of summary judgment was based on its ruling that Cradle did not show that the accused chips, as used, included an idle MTC that is activated so that it could execute instructions, a limitation of all the asserted claims. JA00029-33. In making this ruling, there was no question that the OMAP 4 chips were sold and used in the United States, nor could there be as TI sold millions of the chips here for products such as cell phones and eReaders. JA04821-29; JA04198-99.

The district court also did not dispute that the evidence presented by Cradle *could* support a finding that the OMAP 4 chips included an idle MTC that is activated to execute instructions. Rather, according to the district court, Cradle's evidence only showed the "capacity" for use, not actual use. JA00032.

This was error.  Cradle presented evidence, sometimes direct and sometimes circumstantial, of four different ways in which MTCs in the OMAP 4 chips are used in an infringing manner.  Sufficient evidence on any one of these examples would require a reversal of summary judgment.  Here, Cradle presented sufficient evidence for all four.

For two of these examples, Cradle submitted evidence that two MTCs (the EMIF and the DMM) were designed so that they were idle and then activated to execute instructions.  In such circumstances, the appropriate use is established each time the millions of products having the chips are used.  *Beedle v. Bennett*, 122 U.S. 71, 78 (1887) ("the use of a well so constructed is therefore a continuous infringement, as every time water is drawn from it the patented process is necessarily used"); *Toshiba Corp. v. Imation Corp.,* 681 F.3d 1358, 1365 (Fed. Cir. 2012) (sufficient evidence to find direct infringement where the alleged infringer designs the product in a certain way and users are instructed to use it that way); *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995) (even a product that sometimes embodies a claimed method infringes because "Section 271(a) [of Title 35] prohibits, on its face, any and all uses of a patented invention").

The other two ways that the MTCs are used are dependent upon the settings that are actually employed, typically by TI's customers.  For these, Cradle

submitted the appropriate direct and circumstantial evidence from which a fact finder could conclude that actual infringing use has occurred. *Convolve, Inc. v. Compaq Computer Corp.,* 527 F. App'x 910 (Fed. Cir. 2013); *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1272 (Fed. Cir. 1986); *Lucent Techs.,* 580 F.3d at 1318.[16]

The use evidence for each of these examples is discussed below.

### 1.    Actual Use based on TI's Design of the OMAP 4 Products

#### a.    The EMIF

TI's own technical manual states that "[t]he EMIF can gate off the EMIF_FCLK. There is an internal mechanism which can stop the EMIF_FCLK automatically." JA01691; JA01869; JA01714; JA01735. In other words, this TI document shows that the EMIF, one of the accused MTCs, is hardwired to be idle and wake itself up. JA05927-29; JA04225-27; JA04269; JA01678; JA02999; JA01951; JA01691; JA01869; JA01714; JA01735; JA02680-83; JA03004; JA01879; JA01882; JA01919-20, 1926-27, 28; JA01761; JA01847; JA01950;

---

[16] The district court's opinion noted that some of Cradle's evidence of use involved idle MTCs that have a mechanism where it activates itself to execute instructions (called the internal clock gating strategy) while other evidence relates to the "PRCM based" mechanism where a separate device activates the MTC. JA00030-32. While this description is accurate, it is not important to the issues presented in this appeal.

JA01954; JA01841; JA01843; JA01844; JA01850; JA01920; JA01620; JA01938; JA01962, 68, 69, 79, 83-86, 95-97, 2005. Even the district court recognized that this document supports Cradle, but discounted it because it believed that it only showed that the chip was capable of having an internal wake-up, not that such use actually occurred. JA00033.

The district court cites nothing to support this conclusion. Nor could there be any such support because what the evidence shows is that the EMIF itself is designed so that the internal clock mechanism operates automatically in all the millions of chips that are sold. JA05927-29; JA04225-27; JA04269; JA01678; JA02999; JA01951; JA01691; JA01869; JA01714; JA01735; JA02680-83; JA03004; JA01879; JA01882; JA01919-20, 1926-27, 28; JA01761; JA01847; JA01950; JA01954; JA01841; JA01843; JA01844; JA01850; JA01920; JA01620; JA01938; JA01962, 68, 69, 79, 83-86, 95-97, 2005; JA04266; JA04272; JA02489-92; JA02504; JA02520; JA02533-34; JA02557-58; JA02617-20, 24-26, 28; JA02678; JA02608; JA02678; JA02683. Such evidence establishes direct infringement. *Beedle*, 122 U.S. at 78; *Toshiba*, 681 F.3d at 1365; *Bell Commc'ns*, 55 F.3d at 622-23.

Cradle recognizes that TI may dispute what this document means and what it shows, although it did not do so in its moving papers below. All TI argued below was that there was not a separate device (the PRCM) that activates and deactivates

the EMIF. JA01244-45. That argument misses the point because Cradle alleges and has shown that the EMIF performs this activity by itself, not by some other device. Moreover, TI's document discussed above contradicts TI's argument because it says that the EMIF itself, not some other device, performs these activities. In short, there is a classic factual dispute precluding summary judgment.

### b.    The DMM

The district court's analysis did not even mention Cradle's evidence as it relates to the DMM (another accused MTC). A00032. Cradle presented evidence that the DMM performs this wake-up function because it can be hardwired into the chip. JA01951; JA05927-29; JA01678; JA02999; JA01951; JA01691; JA01869; JA01714; JA01735; JA02680-83; JA03004. When hardwired into the chip, it will always perform this wake-up function when the millions of chips are sold and used by consumers. As explained above (*supra* at 49-50), such evidence establishes direct infringement. *Toshiba*, 681 F.3d at 1365; *Bell Commc'ns,* 55 F.3d at 622-23.

Once again, Cradle recognizes that there is a factual dispute whether the wake-up functionality is hardwired into the chip. In the prior OMAP 3 version, the corresponding MTC enabled this wake-up function by its default setting because TI recognized that this feature saved energy and increased performance. JA01883. TI presented no evidence that it would discontinue this feature in the newer OMAP

4 product. It only makes sense that this same beneficial feature would be hardwired into the newer version. There is no evidence that TI changed its mind; to the contrary, its witness confirmed the reasonableness of hardwiring the feature into the module. JA01951.

As the non-movant, Cradle is entitled to have all reasonable inferences drawn in its favor. *Anderson*, 477 U.S. at 255. As explained above, it is more than a reasonable inference that this wake-up feature is enabled in the DMM chip. This factual issue is yet another reason that summary judgment should not have been granted.

2.    **Use Based on the Establishment of the Proper Settings in the OMAP 4 Products**

While the former two examples of use automatically occur based on the design of the chips, the remaining two examples are based on sufficient evidence upon which the fact finder could find that the chips are set to the proper setting. These are discussed below.

a.    **The GPMC**

Cradle alleges (among other things) that the GPMC is an idle MTC that is activated to execute instructions when the "autoidle" mode is enabled.[17]    Although

_____

[17] Autoidle can be a bit that, when set to the proper setting, allows that internal logic of an idle MTC to activate it. JA04225-27.

the district court correctly recognized that TI itself "strongly recommends the use of autoidle mode,"[18] it nonetheless held that this only showed capability and not actual use. JA00033. That is not the law. As this Court has held, a patentee can meet "its burden of showing infringement under 35 U.S.C. § 271(b) with circumstantial evidence of sales and an instruction sheet showing how to use the device in an infringing manner." *Moleculon,* 793 F.2d at 1272 ("it is hornbook law that direct evidence of a fact is not necessary." A patentee came meet "its burden of showing infringement under 35 U.S.C. § 271(b) with circumstantial evidence of sale and an instruction sheet showing how to use the device in an infringing manner."); *see also Convolve,* 527 F. App'x at 928-29. Likewise, recommendation of use can also suffice as sufficient evidence of use. *Lucent Techs.,* 580 F.3d at 1318.

For example, in *Convolve*, the district court granted summary judgment of non-infringement because, according to the district court, the plaintiff offered no

---

[18] The district court observed that this strong recommendation came from an OMAP 3 document, although its decision was not predicated on this observation. JA00032. It would have been inappropriate had the lower court done so, particularly on summary judgment. TI, like most companies, does not necessarily update all its documentation just because an updated version of a product is released. This is particularly true where the relevant portions do not materially change in an updated version. TI itself proves this point as its expert used OMAP 2 documents to show how OMAP 3 operates. These observations apply here

evidence of actual direct infringement. *Id*. at 928-29. The Federal Circuit reversed the district court's finding, in part because the district court ignored the plaintiff's circumstantial evidence of use. The plaintiff not only demonstrated that the devices were capable of infringing, but also provided evidence of specific tools, with attendant instructions, on how to use the drives in an infringing way. *Id*. at 929. The Federal Circuit confirmed that such evidence is sufficient for a jury to find direct infringement. *Id*. (citing *Toshiba Corp. v. Imation Corp.,* 681 F.3d 1358, 1366 (Fed. Cir. 2012)).

The facts here are stronger than those in *Convolve, Moleculon*, and *Lucent Techs.* It is undisputed that TI has sold millions of infringing chips. And here, TI has made a "strong" recommendation that the infringing autoidle mode be used. That is more than enough to create an issue of fact for the jury.

### b.    The "Smart Idle" feature

Cradle identified the institution of the power savings "smart idle" feature as a way to "activate" an idle MTC so that it could execute instructions. JA04223-25. As the district court acknowledged, Cradle identified source code from a TI customer showing that customers in fact set an MTC to the "smart idle" setting so the devices will "allow sleep transactions to realize the power savings available

---

because the GPMC did not change in a material fashion from OMAP3 to OMAP4.

by" this feature. JA00031-32. *See* JA05920-21; JA02906; JA02921; JA02931.

The district court stated that this evidence only established a capability to use, but not actual use, because it believed that there also had to be evidence that a separate "static dependency" setting had to be changed to "dynamic dependency,"[19] something that Cradle allegedly did not show. JA00031.

Even if the district court's assertion that Cradle must also show the devices have a "dynamic dependency" setting is correct,[20] the district court's conclusion that Cradle did not present such evidence is error. Contrary to the district court assertion, there was a vigorous dispute between the experts whether the "dynamic dependency" feature is also enabled when "smart idle" is made active. As Cradle's expert explained, it would make no sense to enable the "smart idle" power saving

---

JA04201-02.

[19] "Static dependency" is a relationship between an initiator and a target where the PRCM ensures that the target is active whenever the initiator is also active. "Dynamic dependency" is similarly a relationship between an initiator and target. For a "dynamic dependency," the PRCM activates the target whenever it senses a command being sent from the initiator to the target. JA00030. The difference is that "static dependency" ensures that the target is always active when the initiator is active, whereas "dynamic dependency" only activates the target when the initiator sends it a command.

[20] In its original answer to interrogatories and five amendments, TI never asserted that proof of "dynamic dependency" was needed to establish infringement or that it did not infringe because there was no evidence that its products were used in a "dynamic dependency" setting. JA03395-773. TI first raised this issue in its expert report after the close of discovery (which effectively precluded Cradle from investigating this new issue further).

feature, but not enable "dynamic dependency". JA05925-27. OMAP products are high performance chips used in applications where battery life is of utmost importance, such as cell phones. As a result, the chips include a number of energy saving features to keep power consumption low. Smart idle is one such energy saving feature because it allows individual MTCs to be active when they are needed and idle when they are not. JA04272-73; JA05920-21; JA05925-27. The "static dependency" feature, on the other hand, effectively forces all similarly situated MTCs to be active when one of the MTCs is active. Thus, as Cradle's expert has explained, it simply would not make sense to enable the energy saving external wake-up function without disabling the "static dependency" feature (and thus, enabling the "dynamic dependency" feature). JA05925-27. And beyond this, Cradle's expert demonstrated through TI's own documents and testimony, that the accused MTCs *do* have the dynamic dependency feature. JA05924-27; JA01955; JA01899, JA01946; JA01679; JA03000.

While TI surely will disagree, Cradle, as the non-movant, is entitled to all justifiable inferences drawn in its favor. *Anderson*, 477 U.S. at 255. It is far more than a justifiable inference that a user that enables smart idle to take advantage of the all-important energy-saving features, will routinely disable the "static dependency" feature to gain those same advantages. This is yet another classic battle of the experts that should not be resolved on summary judgment.

**E.** **The District Court's Claim Construction For The '295 Patent Is In Error**

**1.** **"Idle Memory Transfer Controller"**

The parties' dispute of this term revolved around the word "idle."[21] Cradle's proffered construction was: "A memory transfer controller that is not ready to execute instructions." TI, on the other hand, offered two different constructions. It first defined this term as "[a] memory transfer controller that is not receiving a clock signal. JA00116. After reviewing Cradle's opening brief,[22] TI changed its construction to an MTC "whose clock is stopped." JA01043.

The district court did not adopt either party's construction. Instead, it construed the term as "a memory transfer controller that is not ready to execute instructions because its clock is stopped, i.e., the run bit is set to '0', and either the wake-up bit or the External WakeUp (XW) bit is set to '1.'" JA00029. In light of this construction (and, at least from Cradle's point of view, because the construction cannot be justified), the parties stipulated that Cradle could not establish infringement under the district court's construction, thus leading to a final judgment on all claims. JA00047-48.

---

[21] The parties agreed to the construction of "memory transfer controller." JA00116.

[22] Under the court's schedule, Cradle filed the first claim construction brief and then TI responded.

The district court's construction suffers from the same problems discussed in connection with the '049 patent. The district court ignored the words of the claim and instead virtually copied language from a preferred embodiment. That was error. This Court instructed in *Phillips* that "to begin with the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. Here, the operative context is the claim language (from claim 1) that requires "activating an idle memory transfer controller so that it can execute instructions." Had the district court considered this language, as it should have, it would have seen that the surrounding language provides the best evidence of what "idle" means because these words demonstrate that the MTC changes to a condition where it can execute instructions upon being activated. Thus, when the MTC is "idle," *i.e.,* before it is activated, it is not ready to execute instructions. That is the fundamental reason why Cradle's proposed construction is the correct one.[23]

The district court, rather than starting with the context in which the words were used, once again jumped immediately to a preferred embodiment. It relied

---

[23] Cradle's proposed construction is also consistent with the specification. For example, Figure 4 shows that when a memory transfer controller is activated, it goes from being "idle" to being "ready" when it is activated. JA00061. At that point, a "ready" MTC is able to execute instructions. An "idle" MTC, by contrast, is *not* ready to execute instructions. JA00066, 5:56-58.

*solely* on a discussion of a preferred embodiment where an idle MTC had a run bit set to '0' and where a separate wake-up bit (or in a different embodiment), the External WakeUp bit, is set to '1.' JA00029.

It is hard to find a more egregious example of limiting the claim to a preferred embodiment. The claim does not say a word about clocks, stopping clocks, run bits, wake-up bits, let alone setting those bits to a '1' or a '0.'[24] The claim is just directed to "activating" an MTC so that it can execute instructions and Cradle is entitled to the full scope of that claim. The details of how an MTC is idled or activated are not in the claim and there is no reason to add those details into the claim.

It is noteworthy that, unlike claim 1, some unasserted claims of the '259 patent do include using a run bit to activate an MTC. For example, claim 6 requires that the activating step "includes setting a run bit of the [MTC]." Likewise, claim 14 requires "setting a first bit in an idle [MTC]" to activate it. These types of limitations should not be added to claim 1.

By contrast, asserted claim 10 requires that activation is performed by the MTC start logic, *without any reference to setting bits or starting clocks.* Claim 1 is

---

[24] As explained above, deciding whether to use a '1' or a '0' is nothing more than the decision of the programmer; the opposite choice works just as well. *Supra* at 44-45.

even broader because it does not refer to anything in the MTC to activate it. Thus, the patentee knew how to refer to specific features, such as bits, when it wanted to, or to be silent. It did not refer to bit setting or clocks in the asserted claims and there is no reason to limit the claims by adding such features from the preferred embodiments.

TI's proposed construction(s), while not as extreme as the one adopted by the district court, are flawed for the same reasons discussed above. The discussion of clocks in the preferred embodiment is just part of the explanation of how an MTC is activated, *something that is conspicuously absent from the asserted claims*. As explained above, those claims do not say a word about clocks or stopping clocks. *Supra* at 60.

## VII.  **CONCLUSION**

This Court should vacate the final judgment of non-infringement, vacate the district court's construction of the claim terms discussed above, and reverse the district court's grant of summary judgment of non-infringement with respect to the '259 and '049 patents.

Respectfully submitted,

Dated:  December 19, 2014       By:   /s/ Charles W. Saber

Charles W. Saber
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006-5403
Tel:  (202) 420-2200
SaberC@dicksteinshapiro.com

Attorney for Plaintiff-Appellant

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

A – Memorandum Opinion
Dkt. No. 345, Filed November 20, 2013 ....................................................JA1 – JA44

B – Order regarding Dkt. Nos. 217, 218, 224, 227, 271, 295, 309, and 315
Dkt. No. 346, Filed November 20, 2013 ...............................................JA45 – JA46

C – Final Judgment of Non-Infringement
Dkt. No. 348, Filed December 3, 2013...................................................JA47 – JA48

D – U.S. Patent No. 6,874,049...............................................................JA49 – JA56

E – U.S. Patent No. 6,708,259 ..............................................................JA57 – JA67

F – U.S. Patent No. 6,647,450 ..............................................................JA68 – JA74

# ADDENDUM A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CRADLE IP, LLC,                    )
                                   )
            Plaintiff,             )
                                   )
    v.                             )    Civ. No. 11-1254-SLR
                                   )
TEXAS INSTRUMENTS, INC.            )
                                   )
            Defendant              )
                                   )

Paul E. Crawford, Esquire and Thatcher A. Rahmeier, Esquire of Novak Druce Connolly Bove + Quigg LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Jeffrey K. Sherwood, Esquire, Frank C. Cimino, Jr., Esquire, Charles W. Saber, Esquire, Robert G. Gingher, Esquire, and Steven T. Skelley, Esquire of Dickstein Shapiro LLP.

Jeffrey L. Moyer, Esquire, Kelly E. Farnan, Esquire, and Jason J. Rawnsley, Esquire of Richards, Layton, & Finger, P.A., Wilmington, Delaware. Counsel for Defendant. Of Counsel: Robert T. Haslam, Esquire, Anupam Sharma, Esquire, Thomas E. Garten, Esquire, Charlin C. Lu, Esquire, Hyun Byun, Esquire, Patrick N. Flynn, Esquire, Jessica R. Baldwin, Esquire, and Eric A. Caligiuri, Esquire of Covington & Burling LLP.

**MEMORANDUM OPINION**

Dated: November 20, 2013
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On December 16, 2011, plaintiff Cradle IP, LLC ("Cradle") filed suit in this district against defendant Texas Instruments, Inc. ("TI") alleging infringement of three of its patents: U.S. Patent Nos. 6,874,049 ("the '049 patent"), 6,708,259 (the "259 patent"), and 6,647,450 (the "450 patent"). (D.I. 1) TI answered the complaint and asserted a counterclaim for declaratory judgment of non-infringement and invalidity of the '049, '259, and '450 patents on February 6, 2012. (D.I. 10) Cradle answered TI's counterclaims on March 1, 2012. (D.I. 15)

Presently before the court are TI's motions for summary judgment of non-infringement and invalidity of the patents-in-suit. (D.I. 217; D.I. 218) TI also filed motions to exclude testimony by Cradle's experts, Dr. James Olivier and Dr. David Albonesi. (D.I. 224; D.I. 227) Additionally, Cradle filed motions to strike the declaration and testimony of Michael Shay, as well as new expert opinions. (D.I. 271; D.I. 309) TI also filed motions to strike inadmissible evidence and untimely expert opinions. (D.I. 295; D.I. 315) The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

Cradle is a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Mountain View, California. (D.I. 1 at ¶ 6) Cradle is a privately-held, majority-owned subsidiary of Cradle Technologies. (*Id.* at ¶ 8) Cradle Technologies recently assigned the patents-in-suit to Cradle. (*Id.*) TI is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Dallas, Texas. (*Id.* at ¶ 7) It makes,

1

manufactures, and sells the accused products. (*Id.* at ¶¶ 13, 16, 19)

## II. STANDARDS OF REVIEW

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."

2

*Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 411 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### B. Claim Construction

Claim construction is a matter of law. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1330 (Fed. Cir. 2005) (en banc). Claim construction focuses on intrinsic evidence - the claims, specification and prosecution history - because intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Claims must be interpreted from the perspective of one of ordinary skill in the relevant art at the time of the invention. *Phillips*, 415 F.3d at 1313.

3

Claim construction starts with the claims, *id.* at 1312, and remains centered on the words of the claims throughout. *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). In the absence of an express intent to impart different meaning to claim terms, the terms are presumed to have their ordinary meaning. *Id.* Claims, however, must be read in view of the specification and prosecution history. Indeed, the specification is often "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315.

### C. Infringement

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). A two-step analysis is employed in making an infringement determination. *See Markman*, 52 F.3d at 976. First, the court must construe the asserted claims to ascertain their meaning and scope. *See id.* Construction of the claims is a question of law subject to de novo review. *See Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). The trier of fact must then compare the properly construed claims with the accused infringing product. *See Markman*, 52 F.3d at 976. This second step is a question of fact. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

"Direct infringement requires a party to perform each and every step or element of a claimed method or product." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007), *overruled on other grounds by* 692 F.3d 1301 (Fed. Cir. 2012). "If any claim limitation is absent from the accused device, there is no literal infringement

4

as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). However, "[o]ne may infringe an independent claim and not infringe a claim dependent on that claim." *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) (quoting *Wahpeton Canvas*, 870 F.2d at 1552) (internal quotations omitted). A product that does not literally infringe a patent claim may still infringe under the doctrine of equivalents if the differences between an individual limitation of the claimed invention and an element of the accused product are insubstantial. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24 (1997). The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

When an accused infringer moves for summary judgment of non-infringement, such relief may be granted only if one or more limitations of the claim in question does not read on an element of the accused product, either literally or under the doctrine of equivalents. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) ("Summary judgment of noninfringement is . . . appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial."). Thus, summary judgment

5

of non-infringement can only be granted if, after viewing the facts in the light most favorable to the non-movant, there is no genuine issue as to whether the accused product is covered by the claims (as construed by the court). *See Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).

"[A] method claim is not directly infringed by the sale of an apparatus even though it is capable of performing only the patented method. The sale of the apparatus is not a sale of the method. A method claim is directly infringed only by one practicing the patented method." *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed. Cir. 1993). Therefore, "an accused infringer must perform all the steps of the claimed method, either personally or through another acting under his direction or control." *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1307 (Fed. Cir. 2012).

With respect to apparatus claims, "to infringe a claim that recites capability and not actual operation, an accused device 'need only be capable of operating in the described mode.'" *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010) (citing *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991). However, if an apparatus claim requires "software [to] be configured in a particular way to infringe," infringement does not occur merely because the apparatus could be used in an infringing fashion. *Finjan*, 626 F.3d at 1204-05.

For there to be infringement under the doctrine of equivalents, the accused product or process must embody every limitation of a claim, either literally or by an equivalent. *Warner-Jenkinson*, 520 U.S. at 41. An element is equivalent if the

6

differences between the element and the claim limitation are "insubstantial." *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1316 (Fed. Cir. 1999). One test used to determine "insubstantiality" is whether the element performs substantially the same function in substantially the same way to obtain substantially the same result as the claim limitation. *See Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950). This test is commonly referred to as the "function-way-result" test. The mere showing that an accused device is equivalent overall to the claimed invention is insufficient to establish infringement under the doctrine of equivalents. The patent owner has the burden of proving infringement under the doctrine of equivalents and must meet its burden by a preponderance of the evidence. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

## D. Invalidity

### 1. Anticipation

Under 35 U.S.C. § 102(b), "[a] person shall be entitled to a patent unless the invention was patented or described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States." The Federal Circuit has stated that "[t]here must be no difference between the claimed invention and the referenced disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991). In determining whether a patented invention is explicitly anticipated, the claims are read in the context of the patent specification in

7

which they arise and in which the invention is described. *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995). The prosecution history and the prior art may be consulted if needed to impart clarity or to avoid ambiguity in ascertaining whether the invention is novel or was previously known in the art. *Id.* The prior art need not be *ipsissimis verbis* (i.e., use identical words as those recited in the claims) to be anticipating. *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984).

A prior art reference also may anticipate without explicitly disclosing a feature of the claimed invention if that missing characteristic is inherently present in the single anticipating reference. *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). The Federal Circuit has explained that an inherent limitation is one that is necessarily present and not one that may be established by probabilities or possibilities. *Id.* That is, "[t]he mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Id.* The Federal Circuit also has observed that "[i]nherency operates to anticipate entire inventions as well as single limitations within an invention." *Schering Corp. v. Geneva Pharms. Inc.,* 339 F.3d 1373, 1380 (Fed. Cir. 2003). Moreover, recognition of an inherent limitation by a person of ordinary skill in the art before the critical date is not required to establish inherent anticipation. *Id.* at 1377.

An anticipation inquiry involves two steps. First, the court must construe the claims of the patent in suit as a matter of law. *Key Pharms. v. Hercon Labs Corp.,* 161 F.3d 709, 714 (Fed. Cir. 1998). Second, the finder of fact must compare the construed claims against the prior art. *Id.* A finding of anticipation will invalidate the patent.

8

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1378 (Fed. Cir. 1998).

### 2. Obviousness

"A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). Obviousness is a question of law, which depends on underlying factual inquiries.

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or non-obviousness of the subject matter is determined.

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. Likewise, a defendant asserting obviousness in view of a combination of references has the burden to show that a person of ordinary skill in the relevant field had a reason to combine the elements in the manner claimed. *Id*. at 418-19. The Supreme Court has emphasized the need for courts to value "common sense" over "rigid preventative rules" in determining whether a motivation to combine existed. *Id*. at 419-20. "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id*. at 420. In addition to showing that a person of ordinary skill in the art would have had reason to attempt to make the composition or

9

device, or carry out the claimed process, a defendant must also demonstrate that "such a person would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).

A combination of prior art elements may have been "obvious to try" where there existed "a design need or market pressure to solve a problem and there [were] a finite number of identified, predictable solutions" to it, and the pursuit of the "known options within [a person of ordinary skill in the art's] technical grasp" leads to the anticipated success. *Id.* at 421. In this circumstance, "the fact that a combination was obvious to try might show that it was obvious under § 103." *Id.* Federal Circuit precedent has also established that "[s]tructural relationships may provide the requisite motivation or suggestion to modify known compounds to obtain new compounds," and that particular types of structural similarity can give rise to a case of prima facie obviousness. *Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.*, 655 F.3d 1291, 1312 (Fed. Cir. 2011) (citing *In re Deuel*, 51 F.3d 1552, 1558 (Fed. Cir. 1995)).

A court is required to consider secondary considerations, or objective indicia of non-obviousness, before reaching an obviousness determination, as a "check against hindsight bias." *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063 (Fed. Cir. 2012). "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

10

"Because patents are presumed to be valid, *see* 35 U.S.C. § 282, an alleged infringer seeking to invalidate a patent on obviousness grounds must establish its obviousness by facts supported by clear and convincing evidence." *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 968 (Fed. Cir. 2006) (citation omitted). In conjunction with this burden, the Federal Circuit has explained that,

> [w]hen no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting *Am. Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed. Cir. 1984)).

## III. RECORD

As explained above, the purpose of the summary judgment exercise is to determine whether there are genuine issues of material fact that require resolution by a jury. Issues of fact are raised by conflicting evidence, not by attorney argument or conclusory expert opinions. Evidence appropriate for review on summary judgment is that which has been vetted through discovery.[1] In order to make its determinations on summary judgment, the court actually peruses the record to confirm that: (1) the parties have cited to evidence in support of their arguments; and (2) the evidence

---

[1] I.e., there should be no surprises in the summary judgment record.

demonstrates the proposition for which it was cited.[2]  With the above in mind, the court

addresses the summary judgment record compiled by the parties at bar, in order to

address the various motions to strike and to exclude filed by the parties in connection

with said record.

With respect to the record in general, the parties could not have been less

helpful to the court.  In connection with their eight motions and 24 briefs, the parties

filed something like 42 declarations and volumes of appendices referencing or

containing exhibits.  Often the parties (and their experts) cited to documents by their

Bates-stamp numbers, with no indicia of their location in the record.  Even when the

parties were kind enough to locate the document in question by an exhibit number, it

was often difficult to discern which of the volumes containing identical exhibit numbers

was actually referenced.  To add insult to injury, the parties organized the appendices

so that the exhibits were not necessarily included in numerical order because, e.g., one

exhibit had to be sealed.  In sum, it was a rare occurrence that a brief cited evidence by

an exhibit number that was clearly identified by the appendix in which it resided.

Which takes us to the various pending motions.  Although not the first-filed

motions, the court would be remiss if it did not recount the tremendous waste of time

spent by the parties (and the court) in connection with the expert reports relating to

infringement.  As reflected in the docket, Cradle's expert (Dr. Albonesi) filed his initial

report on infringement, followed by TI's rebuttal report on non-infringement filed by its

expert (Dr. Hassoun).  Cradle argues that TI revealed for the first time its

---

[2]This is especially important to do in cases such as this, where so much of the
briefing is attorney argument, rather than evidence-based.

12

non-infringement theories through the rebuttal report, causing Dr. Albonesi to file a supplemental report. Because Dr. Albonesi arguably expanded his response beyond that which was vetted through discovery, Dr. Hassoun also filed a supplemental expert report in response to Dr. Albonesi's supplemental report. Bad enough. Not content to rely on this series of reports, both parties submitted expert declarations (complete with appendices) in support of their respective infringement positions on summary judgment. All of these efforts to presumably identify and corroborate their arguments ultimately led to the counter-motions to strike certain portions of the supplemental reports and/or declarations as containing "new" opinions.[3]

The court grants TI's motion to strike certain paragraphs of the Albonesi declaration. (D.I. 295, 315) As far as the court can tell, the declaration (D.I. 285) is longer than his two expert reports combined (D.I. 245, exs. 4 and 23), and primarily cites to itself as authority.[4] Because Dr. Albonesi's initial and supplemental reports are part of the record,[5] there should be no prejudice to plaintiff, to wit, only new theories will truly be stricken. The court also grants TI's motion as it relates to the "Declaration of Third-Party Motorola Solutions, Inc." as said "evidence" was not vetted through discovery. (D.I. 295)

---

[3]To the extent TI has moved to strike the initial and supplemental expert reports of Dr. Albonesi as failing the reliability test set forth in *Daubert* and its progeny, said motion (D.I. 227) is denied as moot, as the sufficiency of Dr. Albonesi's opinions will be addressed in connection with the court's discussion on infringement *infra*.

[4]To the extent it refers to his reports, the court has reviewed his reports and the evidence cited therein.

[5]Unlike complete versions of Dr. Hassoun's two reports, which are dissected and scattered throughout multiple volumes. Again, not helpful.

13

The court, however, denies the remaining motions that relate to the supplemental expert reports, including the motion related to Dr. Hassoun's declaration that relies on his supplemental report. (D.I. 309, 315) In this regard, the court has neither the time nor the resources - nor even the record - to recreate the parties' tortuous litigation strategies insofar as determining whether plaintiff had cause to file a supplemental report in the first instance and whether it ventured into new theories which demanded a response by defendant in the second instance. Because the court relies on the remaining reports only to identify the evidence relied upon by the experts, which evidence has been vetted through discovery, the prejudice to the parties, if any, is minimal and can be addressed through focused evidentiary disputes.

The final motions to be addressed are those related to the parties' invalidity experts. Defendant has filed a motion to exclude the testimony of Dr. Olivier on secondary considerations of non-obviousness based on his alleged failure to establish a nexus between the secondary considerations and any of the claimed inventions. (D.I. 224) The court denies this motion, finding that Dr. Olivier's opinion rests upon a reliable foundation and that defendant's challenge goes to the weight of the evidence.

Plaintiff has filed a motion to strike the declaration and testimony of Michael Shay as containing disclosures that were never vetted through discovery. (D.I. 271) The court grants this motion. If, indeed, Mr. Shay's declaration is consistent with the patent, the NS486SXF Data Sheet, and the NS486SXF chip, then his declaration is redundant, as Dr. Hassoun has described and relied on all three prior art references. To the extent Mr. Shay had anything to add, defendant had the obligation to supplement its discovery responses before the close of fact discovery.

14

## IV. DISCUSSION

For each of the three patents-in-suit, the court will discuss the background technology, any necessary claim construction on summary judgment, and any infringement and invalidity issues on summary judgment.

### A. The '049 patent

The '049 patent, entitled "Semaphores With Interrupt Mechanism," was filed on February 1, 2002 and issued on March 29, 2005. It claims priority from provisional application No. 60/266,002 which was filed on February 2, 2001. The '049 patent is assigned to Cradle. (D.I. 1 at ¶ 8)

A multiprocessor system of the prior art included a system bus coupled to each of a plurality of processors, a main memory, and a shared resource. ('049 patent, 1:16-19) The main memory included a semaphore which was used to monitor access to a shared resource by the processors. (*Id.* at 1:21-23) The processors each include a register. (*Id.* at 1:23-24) The processors examined the content of the semaphore to determine the availability of a shared resource. (*Id.* at 1:26-28) When the shared resource was available for access, the content of the semaphore read a "0." (*Id.* at 1:28-33)

To access the shared resource, the processor would read the content of the semaphore into its register and write a "1" into the semaphore. (*Id.* at 1:33-36) The reading of the semaphore constituted one bus transaction. (*Id.* at 1:37-40) In the event that a processor examined the content of the semaphore and it read that the shared resource was not available for access, the processor executed a program loop that

15

included: (a) reading the content of the semaphore into its register; (b) writing a "1" into the semaphore; and (c) examining the copy of the content of the semaphore which it received in its register. (*Id.* at 1:59-67) "The processor execute[d] the program loop until the copy of the content of the semaphore which the processor receive[d] in its register [was] a '0'." (*Id.* at 1:65, 2:1-2) "This require[d] repeated use of the system bus." (*Id.* at 2:11-12)

The '049 patent eliminates the required repeated reading and writing and aims to increase the system throughput by introducing a digital system comprising a semaphore cell, an interrupt generation circuit coupled to the semaphore cell, and a processor coupled to the interrupt generation circuit. (*Id.* at 2:19-28) "The semaphore cell is configured to have a first state and a second state, the first state of the semaphore cell indicating that a shared resource is available for access, and the second state of the semaphore cell indicating that the shared resource is unavailable for access." (*Id.* at 2:28-32) "The interrupt generation circuit is configured to generate a semaphore interrupt signal to the processor if the semaphore cell changes from the second state to the first state and if the processor needs to access the shared resource." (*Id.* at 2:32-35)

Cradle alleges that TI's digital signal processor ("DSP") chips infringe apparatus claims 1-3 and method claim 6 of the '049 patent. (D.I. 278 at 11) Claims 1 and 6 teach a system and method, respectively, for monitoring access by a processor to a shared resource. The claims are reproduced below:

> 1. In a digital system of the type having at least first and second processors and at least one shared resource

16

accessible to the processors via a system bus, the bus allowing only one bus transaction in any one clock cycle, a hardware semaphore circuit coupled to said system bus and configured to monitor shared resource accesses by said processors, the hardware semaphore circuit comprising:

a semaphore cell coupled to the first and second processors via the system bus and configured to have a first state and a second state, the first state indicating that the shared resource is available for access and the second state indicating that the shared source is unavailable for access, and configured to be in the second state after being read by any processor and to change back to the first state after the shared resource is again made available for access; and

an interrupt generation circuit coupled to the first and second processors via the system bus and coupled to an output of the semaphore cell, and configured to generate a semaphore interrupt signal to any processor requesting access to the shared resource Whenever the semaphore cell changes from the second state back to the first state, the interrupt generation circuit comprising:

> (i) a semaphore interrupt cell coupled to the output of the semaphore cell and configured to have a third state and a fourth state, the fourth state indicating that the semaphore cell has changed from the second state back to the first state and thus that the shared resource has just been made available for access;

> (ii) first and second semaphore interrupt enable cells respectively coupled to the first and second processors via the system bus, each semaphore interrupt enable cell configured to have a fifth state and a sixth state, the fifth state indicating that the corresponding processor does not need to access the shared resource and the sixth state indicating that the corresponding processor has read the semaphore cell and found that the semaphore is in the second state; and

> (iii) first and second logic gate circuits coupled to the semaphore interrupt cell, to respective first and

17

second semaphore interrupt enable cells, and via the system bus to respective first and second processors, each logic gate circuit configured to generate a semaphore interrupt signal to its corresponding processor if the semaphore interrupt cell is in the fourth state and the corresponding semaphore interrupt enable cell is in the sixth state, the semaphore interrupt cell and a corresponding semaphore interrupt enable cell further configured to change back to their respective third and fifth states after the semaphore interrupt signal is sent to its corresponding processor.

(*Id.* at 6:50-67, 7:1-33)

2. The hardware semaphore circuit in a digital system as in claim 1, wherein the system has multiple shared resources, and the semaphore cell, the semaphore interrupt cell and the first and second semaphore interrupt enable cells are cells of corresponding registers with one cell of each register dedicated to semaphore operations for a particular shared resource.

3. The hardware semaphore circuit in a digital system as in claim 1, wherein more than two processors can access the at least one shared resource via the system bus, and the interrupt generation circuit comprises additional semaphore interrupt enable cells and logic gate circuits corresponding each additional processor.

6. A method of using a hardware semaphore circuit to monitor shared resource accesses over a system bus that allows only one bus transaction in any one clock cycle, there being at least first and second processors and at least one shared resource coupled to said system bus together with said hardware semaphore circuit, the method comprising: reading a state of a semaphore cell of the hardware semaphore circuit by a first processor and if the state read from the semaphore cell is a first state, indicating that the shared resource is available for access, then accessing the shared resource by the first processor, but if the state read from the semaphore cell is a second state, indicating that the shared resource is unavailable for access, then setting a

18

first semaphore interrupt enable cell to a state indicating that the first processor needs to access the shared resource and the first processor waiting for a semaphore interrupt signal from the hardware semaphore circuit before again reading the state of the semaphore cell, any reading of the state of the semaphore cell by any processor setting the state of the semaphore cell to its second state, the semaphore cell changing back to its first state after the shared resource is again made available for access;

continually monitoring the state of the semaphore cell by a semaphore interrupt cell of the hardware semaphore, the semaphore interrupt cell having third and fourth states with the fourth state indicating that the shared resource has just been made available for access, the semaphore interrupt cell changing to the fourth state whenever the semaphore cell being monitored has just changed from the second state back to the first state;

reading the state of the semaphore cell by a second processor and if the state read from the semaphore cell is a first state then accessing the shared resource by the second processor, but if the state read from the semaphore cell is second state then setting a second semaphore interrupt enable cell to a state indicating that the second processor reads to access the share resource and the second processor waiting for a semaphore interrupt signal from the hardware semaphore circuit before again reading the state of the semaphore cell; and

whenever the semaphore interrupt cell changes to the fourth state and either the first or second semaphore interrupt enable cell is in a state indicating that the respective first or second processor needs to access the shared resource, generating a semaphore interrupt signal for the respective first and second processor and transmitting said interrupt signal thereto over said system bus.

(*Id.* at 8:19-8:65)

### 1. Claim Limitations

#### a. "A system bus that allows only one bus transaction in any

19

one clock cycle"[6]

The court construes "a system bus that allows only one bus transaction in any one clock cycle" as "a signal path shared by all devices that are connected to the path and used for transactions among them, in which only one device has use of the path for the entire duration of the transaction." "One bus transaction" is construed as "a transaction in which only one device has use of the system bus for the entire duration of the transaction."

That the system bus is a shared path between the processors, the shared resource, and the semaphore circuit is supported by the specification. ('049 patent, 2:66-3:6) Although the only description of "one bus transaction" appears in the background section of the patent and limits it to "the reading of the semaphore and writing a '1' into the semaphore by the processor," the patent provides no further support for the notion that the patentee wished to limit this term to this type of transaction. (See id. at 1:35-40; 1:55-58)[7]

In distinguishing the present invention from the Wenniger reference cited by the PTO, applicant noted that

> the hardware semaphore is accessed via a system bus in
> which only one bus transaction can take place in any one
> clock cycle. (The bus system in the present invention

---

[6] The parties identified the terms "one bus transaction" and "system bus, the bus allowing only one bus transaction in any one clock cycle" in their joint claim construction statement. (D.I. 191) The court will discuss these terms together.

[7] The background further explains that "the processor seizes the system bus continuously for both the reading and writing of the semaphore," and that without this guarantee, a race condition — when at least two processors have access to a shared resource at the same time — may occur. (Id. at 1:40-45)

20

> effectively serializes access to the semaphore from multiple
> contenders).  There is no need for arbitrated access to the
> semaphore in applicant's invention.

(D.I. 201 at CIP 131)  Notably, applicant cancelled the original claims, which did not

specify how the interrupt signals were transmitted to the processor, and included the

limitation to method claim 6 that the interrupt signal is transmitted over the system bus.

(*Id.* at CIP 126-130)[8]

### b.  "Any processor requesting access to the shared resource"

The court adopts TI's construction "all processors requesting access to the

shared resource."  There is no evidence to indicate that the patentee wished to limit his

invention to only a number of processors requesting access to the shared resource as

Cradle argues.  (D.I. 206 at 12-13)  Instead the specification explains that "[t]he

interrupt generation circuit is configured to generate a semaphore interrupt signal to the

processor if the semaphore cell changes from the second state to the first sate and if

the processor needs to access the shared resources."  ('049 patent, 2:33-36)

### c.  "The shared resource is available/unavailable for access"

The court construes the term "the shared resource is available for access" to

mean "the shared resource is not in use by a processor and corresponds to a

semaphore content of '0.'"  The court construes "the shared resource is unavailable for

access" as "a shared resource is in use by a processor and corresponds to a

semaphore content of '1.'"

---

[8]The inventor of the patent testified that "[t]he bus itself is a collection of wires
that allow only one speaker at a time."  (D.I. 223, ex. Y at 69:14-18)

21

The specification provides an illustration of the operation of the digital system. (*Id.* at 3:57-4:3) When a processor needs to access a shared resource, it reads a hardware semaphore cell into its register to determine whether the shared resource is available. A hardware semaphore content of "0" indicates that the resource is available for access. (*Id.*) Conversely a hardware semaphore content of "1" indicates that another processor is currently using the shared resource. (*Id.* at 5:38-41)[9] Assuming that the first processor then accesses the shared resource, "[w]hen the [first] processor finishes using the shared resource, the processor writes a '0' into the semaphore." (*Id.* at 2:3-5; 5:47-49; *see also* 4:22-24) A second processor, which had been waiting to access the shared resource, receives an interrupt signal. It can then determine that the release of the corresponding shared resource caused the interrupt. (*Id.* at 4:40-47; 6:11-13)

### d. "The shared resource has just been made available for access"

The court construes this term as "the shared resource is no longer in use and has been released when a processor changes the content of the hardware semaphore cell to a '0.'" This construction is supported by the specification. "When the processor no longer needs access to the shared resource, the processor writes a '0' into the hardware semaphore cell." (*Id.* at 4:22-24) The second processor then receives an interrupt and it can determine that the release of the corresponding shared resource caused the interrupt. (*Id.* at 4:40-47; 6:11-13)

---

[9]The background section of the '049 patent explains that a shared resource is available for access when both processors are not using the shared resource and the content of the semaphore is a "0." (*Id.* at 1:28-33)

22

### e. "Cell"

The court adopts TI's construction "a portion of one register capable of storing a value." Figure 2 and the specification explain that the hardware semaphore cells, the semaphore interrupt cells, and the semaphore interrupt enable cells are each portions of the hardware semaphore register, the semaphore interrupt register, and the semaphore interrupt enable register, respectively. (*Id.* at 3:7-45)

### 2. Infringement

Cradle has accused TI's DSP chips of infringing apparatus claims 1-3 and method claim 6 of the '049 patent. (D.I. 278 at 11) TI's customers program the DSP chips by installing software that runs on the processing cores that comprise the chips. (*Id.* at 11-12) Each of the '049 accused products also includes a semaphore peripheral. (*Id.* at 12) To use the semaphore peripheral, a customer must install software on the chip. (*Id.*) The software must be programmed to acquire a semaphore in the semaphore peripheral by invoking one of three access modes: (1) the direct mode; (2) the indirect mode; or (3) the combined mode. (*Id.*)

Cradle alleges that the '049 products, without any additional software, infringe apparatus claims 1-3; and that method claim 6 is infringed when software running on an accused product acquires a semaphore using either (1) direct mode followed by indirect mode, or (2) combined mode. (*Id.*)

### a. Apparatus claims 1-3

TI alleges that Cradle has not shown that TI has made, used, sold, or offered to sell the "entire patented invention" or that any of its customers have employed the

23

"entire patented invention in the required configuration set forth in the apparatus claims." (*Id.* at 13)  The asserted apparatus claims require the claimed semaphore circuit to be **configured** so that each semaphore is mapped to or corresponds to a particular shared resource, such that reading a semaphore cell indicates whether a particular shared resource is available for access.  (*See* '049 patent, 6:54-65)  Without additional software, reading a semaphore would not indicate whether a particular shared resource is available for access and, thus, the products by themselves are not configured to monitor shared resource accesses by said processors.  (D.I. 278 at 14)  Cradle responds that there is no requirement that TI's customers add the software in order for the product to infringe the apparatus claim – that because the accused products include a hardware semaphore circuit, they are capable of performing the functions recited in the apparatus claim.  (D.I. 284 at 16-17)

The law does not support Cradle's view.  Because the apparatus claims require the "software [to] be configured in a particular way to infringe," infringement does not occur merely because the apparatus was capable of operating in an infringing fashion. *See Finjan*, 626 F.3d at 1204-05.  Instead, Cradle must provide evidence of the software installed on the chip (apparatus) used in combined mode.  As discussed below regarding the method claim, Cradle has not done so.  There is no evidence to show that TI or its customers used the apparatus in combined mode.  To the contrary, the only evidence provided shows that the software needed for the apparatus to operate in combined mode was not even developed.  Based on the record, the court concludes

24

that Cradle has failed to identify evidence sufficient to raise a genuine issue of material fact as to infringement of the apparatus claims.

### b. Method claim 6

TI further contends that Cradle has failed to provide evidence to show that either TI or its customers have actually performed "all of the steps of the claimed method." (D.I. 278 at 15; see Akamai, 692 F.3d at 1307) In support of its contentions, TI cites to subpoenas issued to its customers by Cradle confirming the lack of evidence of the programming or use of hardware semaphores in the '049 accused products. Alcatel-Lucent informed Cradle that it "found no evidence of use of hardware semaphores in TI's [DSP chips] incorporated in [Alcatel's] products." (D.I. 230, ex. 7) Ericsson provided a declaration stating that "the hardware semaphore peripheral in . . . [TI's] chip is not used." (Id., ex. 10 at ¶ 4) Nokia Siemens Networks ("NSN"), following a motion to compel partially granted by this court, responded that "no employees in NSN US's Bedminster office . . . are knowledgeable about . . . whether hardware semaphores are employed in such devices." (Id., ex. 9) Motorola Solutions, Inc. also submitted a declaration after the close of discovery, which has been stricken from the record.[10] (Id., ex. 17)

In opposing TI's motion, Cradle attempts to identify a genuine issue of material fact by citing to circumstantial evidence relied on by Dr. Albonesi in reaching his conclusion that "the only rational conclusion is that the use of the hardware semaphore

---

[10]Even if not stricken, the declaration did no more than suggest that it had software capable of infringing; there is no averment (despite the clear opportunity to offer one) that such capability was ever utilized by Motorola Solutions, Inc.

25

peripheral module must be substantial." (D.I. 284 at 20; D.I. 230, ex. 1 ¶ 204) Notably, the only exhibits that suggest direct infringement are TI's e-mail communications with customer, Motorola, contemplating the development of a product using the combined mode, and one slide of a PowerPoint that TI presented to Motorola on the use of the combined mode. (D.I. 245, ex. 8-9) Cradle also points to the deposition of a TI field application engineer discussing his communications with a Motorola engineer who informed him that he was attempting to write code for a combo mode relying heavily on examples from the presentation. (*Id.* at ex. 11) The field application engineer did not know, however, whether Motorola was ever able to make the combo mode work. (*Id.* at 32) Dr. Albonesi did not review any customer software, or inspect or test any product incorporating the '049 accused products to determine whether the semaphore peripheral was used. (D.I. 230, ex. 2 at 135:20-136:2; ex. 8 at 60:15-61:3)

Accordingly, the court finds that Cradle has failed to identify evidence sufficient to raise a genuine issue of material fact as to infringement of the method claim. TI's motion for summary judgment of non-infringement with respect to the '049 patent is granted.

### 3. Invalidity

TI alleges that the asserted claims of the '049 patent are invalid because they fail to comply with the written description requirement, specifically, that the '049 patent does not describe a system that selects a subset of processors to receive the interrupts. (D.I. 234 at 37) Because the court has adopted TI's construction for "any processor requesting access to the shared resource" to mean "all processors

26

requesting access to the shared resource," TI's motion for summary judgment of

invalidity for failure to comply with the written description requirement is moot.

## B. The '259 patent

The '259 patent, "Programmable Wake Up of Memory Transfer Controllers in a

Memory Transfer Engine," was filed February 1, 2002 and issued March 16, 2004. It

claims priority from provisional application No. 60/266,002 which was filed on February

2, 2001. The '259 patent is assigned to Cradle. (D.I. 1 at ¶ 8)

The '259 patent relates to "[m]ethods for waking up an idle memory transfer

controller (MTC) in response to an event from an external source." ('259 patent,

Abstract) Independent claim 1 recites:

> 1. In a semiconductor chip, a method of waking up an idle memory transfer controller in response to an event from an external source, said method comprising:
>
> a) Writing to at least one hardware register of a memory transfer engine including a plurality of memory transfer controllers, said writing performed by an external agent; and
>
> b) activating an idle memory transfer controller so that it can execute instructions, said activation enabled by the writing step.

(*Id.* at 6:8-17)

### 1. Limitations of the '259 patent

#### a. "Idle Memory Transfer Controller"

Cradle and TI both propose constructions that could also define the inactive

state of a MTC. These two states can be distinguished by the fact that, in the idle state,

either the wake-up bit or the External WakeUp bit is set enabling the MTC to

automatically wake up in response to a wake-up event. Accordingly, the court

27

construes this term as "a memory transfer controller that is not ready to execute instructions because its clock is stopped, i.e., the run bit is set to '0', and either the wake-up bit or the External WakeUp (XW) bit is set to '1.'"

The '259 patent refers to two wake-up mechanisms available to make an idle MTC ready to execute in response to a wake-up event. (*Id.* at 1:55-57; 2:56-59; 4:58-60) The first mechanism "activates the MTC's run bit, placing the MTC in a state where it can execute instructions." (*Id.* at 1:59-62) The specification explains that

> [t]he run bit helps control the MTC clock. When the run bit is one, the MTC clock runs and the MTC executes instructions. When the run bit is zero, the MTC clock is stopped and the MTC is stalled.

(*Id.* at 4:1-4) Figure 4 and the specification define what it means for a MTC to be idle. This occurs when "the wake-up bit is set to '1' and the run bit is '0' . . . ." (*Id.* at 4:47-52; *see also* 5:47-55) It further explains that "it will become ready if a wake-up event occurs." (*Id.* at 48-49) In contrast, when either the wake-up bit or the XW bit is '0,' the MTC is inactive. (*Id.* at 5:45-46; *see also* 4:50-52) The MTC's run bit is set to 0 in this state as well. (*Id.* at 4:50-52)

Figure 5 describes an external wake-up event during which time the run bit is set to "1." "When the run bit is set, the MTC is ready and eligible to be made executing in the next arbitration round." (*Id.* at 5:9-11; 5:55-57)

### 2. Infringement

Cradle has accused TI's OMAP 3, OMAP 4, OMAP 5, Centaurus and Netra chips of infringing method claims 1-3, 6, and 10-11 of the '259 patent. (D.I. 284 at 5, 32) These products include a Power Clock Reset Management ("PRCM") module that

28

controls the clocks to various initiator and target modules. (D.I. 228 at 8) When an initiator or target module is not needed, the PRCM – either automatically or if instructed by software to do so – can stop the clocks to that module, thereby placing the module in an "idle" state. (*Id.*) When a module is needed, the PRCM can similarly activate the module by turning on its clocks. (*Id.*)

The OMAP 3 products contain a static dependency feature. (D.I. 228 at 9) This feature is a relationship between an initiator module and a target module where the PRCM ensures that the target module is activated whenever the initiator module is also activated. (*Id.*) The static dependency feature can be enabled or disabled by TI's customers, but is enabled by default. (*Id.*; D.I. 278 at 29)

The OMAP 4 and OMAP 5 products further contain a dynamic dependency feature.[11] (*Id.*) This feature is a relationship between an initiator module and a target module where, if the PRCM senses a command being sent from the initiator module to the target module and, if the target module is idle, the PRCM will turn on the clocks of the target module. (*Id.*) Where a product has both features and the static dependency feature has been enabled, the static dependency feature controls and the dynamic dependency feature will never be exercised. (*Id.*)

Cradle alleges that: (1) the PRCM activates the accused memory controllers by turning on their clocks in the OMAP 4 and OMAP 5 products; and (2) the accused controllers activate themselves by turning on their own internal clocks in all accused

---

[11]The Centaurus and Netra products contain neither feature. (D.I. 228 at 9)

29

products. (D.I. 278 at 28-30) The default setting in the accused products is that the PRCM-based clock gating strategy is off and the static dependency feature is on. (D.I. 278 at 31) Therefore, to prove infringement, Cradle must show that the PRCM-based clock gating strategy is turned on and the static dependency has been disabled.

Under the internal clock theory, Cradle must show that: (1) the accused "memory transfer controllers" implement the internal clock gating strategy; and (2) the internal clock gating strategy is on. (*Id.* at 32) Cradle has accused the dynamic memory manager (DMM), general purpose memory controller (GPMC), and external memory interface (EMIF) modules of being the accused memory controllers in OMAP4+.[12] (*Id.*)

### a. Evidence of direct infringement by the OMAP 4+ products

TI contends that Cradle has provided no evidence to prove infringement by OMAP 4 and OMAP 5 under the PRCM-based theory or to prove infringement by OMAP 4+ under the internal clock theory. (D.I. 290 at 15) With respect to the PRCM-based theory, Cradle has failed to proffer evidence showing that any user of TI's products has changed the default setting to disable the static dependency feature. (D.I. 278 at 31) Cradle issued subpoenas to Motorola Solutions and Motorola Mobility, seeking documents relating to "the programming or use of the PRCM module to wake up" the target modules in end-products that incorporate the '259 Accused products. (D.I. 228 at 11) Cradle points to three pages of source code provided by Motorola Mobility as providing evidence that Motorola changes the default values of the accused

---

[12]Omap4+ refers to the OMAP4, OMAP5, Centaurus, and Netra products. (D.I. 278 at 28)

devices to allow sleep transitions to realize the power savings available by the PRCM automatic clock gating features. (*See* D.I. 245, exs. 20-22) However, at best the source code shows capability, but not use thereof.[13] TI's recommendation in its domain architecture document that certain memory modules, within the OMAP 3 products, be reconfigured to take advantage of the PRCM-based clock gating feature also does not provide evidence of use of the infringing mode by OMAP 4 and OMAP 5 products. (D.I. 287, ex. 79 at TI-CRAD-0096741)

Under the clock gating strategy, Cradle attempts to identify a genuine issue of material fact by again pointing to TI documentation to show evidence of direct infringement. (D.I. 284 at 32-34) That TI strongly recommends the use of autoidle mode for OMAP 3 products (not presently at issue) does not provide evidence of use of the allegedly infringing mode under the internal clock gating strategy. (*See* D.I. 287, ex. 79 at TI-CRAD-0096741) Neither does TI's technical reference manual stating that "[t]he EMIF can gate off the EMIF_FCLK. There is an internal mechanism which can stop the EMIF_FCLK automatically." (*Id*, ex. 23 at TI-CRAD-0124269)

Under either theory, the evidence shows that the products are, at best, capable of operating in an infringing manner. Infringement of a method claim, however, requires evidence of use. The court finds, therefore, that Cradle has failed to identify evidence sufficient to raise a genuine issue of material fact as to infringement by the OMAP 4+

---

[13]Contrary to Dr. Albonesi's conclusion that a "large number of users of the OMAP 4 and OMAP 5 chips will disable the default static dependencies to reduce power consumption via the dynamic dependency mechanism," the Motorola Solutions declaration (stricken from the record) merely suggests capability, but not use. (D.I. 228, ex. 11 at App. B ¶ 16; D.I. 230, ex. 17)

31

products. Summary judgment of non-infringement is proper with respect to the OMAP 4+ products.

### b. Infringement by the OMAP 3 products

TI has not carried its burden of persuasion with respect to the OMAP 3 products under the internal clock theory. The evidence cited by Dr. Hassoun (one sentence within the description of the features in the design specification for the clock tree generator), without further explanation or evidence, is not sufficient to support his conclusion that the OMAP 3 products "always keep one of their internal clock branches . . . on." (See D.I. 279 ¶ 10; ex. 27 at TI-CRAD-0875906) Further the parties present issues and arguments regarding the constructions of "execute instructions" and "writing."[14] Because there are genuine issues of material fact, summary judgment is denied as to the OMAP 3 products.

### 3. Invalidity

#### 1. Anticipation

TI alleges that U.S. Patent No. 5,805,923 (the "923 patent") and the NS486SXF chip anticipate the asserted claims of the '259 patent under 35 U.S.C. 102(b). (D.I. 234 at 19-20) The '923 patent "discloses a configurable power management system that can be used in a controller for embedded systems." (Id. at 19) The NS486SXF chip embodies the invention disclosed in the '923 patent. (Id. at 20) Cradle responds that

---

[14]For example, in opposing TI's motion for summary judgment of invalidity, Cradle argued that the prior art memory transfer controllers do not "execute instructions" because they merely respond to the CPU's "address, data and control signals," which are not "instructions" within the meaning of the '259 patent. (D.I. 250 at 30-31)

there exist several factual disputes including whether the '923 patent and the NS486SXF chip disclose: (1) a "writing" to a hardware register; (2) "activating an idle MTC so that it can execute instructions;" and (3) that the activating is "enabled by the writing step." (D.I. 250 at 25-26)

The parties' experts disagree on whether the '923 patent and the NS486SXF chip disclose a "writing" to a hardware register. Cradle's expert contends that "setting a bit in a register as a result of a reset signal is not a writing because a reset is an individual signal line and does not involve a command or decoding any portion of a command." (D.I. 251, ex. 2 at Appx. B ¶ 36) TI's expert disagrees and contends that the "plain and ordinary meaning of writing is setting or resetting a register or changing the value of a register," and under this the '923 patent and the NS486SXF chip disclose "writing to at least one hardware register of a memory transfer engine." (D.I. 236 at ¶ 74; D.I. 264 at 15)

That the parties' experts do not agree on the plain and ordinary meaning of the term presents a genuine issue of material fact not properly resolved on summary judgment.[15] For this reason, the court does not address anticipation of dependent claims 2-3, 6, and 10-11, all of which depend on independent claim 1.[16] TI's motion for summary judgment is denied.

---

[15]The parties make similar arguments related to the plain and ordinary meaning of the terms for the remaining disputed issues. (D.I. 250 at 26-33; D.I. 264 at 12-16)

[16]As the court finds a genuine issue of material fact with respect to anticipation, it does not reach TI's motion with respect to obviousness, as this argument is premised on a finding that the step of "writing to at least one hardware register of a memory transfer engine" is not disclosed in the '923 patent and the NS486SXF chip. (See D.I. 234 at 33)

33

### C. The '450 patent

The '450 patent, "Multiprocessor Computer Systems With Command FIFO Buffer At Each Target Device," was filed October 6, 2000 and issued November 11, 2003. It claims priority from provisional application No. 60/158,184 filed on October 6, 1999. The '450 patent is assigned to Cradle. (D.I. 1 at ¶ 8)

Conventionally, a single transaction bus required that an entire transaction between two devices through the bus be complete before another transaction began. ('450 patent, 1:52-54) This led to the reduction of the data throughput of the computer system because, if the target device was slow in retrieving requested data, the bus was blocked and unused for a very long time. (*Id.* at 1:54-56)

To solve this problem and increase the efficiency of the system, a split transaction bus was devised. (*Id.* at 1:57-58) In a split transaction bus, "the transaction between the master and target devices is split in time into two transactions so that during the time in between the bus is free for use by other devices." (*Id.* at 1:62-2:2) Problems associated with split transaction buses occurred when a second master device sent a command to the same target device while it was busy retrieving data for the first. (*Id.* at 2:8-16) Such problems included the amount of bus time it cost to (1) send busy signals from the target device to the second master device and to (2) resend the transfer command from the second master device to the target device. (*Id.* at 2:14-21) Additionally, "the order of execution of transfer commands [was] not optimal, i.e. not first come first served." (*Id.* at 2:24-25)

34

To decrease the inefficiencies associated with the system bus of the prior art, the

'450 patent provides "[a] multiprocessor computer system in which each processor

being used as a target device has a FIFO (first in first out) buffer for receiving and

storing transfer commands for a split transactional global bus for later execution." (*Id.*

at Abstract) Independent claim 22 recites:

> A method of preventing a bus in a multiprocessor computer
> system from being blocked comprising:
>
>> a) sending a command from a master device to a split
>> transaction global bus;
>>
>> b) placing the command in a command FIFO of a
>> target device;
>>
>> c) sending the master device an acknowledgement of
>> command receipt;
>>
>> d) releasing the split transaction global bus for use by
>> other bus devices, where such use includes another
>> master device issuing a command accepted by the
>> target device while the target device is executing a
>> previously-issued transaction; and
>>
>> e) repeating steps a)—d) as necessary.

(*Id.* at 6:28-41)  Dependent claim 26 includes the limitation "executing commands

stored in a command FIFO on a first come first served basis. (*Id.* at 6:49-51)

### 1. Claim limitations

#### a. "Command FIFO"

Cradle argues that, although the preferred embodiment includes commands

released in a first in, first out basis, the patentee did not intend to so limit the invention.

(D.I. 206 at 22)  TI responds that "command FIFO" is the centerpiece of the alleged

invention.  (D.I. 207 at 4)  Because the specification includes ample evidence that the

35

command FIFO buffer executes its commands in a "first come first serve order," the court construes the term "command FIFO" as "a buffer of the target device in which commands are stored in the order of their arrival and taken out in that same order (First in, First out)."

The abstract of the '450 patent explains that transfer commands are "put in the FIFO of the target device in the order of their arrival and are taken out of the FIFO and executed by the target device in the same order." ('450 Patent, Abstract) The specification further highlights a problem associated with the split transaction global bus of the prior art – that "the order of execution of transfer commands [was] not optimal, i.e. not first come first served." (*Id.* at 2:24-25) Importantly, an object of the invention was "to provide a multiprocessor computer system in which the transfer commands from master devices to a target device are executed by the target device in a first come first serve order." (*Id.* at 2:34-37) The specification indicates that "[t]he transfer command will be taken out of the FIFO [buffer] and be executed by the target device in the same order [it was put in]." (*Id.* at 2:44-46)

Figure 5 and the specification in columns 4:31-54 illustrate how the command FIFO functions. Importantly, after a second command is sent to the target device, "[t]he second transfer command is put in command FIFO to be executed by target device after the execution of the first read command." (*Id.* at 4:43-45) Following the execution of the first read command, the "target device executes the second transfer command in a similar manner." (*Id.* at 4:52-54) Finally, the specification spells out that "commands in command FIFO will be executed in first come first served order." (*Id.* at 5:10-11)

36

With respect to Cradle's claim differentiation argument (D.I. 206 at 22-23), claim 26 further explains the execution of the command function on a first come first served basis. *(Id.* at 6:32-33) Claim 22, however, merely describes the action of "placing a command in a command FIFO of a target device." *(Id.* at 6:49-51)

### b. "Split transaction global bus"

The court adopts TI's construction "a signal path shared by master and target devices in which one device has sole use of the path until it releases the path, wherein read transactions are split in time into two transactions." The specification defines a bus as "the means by which the electrical signals are communicated back and forth between a central processor, memory, and other devices . . . ." *(Id.* at 1:18-20) In a single transaction bus, "the entire transaction between two devices through the bus must complete before another transaction starts through the bus." *(Id.* at 1:51-54) To increase the efficiency of a system, the split transaction bus splits the transactions between the master and target devices in time into two transactions "so that during the time in between the bus is free for use by other devices." *(Id.* at 1:65-2:2) "Write transactions are still single transactions . . . ." *(Id.* at 2:2-3)

Figure 5 and the specification (in columns 4:30-54) describe how transactions are executed through the use of the global bus. The transaction begins when a first master device gets a bus use permit from a bus arbiter and sends a first read command through the global bus to the target device. After the first read command is put in command FIFO, the target device sends back to master device an acknowledgment of command receipt. "Upon receiving this acknowledgment, master device releases global

37

bus for use by other bus devices." (*Id.* at 4:37-39; 4:46-48) Although, as Cradle avers, the patent does not include the words "sole use" (D.I. 206 at 25-26), the description in the specification indicates that during the use of the bus by one device, it is unavailable for use by another.

### c. "Acknowledgment of command receipt"

The court construes this term as "a signal generated by the target device to the master device, in response to receipt of the command, leading to release of the split transaction global bus by the master device for use by other devices." Cradle contends that the patent does not indicate what sends the acknowledgment to the master device. (D.I. 206 at 26) In illustrating how command FIFO operates, however, the specification does include the requirement that the target device sends the acknowledgment to the master device. (*See* '450 Patent at 4:31-54) This illustration explains that the "[t]arget device sends back to master device an acknowledgment of command receipt." (*Id.* at 4:35-37; 4:45-46) Further, "[u]pon receiving this acknowledgment, master device releases global bus for use by other bus devices." (*Id.* at 4:37-39; 4:47-49) The file history of the '450 patent provides additional support for this construction. To distinguish prior art in response to a rejection by the PTO, applicant argued that the invention teaches releasing a split transaction global bus for use by other devices "upon receipt of an acknowledgment of command receipt from the target device." (D.I. 201 at CIP 341-42)

38

### d. "Releasing the split transaction global bus"

The court construes this term as "after receiving the acknowledgment, the master device releases the split transaction global bus for use by other bus devices." This construction finds support in several places in the specification. First, the claim itself recites "releasing the split transaction global bus for use by other bus devices . . . ." ('450 Patent at 6:36-37) Figure 5 and the specification illustrate that, "[u]pon receiving this acknowledgment, master device releases global bus for use by other bus devices." (*Id.* at 4:37-39; 4:46-48) Finally, during prosecution the applicant stated that the master device releases the split transaction global bus for use by other devices. (D.I. 201 at CIP 341-42)

### e. Limiting preamble

The court agrees with TI that the preamble of claim 22 which recites, "[a] method of preventing a bus in a multiprocessor computer system from being blocked," is not limiting because it merely recites an intended use of the invention.

### 2. Infringement

Cradle has accused TI's OMAP 3, OMAP 4, OMAP 5, Netra, and Centaurus chips of infringing claims 22 and 24-30 of the '450 patent. (D.I. 284 at 5) "[T]hese chips contain initiator modules and target modules, which are connected to each other through an L3 interconnect." (D.I. 228 at 13) Cradle alleges that the accused "split transaction global bus" is the L3 interconnect and the OCP interfaces connected to it. (D.I. 278 at 6)[17]

---

[17]Cradle also alleged that the accused "split transaction global bus" may be an OCP interface between the L3 interconnect and the target device. This theory was

39

TI contends that no device has sole use of the "split transaction global bus," which includes the L3 interconnect, as "[m]ultiple devices can use the L3 interconnect simultaneously because it has: (1) crossbar switches and (2) independent request and response networks." (D.I. 278 at 3; D.I. 279 at Pt. A ¶ 11) A review of the evidence[18] cited by TI indicates that multiple crossbar switches in both the OMAP 3 and OMAP4 + products are used to allow multiple connections between multiple master and target devices. (See D.I. 279 at Part A, ¶¶ 13-16; ex. 37; ex. 51-52; D.I. 280, ex. 13) TI's products, therefore, do not require that only one device has sole use of the path until it releases it for use by other devices.

Cradle fails to identify evidence to support a finding of a genuine issue of material fact, instead pointing only to a conclusory opinion, unsupported by evidence, in Dr. Albonesi's declaration. According to Cradle's expert, "even though multiple devices may have commands pending on the L3 interconnect at any given time, only a single command from a single master device can be issued at a time through the target OCP interface and only one command can traverse the target OCP interface at a time." (D.I. 285 at ¶¶ 155, 220-21 (citing generic timing diagrams)) Because TI provides evidence to show that its products do not meet the "split transaction global bus" limitation, and Cradle has failed to rebut this with actual evidence to show otherwise, the accused products do not infringe the '450 patent.

---

subject to TI's motion to strike untimely expert opinions cited in Dr. Albonesi's declaration. (D.I. 295) As the motion was granted, this theory will not be addressed.

[18]Including a white paper describing the Arteris chip, a description of the components and performance of SonicsMX interconnect, and specification of the L3 interconnect.

40

Similarly, the court finds no genuine issue of material fact as to whether the accused structures are equivalent under the doctrine of equivalents. Cradle asserts that the structures are equivalent to the claimed split transaction global bus because they perform the same function (transmitting split read transactions) in substantially the same way (from master to target, where no other master can send a command to the same target) and achieve substantially the same results (the command is sent to the target and then the split transaction global bus is released for use by the other master devices to send a command to the same target). (D.I. 284 at 7; D.I. 285 at ¶ 156) However, as described above, the crossbars are more complex and provide a higher throughput, as they allow multiple devices to send commands and data simultaneously. As such, the differences between the "split transaction global bus" limitation and the accused structures are not insubstantial.[19] The court finds that Cradle has failed to identify evidence sufficient to raise a genuine issue of material fact as to infringement of the '450 patent. TI's motion is granted.

### 3. Invalidity

#### a. Anticipation

TI alleges that U.S. Patent No. 5,546,546 (the "546 patent") anticipates the asserted claims of the '450 patent under 35 U.S.C. 102(b). (D.I. 234 at 3) The only disputed issues are: (1) whether the In-Order Queue is a "command FIFO;" and (2) whether the response sent by the target device after it receives a command, and before

---

[19]Because the court finds summary judgment is appropriate, it does not address the "infringement by proxy" theory that Cradle uses in support of its infringement arguments for the limitation "acknowledgment of command receipt" (D.I. 284 at 11) and discussed in TI's motion to exclude Dr. Albonesi's testimony (D.I. 227).

it supplies the requested data or completion signals, is an "acknowledgment of command receipt." (*Id.* at 7)

The parties' dispute centers on whether the entries in the In-Order Queue are "commands" within the meaning of claim 22. (*Id.* at 9; D.I. 236 at ¶¶ 35-36, 40; D.I. 251, ex. 2 at App. A ¶¶ 24-30) In particular, the parties' arguments rely on their experts' differing interpretations of Figure 3 in the '546 patent. (*See* D.I. 236 at ¶¶ 35-36, 40; D.I. 251, ex. 2 at App. A ¶¶ 24-30) With respect to the second issue, the parties again differ in their reading of Figure 3. Although TI's expert explains that the '546 patent discloses this limitation, Cradle's expert argues that the response will be generated when the responding agent is ready to complete a deferred bus transaction, not when a command is received. (D.I. 236 at ¶37; D.I. 251, ex. 2 at App. A ¶¶ 31-35)

Because the court finds a genuine issue of material fact regarding whether the '546 patent anticipates independent claim 22 of the '450 patent, it does not consider anticipation of dependent claims 24-30. TI's motion is denied.

### b. Obviousness

TI further asserts that the '546 patent renders the asserted claims of the '450 patent obvious, alleging that it would have been obvious to one of skill in the art at the time of the invention to modify the In-Order Queue to store commands. (D.I. 234 at 16-17; D.I. 236 at ¶¶ 50-51) Cradle asserts that TI did not consider the secondary considerations of non-obviousness, as discussed by Dr. Olivier. (D.I. 226, ex. 1 ¶¶ 52-53) A court is required to consider secondary considerations, or objective indicia of non-obviousness, before reaching an obviousness determination, as a "check against

42

hindsight bias." *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063 (Fed. Cir. 2012). TI is correct that Cradle did not present these considerations in its briefing. (D.I. 264 at 9-10)

As TI's burden of proof is one of clear and convincing evidence and the existence of secondary considerations of non-obviousness represent factual inquiries to be determined by a fact-finder, summary judgment of invalidity is denied.

## VI. Conclusion

For the foregoing reasons, the court grants in part and denies in part TI's motion for summary judgment of non-infringement and denies its motion for summary judgment of invalidity of the patents-in-suit. (D.I. 217; D.I. 218) The court denies TI's motion to exclude the testimony of Dr. Olivier. (D.I. 224) The court denies as moot TI's motion to strike the testimony of Dr. Albonesi. (D.I. 227) The court grants Cradle's motion to strike the declaration and testimony of Michael Shay. (D.I. 271) The court grants TI's motion to strike inadmissible evidence and untimely expert opinions. (D.I. 295) The court denies Cradle's motion to strike new expert opinions. (D.I. 309) The court grants in part and denies in part TI's motion to strike untimely expert opinions. (D.I. 315) An appropriate order shall issue.

43

# ADDENDUM B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CRADLE IP, LLC,                    )
                                   )
          Plaintiff,               )
                                   )
     v.                            )        Civ. No. 11-1254-SLR
                                   )
TEXAS INSTRUMENTS, INC.            )
                                   )
          Defendant                )
                                   )

**O R D E R**

At Wilmington this $\partial^0$ th day of November 2013, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. TI's motion of summary judgment of non-infringement (D.I. 217) is granted in part and denied in part.

2. TI's motion of summary judgment of invalidity (D.I. 218) is denied.

3. TI's motion to exclude the testimony of Dr. James Olivier (D.I. 224) is denied.

4. TI's motion to exclude the testimony of Dr. David Albonesi (D.I. 227) is denied as moot.

5. Cradle's motion to strike the declaration and testimony of Michael Shay (D.I. 271) is granted.

6. TI's motion to strike inadmissible evidence and untimely expert opinions (D.I. 295) is granted.

7.  Cradle's motion to strike new expert opinions (D.I. 309) is denied.

8.  TI's motion to strike untimely expert opinions (D.I. 315) is granted in part, denied in part.

United States District Judge

# ADDENDUM C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRADLE IP, LLC | C.A. No. 11-1254-SLR |
| Plaintiff, | |
| v. | |
| TEXAS INSTRUMENTS INCORPORATED, | |
| Defendant. | |

## [PROPOSED] FINAL JUDGMENT OF NON-INFRINGEMENT

Pursuant to and for the reasons set forth in the Court's Memorandum Opinion (D.I. 345) and Order (D.I. 346), IT IS ORDERED AND ADJUDGED that:

This Final Judgment of Non-Infringement is entered against Plaintiff Cradle IP, LLC and for Defendant Texas Instruments Incorporated on (1) Plaintiff's claims of infringement with respect to U.S. Patent No. 6,874,049; (2) Plaintiff's claims of infringement with respect to U.S. Patent No. 6,647,450; and (3) Plaintiff's claims of infringement against TI's OMAP 4, OMAP 5, Centaurus and Netra products with respect to U.S. Patent No. 6,708,259.

Pursuant to and for the reasons set forth in the parties' Joint Stipulation for Entry of Final Judgment of Non-Infringement, IT IS ORDERED AND ADJUDGED that:

This Final Judgment of Non-Infringement is entered against Plaintiff Cradle IP, LLC and for Defendant Texas Instruments Incorporated on Plaintiff's claims of infringement against TI's OMAP 3 products with respect to U.S. Patent No. 6,708,259.

All other claims, counterclaims, defenses, or other matters that have been asserted, including Defendant's invalidity counterclaims, are dismissed without prejudice.

Plaintiff and Defendant shall each bear its own costs and attorneys' fees, including such costs and fees on appeal.

Dated: _____12/3/13_____

_____
The Honorable Sue L. Robinson
UNITED STATES DISTRICT JUDGE

# ADDENDUM D

US006874049B1

(12) **United States Patent**
Wyland

(10) Patent No.: **US 6,874,049 B1**
(45) Date of Patent: **Mar. 29, 2005**

(54) **SEMAPHORES WITH INTERRUPT MECHANISM**

(75) Inventor: **David C. Wyland**, Morgan Hill, CA (US)

(73) Assignee: **Cradle Technologies, Inc.,** Sunnyvale, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 388 days.

(21) Appl. No.: **10/061,544**

(22) Filed: **Feb. 1, 2002**

**Related U.S. Application Data**

(60) Provisional application No. 60/266,002, filed on Feb. 2, 2001.

(51) Int. Cl.$^7$ ............................................... G06F 9/48
(52) U.S. Cl. ...................................... 710/260; 712/244
(58) Field of Search ............................... 710/240, 260; 712/244

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,534,795 A | 7/1996 | Wert et al. | 326/81 |
| 5,940,856 A | 8/1999 | Arimilli et al. | 711/119 |
| 6,018,785 A * | 1/2000 | Wenniger | 710/200 |
| 6,108,756 A * | 8/2000 | Miller et al. | 711/148 |

| | | | |
|---|---|---|---|
| 2002/0073259 A1 * | 6/2002 | Grisenthwaite | 710/107 |
| 2003/0018841 A1 * | 1/2003 | Lesartre | 710/200 |

* cited by examiner

*Primary Examiner*—Glenn A. Auve
(74) *Attorney, Agent, or Firm*—Schneck & Schneck; Thomas Schneck; Mark Protsik

(57) **ABSTRACT**

Disclosed is a multiprocessor system including a semaphore register and a semaphore interrupt register. In addition, for each processor in the multiprocessor system, there is a semaphore interrupt enable register. If a first processor finds that a semaphore cell of the semaphore register holds a "1" indicating that an associated shared resource is being accessed by a second processor, the first processor sets a corresponding semaphore interrupt enable cell of the semaphore interrupt enable register to "1" so as to enable semaphore interrupt. When the second processor finishes with the shared resource, the second processor writes a 0 into the semaphore cell, causing a corresponding semaphore interrupt cell of the semaphore interrupt register to hold a "1". This, combined with the fact that the semaphore interrupt enable cell also holds a "1", causes an interrupt to the first processor. In response, the first processor services the interrupt and accesses the shared resource. As a result, repetitive reading and writing the semaphore cell by the first processor via a system bus of the multiprocessor system can be avoided.

**6 Claims, 3 Drawing Sheets**



**U.S. Patent**     Mar. 29, 2005     Sheet 1 of 3     US 6,874,049 B1

JA00050



*FIG._1*

Case 1:11-cv-01254-SLR   Document 1-1   Filed 12/16/11   Page 4 of 9 PageID # 16



**FIG._2**

JA00051



**FIG._3**

U.S. Patent    Mar. 29, 2005    Sheet 3 of 3    US 6,874,049 B1

JA00052

US 6,874,049 B1

**1**

## SEMAPHORES WITH INTERRUPT MECHANISM

### CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit of U.S. provisional application No. 60/266,002, filed Feb. 2, 2001.

### TECHNICAL FIELD

The invention generally relates to semaphores, and more particularly to semaphores in a multiprocessor system.

### BACKGROUND ART

FIG. 1 shows a multiprocessor system **100** of the prior art. The multiprocessor system **100** includes a system bus **110**, a plurality of processors **120a**, **120b** coupled to the system bus **110**, a main memory **130** coupled to the system bus **110**, and a shared resource **150** coupled to the system bus **110**. The main memory **130** includes a semaphore **140** which is used to monitor access to the shared resource **150** by the processors **120a**, **120b**. The processors **120a**, **120b** each include a register **125a**, **125b**.

In the prior art, the semaphore **140** is implemented by using a location in the main memory **130** whose content the processors **120a**, **120b** examine to determine whether the shared resource **150** is available for access. Assuming that initially the shared resource **150** is available for access, that is, both the processors **120a**, **120b** are not using the shared resource **150**, then the content of the semaphore **140** would be a "0", indicating that the shared resource **150** is available for access. Assuming further that the processor **120a** needs to access the shared resource **150**, then the processor **120a** would read the content of the semaphore **140** into its register **125a** and then write a "1" into the semaphore **140**. Design of the multiprocessor system **100** guarantees that the reading of the semaphore **140** and writing a "1" into the semaphore **140** by the processor **120a**, or by any other processor, constitutes one bus transaction. That is, the processor **120a** seizes the system bus **110** continuously for both the reading and writing of the semaphore **140**. Without this guarantee by design, a race condition may occur. A race condition occurs when at least two processors have access to a shared resource at the same time.

The processor **120a** examines the copy of the content of the semaphore **140** which it receives in its register **125a** and finds that the copy is a "0", indicating that the shared resource **150** is currently available for access. The processor **120a** accesses the shared resource **150**. Assume that while the processor **120a** is using the shared resource **150**, the processor **120b** needs to access the shared resource **150**. The processor **120b** reads the content of the semaphore **140** into its register **125b** and writes a "1" into the semaphore **140**. Again, the design of the multiprocessor system **100** guarantees that the reading of the semaphore **140** and writing a "1" into the semaphore **140** by the processor **120b** would constitute one bus transaction. The processor **120b** then examines the copy of the content of the semaphore **140** which it receives in its register **125b** and finds that the copy is a "1" indicating that the shared resource **150** is currently not available for access. The processor **120b** would then execute a program loop that includes: (a) reading the content of the semaphore **140** into its register **125a**, (b) writing a "1" into the semaphore **140**, and (c) examining the copy of the content of the semaphore **140** which it receives in its register **125b**. The processor **120b** executes the program loop until

**2**

the copy of the content of the semaphore **140** which the processor **120b** receives in its register **125b** is a "0".

When the processor **120a** finishes using the shared resource **150**, the processor **120a** writes a "0" into the semaphore **140**. Recognizing that the content of the semaphore **140** becomes a "0", the processor **120b** exits the program loop and accesses the shared resource **150**. As a result, no race condition can occur.

While waiting for the shared resource **150** to be released by the processor **120a**, the processor **120b** keeps reading and writing the semaphore **140**. This requires repeated use of the system bus **110**. When the number of processors in the multiprocessor system **100** increases, a higher percentage of system bus cycles will be wasted on the processors reading and writing the semaphore **140** to determine when the shared resource **150** is released.

It is the object of the present invention to provide a method and apparatus in which semaphore implementation does not require repeated reading and writing the semaphore and, therefore, effectively increases the system bus throughput.

### SUMMARY OF THE INVENTION

The above objects have been achieved by a digital system comprising a semaphore cell, an interrupt generation circuit coupled to the semaphore cell, and a processor coupled to the interrupt generation circuit. The semaphore cell is configured to have a first state and a second state, the first state of the semaphore cell indicating that a shared resource is available for access, and the second state of the semaphore cell indicating that the shared resource is unavailable for access. The interrupt generation circuit is configured to generate a semaphore interrupt signal to the processor if the semaphore cell changes from the second state to the first state and if the processor need to access the shared resource.

In another embodiment of the present invention, a method of using semaphores to monitor shared resource accesses is described. The method comprises providing a the semaphore cell configured to have a first state and a second state, the first state of the semaphore cell indicating that the shared resource is available for access, and the second state of the semaphore cell indicating that the shared resource is unavailable for access. The method further comprises providing an interrupt generation circuit coupled to the semaphore cell and a processor coupled to the interrupt generation circuit. The method further comprises generating, with the interrupt generation circuit, a semaphore interrupt signal to the processor if the semaphore cell changes from the second state to the first state and if the processor need to access the shared resource.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a block diagram of a multiprocessor system **100** of prior art.

FIG. 2 shows a circuit diagram of a digital system **200** for implementing semaphores according to one embodiment of the present invention.

FIG. 3 shows a circuit diagram of one embodiment of the hardware semaphore cell **220a** of the hardware semaphore register **220** and the corresponding semaphore interrupt cell **230a** of the semaphore interrupt register **230** of FIG. 2.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

With reference to FIG. 2, the digital system **200** includes, illustratively, a system bus **210**, processors **202a** and **202b**,

US 6,874,049 B1

3

shared resources 206a, 206b, and 206c, a hardware sema-phore register 220, a semaphore interrupt register 230, semaphore interrupt enable registers 240 and 250, six AND gates 260a, 260b, 260c, 270a, 270b, and 270c, and two OR gates 280 and 290. The processors 202a and 202b include registers 204a and 204b, respectively.

The hardware semaphore register 220 includes, illustratively, three hardware semaphore cells 220a, 220b, and 220c. The hardware semaphore cells 220a, 220b, and 220c are used to monitor access to the shared resources 206a, 206b, and 206c, respectively. In general, if a processor 202i (i=a or b) reads a hardware semaphore cell 220j (j=a, b, or c), the processor 202i receives the current content of the hardware semaphore cell 220j and the content of the hard-ware semaphore cell 220j becomes a "1". If a processor 202i writes a hardware semaphore cell 220j, the content of the hardware semaphore cell 220j always becomes a "0". In other words, if a processor 202i reads a hardware semaphore cell 220j which currently holds a "0", the processor 202i receives a "0" and the content of the hardware semaphore cell 220j becomes "1". If a processor 202i reads a hardware semaphore cell 220J which currently holds a "1", the pro-cessor 202i receives a "1" and the content of the hardware semaphore cell 220J remains "1".

The semaphore interrupt register 230 includes, illustratively, three semaphore interrupt cells 230a, 230b, and 230c, coupled to the hardware semaphore cells 220a, 220b, and 220c via connection line 223, 225, and 227, respectively. The semaphore interrupt enable register 240 includes, illustratively, three semaphore interrupt enable cells 240a, 240b, and 240c. The semaphore interrupt enable cells 240a, 240b, and 240c provides inputs to the AND gates 260a, 260b, and 260c via connection lines 243, 245, and 247, respectively. The AND gates 260a, 260b, and 260c also receive inputs from the semaphore interrupt cells 230a, 230b, and 230c via connection lines 233–283, 235–285, and 237–287. The AND gates 260a, 260b, and 260c generates three outputs to the OR gate 280 via connection lines 263, 265, and 267, respectively. The OR gate 280 generates a first semaphore interrupt signal to the processor 202a via con-nection line 281 if at least one of the AND gates 260a, 260b, and 260c generates a "1" to the OR gate 280.

Similarly, the semaphore interrupt enable register 250 includes, illustratively, three semaphore interrupt enable cells 250a, 250b, and 250c. The semaphore interrupt enable cells 250a, 250b, and 250c provides inputs to the AND gates 270a, 270b, and 270c via connection lines 253, 255, and 257, respectively. The AND gates 270a, 270b, and 270c also receive inputs from the semaphore interrupt cells 230a, 230b, and 230c via connection lines 233–293, 235–295, and 237–297. The AND gates 270a, 270b, and 270c generates three outputs to the OR gate 290 via connection lines 273, 275, and 277, respectively. The OR gate 290 generates a second semaphore interrupt signal to the processor 202b via connection line 291 if at least one of the AND gates 270a, 270b, and 270c generates a "1" to the OR gate 290.

For illustration of the operation of the digital system 200, assume that, initially, the hardware semaphore cell 220a, the semaphore interrupt cell 230a, and the semaphore interrupt enable cells 240a and 250a all hold a "0". Assume further that the processor 202a needs to access the shared resource 206a. The processor 202a reads the hardware semaphore cell 220a into its register 204a. Reading the hardware semaphore cell 220a by the processor 202a automatically changes the content of the hardware semaphore cell 220a from "0" to "1". The processor 202a then examines the copy of the hardware semaphore cell 220a which it gets in its

4

register 204a and finds that the copy is a "0" indicating that the shared resource 206a is currently available for access. The processor 202a then accesses the shared resource 206a.

Assume that while the processor 202a is using the shared resource 206a, the processor 202b needs to access the shared resource 206a. The processor 202b reads the hardware semaphore cell 220a into its register 204b. Any reading of the hardware semaphore cell 220a by any processor auto-matically sets the content of the hardware semaphore cell 220a to "1". Because the hardware semaphore cell 220a currently holds a "1", reading the hardware semaphore cell 220a by the processor 202b does not change this content of hardware semaphore cell 220a (still a "1"). The processor 202b then examines the copy of the hardware semaphore cell 220a which it gets in its register 204b and finds that the copy is a "1" indicating that the shared resource 206a is currently unavailable for access. The processor 202b sets the content of the semaphore interrupt enable cell 250a to "1" and then switches to another task. As a result, the AND gate 270a receives as an input a "1" from the semaphore interrupt enable cell 250a via connection line 253.

When the processor 202a no longer needs access to the shared resource 206a, the processor 202a writes a "0" into the hardware semaphore cell 220a. This causes the content of the semaphore interrupt cell 230a to change from "0" to "1". This content of "1" of the semaphore interrupt cell 230a propagates to the AND gate 270a as an input via connection line 233–293. In response, the AND gate 270a generates a "1" to the OR gate 290 which in turn generates a "1" as the second semaphore interrupt signal to the processor 202b causing an interrupt in the processor 202b.

This content of "1" of the semaphore interrupt cell 230a also propagates to the AND gate 260a as an input via connection line 233–283. However, because the semaphore interrupt enable cell 240a holds a "0", the other input of the AND gate 260a is a "0". As a result, the AND gate 260a generates a "0" to the OR gate 280 which in turn generates a "0". Therefore, no interrupt occurs in the processor 202a.

In response to the interrupt, the processor 202b services the interrupt by reading the contents of the semaphore interrupt register 230 and semaphore interrupt enable reg-isters 250 via connection buses 239 and 259, respectively. Because both the semaphore interrupt cell 230a and the semaphore interrupt enable cell 250a hold a "1", processor 202b can determine that the release of the corresponding shared resource 260a caused the interrupt. The processor 202b then writes a "0" to both the semaphore interrupt cell 230a and semaphore interrupt enable cell 250a via connec-tion buses 239 and 259, respectively. The processor 202b then reads the hardware semaphore cell 220a into its register 204b. The reading of the hardware semaphore cell 220a by the processor 202b also changes to content of the hardware semaphore cell 220a from "0" to "1". The processor 202b then examines the copy of the hardware semaphore cell 220a which it gets in its register 204b and finds that the copy is a "0" indicating that the shared resource 206a is currently available for access. The processor 202b then accesses the shared resource 206a. In summary, the processor 202b does not have to repeatedly check the hardware semaphore cell 220a via the system bus 210 to determine if the shared resource 206a is released. As a result, the throughput of the system bus 210 is increased.

In a similar manner, the hardware semaphore cell 220b, the semaphore interrupt cell 230b, and the semaphore inter-rupt enable cells 240b and 250b are used to monitor access to the shared resource 206b by the processors 202a and

5

202b, respectively. Also in a similar manner, the hardware semaphore cell 220c, the semaphore interrupt cell 230c, and the semaphore interrupt enable cells 240c and 250c are used to monitor access to the shared resource 206c by the processors 202a and 202b, respectively.

With reference to FIG. 3, the hardware semaphore cell 220a and the semaphore interrupt cell 230a of FIG. 2 are shown in further detail according to one preferred embodiment. The hardware semaphore cell 220a includes an address decoder 310, a multiplexer 320, a D flip-flop 330, an AND gate 340, and a tri-state buffer 390. The Q output of the D flip-flop 330 holds the current content of the hardware semaphore cell 220a.

Assume the processor 202a (FIG. 2) reads the hardware semaphore cell 220a. The processor 202a reads the hardware semaphore cell 220a by putting a unique address of the hardware semaphore cell 220a on a semaphore address bus 313 and putting a "1" on a control line 315. In response, the address decoder 310 generates a "1" to the multiplexer 320 via a connection line 325 causing the multiplexer 320 to electrically connect the control line 315 to the D input of the D flip-flop 330 via connection line 329. AB a result, the output Q of the D flip-flop 330 will hold a "1" in the next clock cycle. The AND gate 340 receives a "1" from the address decoder 310 via connection line 323. The AND gate 340 also receives a "1" from the control line 315. As a result, the AND gate 340 generates a "1" to the buffer 390 causing the buffer 390 to pass the current content of the D flip-flop 330 at the output Q of the D flip-flop 330 to the processor 202a via connection lines 393, 317, and the system bus 210. In summary, the reading of the hardware semaphore cell 220a by the processor 202a gives the processor 202a the current content of the hardware semaphore cell 220a and puts a "1" into the hardware semaphore cell 220a.

The semaphore interrupt cell 230a includes, illustratively, D flip-flops 350 and 380, an OR gate 360, and an AND gate 370. The Q output of the D flip-flop 350 holds the current content of the semaphore interrupt cell 230a. Assume that the hardware semaphore cell 220a currently holds a "1" indicating the processor 202a is using the shared resource 206a (FIG. 2) and that the semaphore interrupt cell 230a currently holds a "0". In other words, the Q output of the D flip-flop 330 currently holds a "1" and the Q output of the D flip-flop 350 currently holds a "0". The D input and the Q output of the D flip-flop 380 also hold a "1".

When the processor 202a finishes using the shared resource 206a, the processor 202a writes a "0" into the hardware semaphore cell 220a. The processor 202a writes a "0" into the hardware semaphore cell 220a by putting the unique address of the hardware semaphore cell 220a on the semaphore address bus 313 and putting a "0" on the control line 315. The address decoder 310 generates a "1" to the multiplexer 320 causing the multiplexer 320 to pass the value "0" on the control line 315 to the D input of the D flip-flop 330. As a result, the hardware semaphore cell 220a will hold a "0" in the next clock cycle.

When the Q output of the D flip-flop 330 changes from "1" to "0", the output of the AND gate 370 changes from "0" to "1". As a result, the output of the OR gate 360 changes from "0" to "1", which is applied to the D input of the D flip-flop 350. In the next clock cycle, the semaphore interrupt cell 230a will hold a "1", which is applied to the AND gate 270a (FIG. 2) via connection line 233–293. In response, the AND gate 270a generates a "1" to the OR gate 290, assuming that the semaphore interrupt enable cell 250a has been set to "1" by the processor 202b. As a result, the OR

6

gate 290 generates a "1" as the second semaphore interrupt signal to the processor 202b causing an interrupt in the processor 202b. In response to the interrupt, the processor 202b services the interrupt by determining which semaphore caused the interrupt. The processor 202b makes this determination by comparing the contents of the semaphore interrupt register 230 and semaphore interrupt enable register 250. Because both the semaphore interrupt cell 230a and the semaphore interrupt enable cell 250a hold a "1", the processor 202b can determine that the semaphore interrupt cell 230a caused the interrupt. In other words, the processor 202b can determine that the release of the shared resource 206a caused the interrupt. The processor 202b then writes a "0" to both the semaphore interrupt cell 230a and semaphore interrupt enable cell 250a via connection buses 239 and 259, respectively. The processor 202b then reads the hardware semaphore cell 220a into its register 204b. The reading of the hardware semaphore cell 220a by the processor 202b also changes to content of the hardware semaphore cell 220a from "0" to "1". The processor 202b then examines the copy of the hardware semaphore cell 220a which it gets in its register 204b and finds that the copy is a "0" indicating that the shared resource 206a is currently available for access. The processor 202b then accesses the shared resource 206a. In summary, in the present invention, the use of hardware semaphores coupled with interrupt mechanism avoids race conditions and repetitive use of the system bus for checking the contents of the hardware semaphores.

In one embodiment of the present invention, "software semaphores" may be used in place of hardware semaphores 220. The software semaphores may be registers like the hardware semaphores 220 but do not automatically change to a certain state (e.g., become "1") when being read by a processor. If software semaphores are used, the instruction set must include a special test-and-set instruction which reads the software semaphores and sets the software semaphores to "1" in one atomic action.

In another embodiment of the present invention, the digital system 200 may have M processors 202 and N shared resources 206. Accordingly, the digital system 200 has a hardware semaphore register 220 and a semaphore interrupt register 230 each of which has N cells corresponding to the N shared resources 206. The digital system 200 further has M semaphore interrupt enable registers 240, 250 corresponding to the M processors 202. Each semaphore interrupt enable register 240, 250 has N cells corresponding to the N shared resources 206. In the embodiments of the present invention described above, M=2 and N=3.

What is claimed is:

1. In a digital system of the type having at least first and second processors and at least one shared resource accessible to the processors via a system bus, the bus allowing only one bus transaction in any one clock cycle, a hardware semaphore circuit coupled to said system bus and configured to monitor shared resource accesses by said processors, the hardware semaphore circuit comprising:

   a semaphore cell coupled to the first and second processors via the system bus and configured to have a first state and a second state, the first state indicating that the shared resource is available for access and the second state indicating that the shared source is unavailable for access, and configured to be in the second state after being read by any processor and to change back to the first state after the shared resource is again made available for access; and

   an interrupt generation circuit coupled to the first and second processors via the system bus and coupled to an

US 6,874,049 B1

7

output of the semaphore cell, and configured to generate a semaphore interrupt signal to any processor requesting access to the shared resource whenever the semaphore cell changes from the second state back to the first state, the interrupt generation circuit comprising:

(i) a semaphore interrupt cell coupled to the output of the semaphore cell and configured to have a third state and a fourth state, the fourth state indicating that the semaphore cell has changed from the second state back to the first state and thus that the shared resource has just been made available for access;

(ii) first and second semaphore interrupt enable cells respectively coupled to the first and second processors via the system bus, each semaphore interrupt enable cell configured to have a fifth state and a sixth state, the fifth state indicating that the corresponding processor does not need to access the shared resource and the sixth state indicating that the corresponding processor has read the semaphore cell and found that the semaphore is in the second state; and

(iii) first and second logic gate circuits coupled to the semaphore interrupt cell, to respective first and second semaphore interrupt enable cells, and via the system bus to respective first and second processors, each logic gate circuit configured to generate a semaphore interrupt signal to its corresponding processor if the semaphore interrupt cell is in the fourth state and the corresponding semaphore interrupt enable cell is in the sixth state, the semaphore interrupt cell and a corresponding semaphore interrupt enable cell further configured to change back to their respective third and fifth states after the semaphore interrupt signal is sent to its corresponding processor.

2. The hardware semaphore circuit in a digital system as in claim 1, wherein the system has multiple shared resources, and the semaphore cell, the semaphore interrupt cell and the first and second semaphore interrupt enable cells are cells of corresponding registers with one cell of each register dedicated to semaphore operations for a particular shared resource.

3. The hardware semaphore circuit in a digital system as in claim 1, wherein more than two processors can access the at least one shared resource via the system bus, and the interrupt generation circuit comprises additional semaphore interrupt enable cells and logic gate circuits corresponding each additional processor.

4. The hardware semaphore circuit in a digital system as in claim 1, wherein the semaphore cell comprises (i) a semaphore address input bus, a read/write control input line, and a semaphore data output line, all coupled to the system bus, (ii) an address decoder coupled to the semaphore address input bus and configured to generate a signal in response to a unique address associated with the semaphore cell for the shared resource, (iii) a multiplexer having a first input, a second input coupled to the read/write control input line, a control input coupled to receive the signal generated by the address decoder, and an output, the multiplexer configured to connect its second input to its output in response to the signal received from the address decoder but otherwise to connect its first input to its output, (iv) a flip-flop having a data input coupled to the output of the multiplexer and a data output coupled to the semaphore interrupt cell as an output of the semaphore cell and to the first input of the multiplexer, (v) an AND gate having a first input coupled to receive the signal generated by the address decoder, a second input coupled to the read/write control input line, and an output, and (vi) a buffer having a buffer

8

input coupled to the output of the flip-flop, an enable input coupled to the output of the AND gate, and a buffer output coupled via the semaphore data output line to the system bus.

5. They hardware semaphore circuit in a digital system as in claim 1, wherein the semaphore interrupt cell comprises (i) a first flip-flop having a data input coupled to the output of the semaphore cell, and a data output, (ii) an AND gate having a first input coupled to the output of the semaphore cell and a second input coupled to the output of the first flip-flop, one of the data input of the first flip-flop and the first input of the AND gate being an inverted input, the AND gate also having an output, (iii) an OR gate having a first input, a second input coupled to the output of the AND gate, and an output, and (iv) a second flip-flop having a data input coupled to the output of the OR gate and a data output coupled to the first input of the OR gate, the data output of the second flip-flop forming the output of the semaphore interrupt cell.

6. A method of using a hardware semaphore circuit to monitor shared resource accesses over a system bus that allows only one bus transaction in any one clock cycle, there being at least first and second processors and at least one shared resource coupled to said system bus together with said hardware semaphore circuit, the method comprising:

reading a state of a semaphore cell of the hardware semaphore circuit by a first processor and if the state read from the semaphore cell is a first state, indicating that the shared resource is available for access, then accessing the shared resource by the first processor, but if the state read from the semaphore cell is a second state, indicating that the shared resource is unavailable for access, then setting a first semaphore interrupt enable cell to a state indicating that the first processor needs to access the shared resource and the first processor waiting for a semaphore interrupt signal from the hardware semaphore circuit before again reading the state of the semaphore cell, any reading of the state of the semaphore cell by any processor setting the state of the semaphore cell to its second state, the semaphore cell changing back to its first state after the shared resource is again made available for access;

continually monitoring the state of the semaphore cell by a semaphore interrupt cell of the hardware semaphore, the semaphore interrupt cell having third and fourth states with the fourth state indicating that the shared resource has just been made available for access, the semaphore interrupt cell changing to the fourth state whenever the semaphore cell being monitored has just changed from the second state back to the first state;

reading the state of the semaphore cell by a second processor and if the state read from the semaphore cell is a first state then accessing the shared resource by the second processor, but if the state read from the semaphore cell is second state then setting a second semaphore interrupt enable cell to a state indicating that the second processor reads to access the share resource and the second processor waiting for a semaphore interrupt signal from the hardware semaphore circuit before again reading the state of the semaphore cell; and

whenever the semaphore interrupt cell changes to the fourth state and either the first or second semaphore interrupt enable cell is in a state indicating that the respective first or second processor needs to access the shared resource, generating a semaphore interrupt signal for the respective first and second processor and transmitting said interrupt signal thereto over said system bus.

* * * * *

# ADDENDUM E

US006708259B1

## (12) United States Patent
### Wyland

(10) Patent No.: **US 6,708,259 B1**
(45) Date of Patent: **Mar. 16, 2004**

(54) **PROGRAMMABLE WAKE UP OF MEMORY TRANSFER CONTROLLERS IN A MEMORY TRANSFER ENGINE**

(75) Inventor: **David C. Wyland**, Morgan Hill, CA (US)

(73) Assignee: **Cradle Technologies, Inc.**, Mountain View, CA (US)

( * ) Notice:   Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 252 days.

(21) Appl. No.: **10/061,543**

(22) Filed:   **Feb. 1, 2002**

**Related U.S. Application Data**

(60) Provisional application No. 60/266,002, filed on Feb. 2, 2001.

(51) Int. Cl.[7] ............................................. G06F 12/00
(52) U.S. Cl. ...................................................... 711/154
(58) Field of Search ........................ 711/147, 154

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,043,937 A | * 8/1991 | Glaise et al. | 711/147 |
| 5,247,643 A | * 9/1993 | Shottan | 711/143 |
| 5,652,895 A | 7/1997 | Poisner | 395/750 |
| 5,713,029 A | 1/1998 | Kaiser et al. | 395/750 |
| 6,052,756 A | * 4/2000 | Barnaby et al. | 711/105 |

FOREIGN PATENT DOCUMENTS

JP     04038550 A  * 2/1992  ........... G06F/13/16

* cited by examiner

*Primary Examiner*—Kevin Verbrugge
(74) *Attorney, Agent, or Firm*—Thomas Schneck; Nissa Strottman

(57)        **ABSTRACT**

Methods for waking up an idle memory transfer controller (MTC) in response to an event from an external source. The first mechanism, Parameter List Pointer (PLP) FIFO Wake Up, wakes up an MTC after an external agent writes to an MTC's PLP FIFO. This activates the MTC's run bit, making the MTC eligible to execute instructions if chosen to do so by the memory transfer engine arbiter. This mechanism allows the MTC to distinguish between multiple possible originators of multiple possible wake-up events; wake-up events may be queued. Events may be directed to particular MTCs or to the next MTC available to process the event. The second mechanism wakes up an MTC after an external agent writes to an MTC's external wake-up address. This sets the MTC's run bit, making the MTC eligible to execute instructions if chosen to do so by the memory transfer engine arbiter. This approach only recognizes one event and one source. Events may not be queued using this approach.

**30 Claims, 6 Drawing Sheets**





*FIG._1*

U.S. Patent    Mar. 16, 2004    Sheet 1 of 6    US 6,708,259 B1

JA00058

Case 1:11-cv-01254-SLR   Document 1-2   Filed 12/16/11   Page 4 of 12 PageID #: 25

U.S. Patent

Mar. 16, 2004

Sheet 2 of 6

US 6,708,259 B1

JA00059

**MTC Program Addressable Registers**

| Reg | Addr | Name | Type | R/W | Function | Comments |
|-----|------|------|------|-----|----------|----------|
| 0-15 | 0-120 | R0-R15 | | RW | Data Registers 0-15 | |
| 16 | 128 | PLP | Com | RO | Parameter List Pointer FIFO | Read Only: Read pops FIFO |
| 17 | 136 | PLT | Com | RO | PLP FIFO tag bits | Read Only: Address LSBs |
| 18 | 144 | PEEKL | | RO | Read FIFO Peek, low 32 Bits | |
| 19 | 152 | PEEKH | | RO | Read FIFO Peek, high 32 Bits | |
| 20 | 160 | BBC | | RW | BitBLT Byte Counter | 24 bits |
| 21 | 168 | PXL | | RW | BitBLT Pixel Fill register | 32-bit pixel fill |
| 22 | 176 | | | RO | Reserved | |
| 23 | 184 | SINC | | RO | Source Increment | BitBLT Address increments |
| 24 | 192 | DINC | | RO | Destination Increment | BitBLT Address increments |
| 25 | 200 | RSD | Com | RW | RS Result | |
| 26 | 208 | MX | | RW | MTC select for indexed access | MTC H/W regs map to 112-127 |
| 27 | 216 | CA | | R-W | Quad Base Addr & MTC Offset | Write = XW Set Run |
| 28 | 224 | MEM | | RW | Read FIFO, Write FIFO | Each MTC has one of each |
| 29 | 232 | LC | | RW | Loop Counters | 12 Bits |
| 30 | 240 | RA | | RO | JSR Return Addresses | Read Only |
| 31 | 248 | PSW | | RW | MTC PSW | Read while running |

Column labels: 44 (Reg), 46 (Addr), 48 (Name), 50 (Type), 52 (R/W), 54 (Function), 56 (Comments)

Row markers: 58, 60, 68, 66

42

*FIG._2*

U.S. Patent    Mar. 16, 2004    Sheet 3 of 6    US 6,708,259 B1

JA00060

**MTC PSW Bit Assignments**



| Reg | Addr | Name | Type | R/W | Function | Comments |
|-----|------|------|------|-----|----------|----------|
| 0-15 | 0-120 | R0-R15 | | RW | Data Registers 0-15 | |
| 16 | 128 | PLP | Com | RO | Parameter List Pointer FIFO | Read Only: Read pops FIFO |
| 17 | 136 | PLT | Com | RO | PLP FIFO tag bits | Read Only: Address LSBs |
| 18 | 144 | PEEKL | | RO | Read FIFO Peek, low 32 bits | |
| 19 | 152 | PEEKH | | RO | Read FIFO Peek, high 32 bits | |
| 20 | 160 | BBC | | RW | BitBLT Byte Counter | 24 bits |
| 21 | 168 | PXL | | RW | BitBLT Pixel Fill register | 32-bit pixel fill |
| 22 | 176 | | | RO | reserved | |
| 23 | 184 | SINC | | RO | Source Increment | BitBLT Address increments |
| 24 | 192 | DINC | | RO | Destination Increment | BitBLT Address increments |
| 25 | 200 | RSD | Com | RW | RS Result | |
| 26 | 208 | MX | | RW | MTC select for indexed access | MTC H/W regs map to 112-127 |
| 27 | 216 | CA | | R-W | Quad Base Addr & MTC Offset | Write = XW Set Run |
| 28 | 224 | MEM | | RW | Read FIFO, Write FIFO | Each MTC has one of each |
| 29 | 232 | LC | | RW | Loop Counters | 12 bits |
| 30 | 240 | RA | | RO | JSR Return Addresses | Read Only |
| 31 | 248 | PSW | | RW | MTC PSW | Read while running |

*FIG._3*



*156*

*164*
MTC Does
HALT, PAUSE, READ:
Arbiter Switches Context
to Next MTC

*154*
Executing

PAUSE
*166*

Ready  *152*

*180*

Data
Arrived
*168*

Read
*170*

XW=1 and  *162*
Write to R27
OR
Wake=1 and  *176*
Write to PLP
FIFO for this
MTC
OR  *178*
1→PSW Run Bit

Waiting
For
Data

*74*

Halt
*172*

*174*
0--> PSW Run Bit

1→PSW Run Bit
*182*

XW=1 or Wake=1
*160*

*70*  Inactive

Idle  *72*

XW=0 and Wake=0
*158*

**FIG._4**



FIG._5

FIG._6

**MTC Start-up Address Map:
External Wake-up**

| GB Address | Register Address | Function |
|---|---|---|
| 216 | R27 | $MTC_0$ External Wake-up Address |
| 472 | R27 | $MTC_1$ External Wake-up Address |
| 728 | R27 | $MTC_2$ External Wake-up Address |
| 984 | R27 | $MTC_3$ External Wake-up Address |
| 1240 | R27 | $MTC_4$ External Wake-up Address |
| 1496 | R27 | $MTC_5$ External Wake-up Address |

*FIG._7a*

**MTC Start-up Address Map:
PLP FIFO Start-up**

| GB Address | PLP Control | Function |
|---|---|---|
| 1536-1791 | Semaphore | Round-robin |
| 1792 | Hardware | $MTC_0$ Start-up |
| 1824 | Hardware | $MTC_1$ Start-up |
| 1856 | Hardware | $MTC_2$ Start-up |
| 1888 | Hardware | $MTC_3$ Start-up |
| 1920 | Hardware | $MTC_4$ Start-up |
| 1952 | Hardware | $MTC_5$ Start-up |

*FIG._7b*

US 6,708,259 B1

1

# PROGRAMMABLE WAKE UP OF MEMORY TRANSFER CONTROLLERS IN A MEMORY TRANSFER ENGINE

## CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit of U.S. provisional application Ser. No. 60/266,002, filed Feb. 2, 2001.

## FIELD OF THE INVENTION

This invention relates to memory transfer engines in semiconductor chips.

## BACKGROUND OF THE INVENTION

As the demand for faster microprocessors increases, there is a need for decreasing data processing latency. One of the ways this is done is by employing split read transactions, where reading data is split into two different actions—requesting a read and providing the requested data. The split transaction allows the processor to perform other tasks while the requested data is being fetched, thus reducing processing latency.

In a memory transfer engine having a plurality of memory transfer controllers (MTCs) for transferring data to memory, a processor may be shared among the various MTCs. If split read transactions are employed, the processor can request data for at least one MTC and perform at least one other task for another MTC while the requested data is fetched. Such an arrangement increases the data bandwidth of the system.

If the above arrangement is employed, it is necessary to have both a hardware context-switching system for switching the processor to another MTC and a notification system for waking up inactive MTCs in order for the system to operate efficiently. It is an object of this invention to provide a mechanism for waking up an idle MTC in response to notification of an event from an external source.

## SUMMARY OF THE INVENTION

A semiconductor chip's memory transfer engine (MTE) consists of a plurality of memory transfer controllers (MTCs), each MTC having direct access to its associated plurality of dual port data memory (DPDM) registers and hardware registers. Each MTC can also access the DPDM registers and hardware registers associated with the other MTCs in the MTE.

The MTE has one hardware processor which is shared among the MTCs in a round-robin, time-sliced manner. When an executing MTC relinquishes control of the processor, an arbiter chooses the next MTC to control the processor from the MTCs that are ready to execute an instruction.

Two wake-up mechanisms are available to make an idle MTC ready to execute in response to a wake-up event from an external source, thus facilitating event-driven multi-threading of the MTCs in an MTE.

The first mechanism, Parameter List Pointer (PLP) FIFO wakeup, wakes up an MTC after an external agent writes to an MTC's PLP FIFO. This activates the MTC's run bit, placing the MTC in a state where it can execute instructions. This mechanism allows the MTC to distinguish between multiple possible originators of multiple possible wake-up events. Wake-up events may be queued. Events may be directed to particular MTCs or to the next MTC available to process the event.

2

The second mechanism wakes up an MTC after an external agent writes to an MTC's external wake-up address. This activates the MTC's run bit. This approach only recognizes one event and one source. Events may not be queued using this approach.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram showing the memory transfer engine.

FIG. 2 is an example of a register map of a memory transfer controller in the memory transfer engine shown in FIG. 1.

FIG. 3 is a chart showing processor status word bit assignments for a memory transfer controller in the memory transfer engine shown in FIG. 1.

FIG. 4 is a state diagram showing various states of a memory transfer controller in the memory transfer engine shown in FIG. 1.

FIG. 5 is a flow chart showing a first wake-up mechanism for a memory transfer controller in the memory transfer engine shown in FIG. 1.

FIG. 6 is a flow chart showing a second wake-up mechanism for a memory transfer controller in the memory transfer engine shown in FIG. 1.

FIG. 7a is a chart showing memory transfer controller start-up addresses for a wake-up mechanism shown in FIG. 5.

FIG. 7b is a flow chart showing memory transfer controller start-up addresses for a wake-up mechanism shown in FIG. 6.

## BEST MODE FOR CARRYING OUT THE INVENTION

With respect to FIG. 1, in this embodiment the wake-up mechanisms are employed in a memory transfer engine (MTE) 10, which consists of six memory transfer controllers (MTCs) 14 which move blocks of data from a source address to a destination address. (In this embodiment, the chip containing the MTE is a UMS0103, a multiprocessor manufactured by Cradle Technologies, Inc. However, the invention could be used in any system where there are multiple memory transfer controllers.) Each of the MTCs 14 has direct access to its own group of 16 dual port memory data (DPDM) registers 22 (in this embodiment, 96×32 bits) and 16 hardware registers 16. Each MTC 14 can write to the DPDM registers 22 and hardware registers 16 associated with the other five MTCs 14. The MTCs 14 share the MTE's 10 hardware processor in a round-robin, time-sliced manner. No more than one MTC 14 executes an instruction at any one time; however, more than one MTC 14 may be active at any given time (i.e., waiting for data) (see FIG. 4, below). Each MTC 14 performs one task, such as transferring data, then relinquishes control of the processor to another MTC 14. An arbiter 12 chooses the next MTC 14 to execute an instruction. As will be shown below in FIGS. 5 and 6, there are two mechanisms which may be used to make an idle MTC ready to execute in response to a wake-up event from an external source.

Each of the MTCs 14 has its own Read FIFO 32 and Write FIFO 36 which operate independently from the other MTCs 14 Read and Write FIFOS 32, 36. Each MTC 13 also has its own Read Address Register 30 and Write Address Register 38, which are associated with the Read and Write FIFOS 32, 36.

The MTE 10 reads data in a split transaction. When an MTC 14 executes a READ instruction, the instruction writes

3

the memory address into its associated Read Address Register 30. The read data is subsequently put into the MTC's 14 Read FIFO. When an MTC 14 executes a WRITE instruction, the data and address are each written into the Write FIFO 32 and the Write Address Register 38, respectively. The Write FIFO 32 logic writes the data into memory at the next available memory cycle.

The MTE 10 also has a bit block transfer (BitBLT) engine 34 which does byte alignment of data transfers on the fly. It takes an input stream from the Read FIFO 32 and generates the output stream into the Write FIFO 36. The MTC 14 sets up the FIFOS 32, 36 for the transfer and the BitBLT engine 34 moves the data.

The parameter list pointer (PLP) FIFO 28 is the command input FIFO for the MTE 10. Commands are issued to the MTE 10 by writing the address of a parameter block into the PLP FIFO 28. The PLP FIFO 28 occupies a global address range of 512 bytes and is 32 words deep. Writing to any address within its address range writes data to the PLP register (described below in FIG. 2). Interpretation of the PLP FIFO's 28 contents is done by MTE 10 firmware. As discussed below in FIGS. 2 and 6, the PLP FIFO is central to one of the MTC wake-up mechanisms.

Instructions to be executed are fetched from the MTE's 10 instruction memory 18 (in this embodiment, 512×20 bits) and placed in the instruction register 20. The MTE's 10 Arithmetic Logic Unit 24 performs Boolean operations as well as addition, subtraction, and multiplication of integers.

With respect to FIG. 2, the MTC's program-addressable registers include data registers and hardware registers. A possible configuration of these registers is shown in the table 42, including the register number 44, the address 46, the name of the register 48, the type of the register, the read/write capacity of the register 52, the register's function 54, and comments about the register 56. Some registers of particular interest for purposes of this invention are the PLP register 58, the parameter list tag (PLT) register 60, the CA register 68, in this embodiment, the Quad (a cluster of processors and memory) address register, and the Processor Status Word (PSW) register 66, which shows the MTC processor operation.

The PLP FIFO was described above in FIG. 1. Referring again to FIG. 2, when data is written to PLP register 58, a 9-bit address code or tag is also written to an extension of the PLP FIFO, the PLP FIFO tag. The 9-bit address code of the PLP FIFO tag indicates which address in the PLP FIFO's global address range was used. The MTE firmware can use this address code, or tag, by reading the Parameter List Tag (PLT) register 60. The MTE firmware can use this tag to select other MTE functions and other interpretations of the PLP FIFO contents.

CA register 68 serves two purposes. When read, it returns the global address of the MTC. When written it serves as the external wake-up address of the MTC (see FIG. 5, below).

The PSW register 66 shows MTC processor operation. With reference to FIG. 3, the table 76 shows MTC PSW bit assignments, including the bit 78, the name of the bit 80, whether the bits may be modified by an external write to the PSW's GBus address while the MTC is not running 82 or when it is running 84. The table 76 also indicates which bits may be modified by an instruction running on the MTC 86. The function 88 of each bit is also given. For this invention, bits of particular interest are: the MTC run bit 102; the wake-up bit 90; the external wake-up bit 92; the enable bit 96; the waiting-for-data bit 94; and the MTC program counter 104.

4

The run 102 bit helps control the MTC clock. When the run bit 102 is one, the MTC clock runs and the MTC executes instructions. When the run bit 102 is zero, the MTC clock is stopped and the MTC is stalled.

The wake-up bit 90 enables the MTC to automatically wake up when the PLP FIFO is not empty. The PLP FIFO not empty flag may set the run bit 102 in the PSW. If the wake-up bit 90 is set and the MTC Run bit 102 is cleared, the MTC run bit 102 will be set whenever the PLP FIFO empty flag goes inactive (i.e., when it has received one or more parameter list addresses). Clearing the empty flag activates the MTC start-up logic.

The External WakeUp (XW) bit 92 enables the MTC to automatically wake up in response to an external write to register 27 (see FIG. 2, number 68) of the MTC in question. Register 27 is the Quad address register. If the XW bit 92 is set and the run bit 102 in the PSW is cleared, an external write to register 27 will set the run bit 102. The contents of register 27, the Quad address register, are unmodified by the write.

The enable bit 96 enables the MTC to participate in arbitration (the selection of which MTC will next execute an instruction). This bit is set and cleared by enable and pause instructions. The enable bit 96 also controls start up. Writing to the first 256 addresses of the PLP FIFO will start an MTC as long as at least one MTC PSW has its enable bit 96 set. Writing to the upper 256 bytes requires the enable bit 96 in the appropriate MTC PSW be set in order for it to start up as a result of the write.

The waiting-for-data (WFD) bit 94 is set if the MTC is waiting for data after a READ or cyclic redundancy check instruction is executed. When a READ instruction is initiated, the MTC must wait for the data to arrive. The READ instruction sets the WFD bit 94 and causes the arbiter to select the next MTC to execute an instruction. When the data for an MTC arrives in the read FIFO, the WFD bit 94 is cleared, allowing the MTC to be selected by the arbiter, which only selects MTCs in the Ready state.

The MTC program counter 104 holds the address of the next instruction to be executed by its associated MTC. MTE execution logic uses the program counter 104 to access MTE instruction memory and read the next instruction while the current instruction is executed.

As shown in FIG. 4, an MTC can be in one of 5 states: executing 154, waiting for data 74, ready 152, idle 72, and inactive 70. If an MTC is in the executing 154, waiting for data 74, or ready state 152, the run bit is set to "1." If the wake-up bit is set to "1" and the run bit is "0," the MTC is idle 72 (however, as mentioned above, it will become ready if a wake-up event occurs). If the MTC's run bit is "0" and the wake-up bit is also "0," the MTC is inactive 70 and no task is assigned to it.

An executing MTC relinquishes control of the processor when it executes a READ, HALT, or PAUSE instruction 164. The arbiter then places the next ready MTC in an executing state 154.

As noted above, there are two mechanisms, External Wake Up and PLP FIFO Wake Up, which may be used to make an idle MTC ready to execute in response to a wake-up event from an external source. (Another mechanism for making an idle MTC ready 152 is to set the run bit to "1" via an external write. This can be done to make 178 an idle 72 MTC ready 152 or to make an inactive 70 MTC ready 152.) These two mechanisms, described below, facilitate event-driven multithreading of the six MTCs in the MTE.

In External Wake Up, only one event type and source is supported and events cannot be queued. However, in PLP

US 6,708,259 B1

5

FIFO Wake Ups, the value retrieved from the PLP FIFO defines the event type, while the value read from the PLP Tag FIFO defines the event originator. As many as 32 events may be queued in the FIFOS. Typically, only one of the wake-up mechanisms is employed at any given time.

As shown in FIG. 5, External Wake Up may occur when there is an external write to register 27 of $MTC_N$ (block 110). If the XW bit in the PSW is set (block 112), the MTC's logic sets the run bit in the PSW to "1" (block 116). When the run bit is set, the MTC is ready and eligible to be made executing in the next arbitration round. If the MTC is chosen, it begins to execute instructions starting with the program counter value in the PSW (block 118). However, if the XW bit in the PSW is "0," the run bit in the PSW may not be set by an external write to register 27. An MTC does not have to be idle at the time the external write is performed.

With reference to FIG. 6, PLP FIFO Wake Up may occur after writing to an MTC's PLP FIFO address (block 120). (As with External Wake Up, an MTC does not have to be idle when the external write occurs.) If the PLP FIFO address identifies a specific MTC (block 122), and the wake-up bit in the PSW is set (block 124), the start-up logic sets the run bit in the PSW (block 126). The MTC is thus placed in ready state and is eligible to be made executing during the next arbitration round. If the MTC is chosen by the arbiter, it begins to execute instructions starting with the program counter value in the PSW (block 128). If the wake-up bit in the PSW is not set, the run bit in the PSW cannot be set by writing to the PLP tag address (block 130).

If the PLP FIFO address does not identify a specific MTC, but instead is a round-robin address (see below in FIG. 7b) (block 122), the round-robin start-up logic is activated. The round-robin start-up logic determines which MTCs are idle (i.e., have their wake-up bits but not their run bits set) (block 132) and sets the run bit in the next available MTC in a round-robin fashion (block 134). The MTC is now ready and eligible to be made executing during the next arbitration round; if the MTC is chosen, it begins to execute instructions starting with the program counter value in the PSW (block 128).

Referring again to FIG. 4, the diagram 156 summarizes the various states of an MTC and the corresponding status of the wake-up bit, the XW bit, and the run bit in the MTC with regard to the two wake-up mechanisms described above. When an MTC is inactive 70, either the wake-up bit or the XW bit is "0" 158. If an MTC is idle 72, either the wake-up bit or the XW bit is "1" 160 while the run bit is "0" 174. In order for the MTC to become ready 152 via a wake-up mechanism, two things could happen. If the XW bit is "1" and register 27 is written to 162, the run bit is changed to "1" and the MTC becomes ready 152. If the wake-up bit is "1" and the MTC's PLP register is written to 176, the run bit is changed to "1" and the MTC will move from idle 72 to ready state 152.

Once the MTC is ready 152, it is eligible to be made executing during the next arbitration round. If the MTC executes 154 a HALT, PAUSE, or READ instruction, the MTE Arbiter switches to another MTC 164. If the MTC executes a READ instruction 170, the MTC has to wait for data 74. Once the data arrives 168, the MTC returns to the ready state 152. If the MTC executes a PAUSE instruction 166, the MTC goes from the executing state 154 to the ready state 152. When a HALT instruction is executed 172, the run bit is set to "0" and the MTC returns to the idle state 72.

In FIG. 7a, the table 136 indicates the global bus addresses 138 for each MTC's register 27 140. Each of these

6

addresses serves as the external wake-up address 142 for the corresponding MTC.

In FIG. 7b, the table 144 indicates the global bus addresses 146 for each of the MTC's PLP FIFOS (including the round-robin addresses). The PLP control 148 for each of these addresses is also indicated.

What is claimed is:

1. In a semiconductor chip, a method of waking up an idle memory transfer controller in response to an event from an external source, said method comprising:

a) writing to at least one hardware register of a memory transfer engine including a plurality of memory transfer controllers, said writing performed by an external agent; and

b) activating an idle memory transfer controller so that it can execute instructions, said activation enabled by the writing step.

2. The method of claim 1 further including selecting a memory transfer controller to activate.

3. The method of claim 1 wherein the writing step identifies a specific memory transfer controller to be activated.

4. The method of claim 1 wherein the writing step does not specify which memory transfer controller is to be activated.

5. The method of claim 4 wherein the memory transfer controller to be activated is chosen in round-robin fashion.

6. The method of claim 1 wherein the activating step includes setting a run bit of the memory transfer controller.

7. The method of claim 4 further including a selection step, wherein one of the plurality of memory transfer controllers is chosen to execute an instruction.

8. The method of claim 1 wherein the hardware register is an external wake-up register.

9. The method of claim 1 wherein the hardware register is a command input buffer for the memory transfer engine.

10. The method of claim 1 wherein the activating step is performed by memory transfer controller start logic.

11. The method of claim 1 wherein at least one of the plurality of memory transfer controllers is idle when the writing step occurs.

12. The method of claim 1 wherein none of the plurality of memory transfer controllers is idle when the writing step occurs.

13. The method of claim 12 wherein the activating step occurs after a memory transfer controller becomes idle.

14. In a semiconductor chip, a method of causing an idle memory transfer controller to execute instructions in response to an event from an external source, said method comprising:

a) writing to at least one hardware register of a memory transfer engine including a plurality of memory transfer controllers, said writing performed by an external agent;

b) setting a first bit in an idle memory transfer controller, thereby activating said memory transfer controller; and

c) executing instructions.

15. The method of claim 14 wherein the hardware register is a command input buffer of the memory transfer engine.

16. The method of claim 14 wherein the hardware register is an external wake-up register.

17. The method of claim 14 wherein the external agent writes to two hardware registers of the memory transfer engine.

18. The method of claim 15 wherein a value written to the command input buffer defines an event type.

US 6,708,259 B1

7

**19.** The method of claim **15** wherein a value written to a second hardware register defines an event originator.

**20.** The method of claim **15** wherein a plurality of values may be queued in the command input buffer, said values defining a plurality of events.

**21.** The method of claim **14** wherein at least one of the plurality of memory transfer controllers is idle when the writing step occurs.

**22.** The method of claim **14** wherein none of the plurality of memory transfer controllers is idle when the writing step occurs.

**23.** The method of claim **22** wherein the activating step occurs after a memory transfer controller becomes idle.

**24.** In a semiconductor chip, a method of operating a memory transfer engine including a plurality of memory transfer controllers and a shared processor in an event-driven fashion, said method comprising:

a) executing initialization code with the processor;

b) stopping the executing memory transfer controller such that the processor is surrendered by said executing memory transfer controller;

c) writing to a hardware register of a memory transfer engine, said writing performed by an external agent,

8

wherein the value written to the hardware register identifies an event type; and

d) activating an idle memory transfer controller so that it can execute instructions with the processor, said activation enabled by the writing step.

**25.** The method of claim **24** further including a selection step, wherein one of the plurality of memory transfer controllers is chosen to be activated.

**26.** The method of claim **24** wherein the writing step identifies a specific memory transfer controller to be activated.

**27.** The method of claim **24** wherein the writing step does not identify a specific memory transfer controller to be activated.

**28.** The method of claim **24** wherein at least one of the plurality of memory transfer controllers is idle when the writing step occurs.

**29.** The method of claim **24** wherein none of the plurality of memory transfer controllers is idle when the writing step occurs.

**30.** The method of claim **29** wherein the activating step occurs after a memory transfer controller becomes idle.

\* \* \* \* \*

# ADDENDUM F

US006647450B1

(12) **United States Patent**
Kaplinsky

(10) Patent No.: **US 6,647,450 B1**
(45) Date of Patent: **Nov. 11, 2003**

(54) **MULTIPROCESSOR COMPUTER SYSTEMS WITH COMMAND FIFO BUFFER AT EACH TARGET DEVICE**

(75) Inventor: **Cecil H. Kaplinsky**, deceased, late of Palo Alto, CA (US), by Vesselina Kaplinsky, executrix

(73) Assignee: **Cradle Technologies, Inc.**, Mountain View, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 457 days.

(21) Appl. No.: **09/680,652**

(22) Filed: **Oct. 6, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/158,184, filed on Oct. 6, 1999.

(51) Int. Cl.[7] .......................... G06F 13/00; G06F 13/36
(52) U.S. Cl. ..................................... 710/300; 710/310
(58) Field of Search ................................. 710/300, 305, 710/306, 310

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,041,968 A | 8/1991 | Yamaguchi | 364/200 |
| 5,197,130 A | 3/1993 | Chen et al. | 395/325 |
| 5,239,661 A | 8/1993 | Ando et al. | 395/800 |
| 5,371,711 A | 12/1994 | Nakayama | 361/230.03 |
| 5,440,701 A | 8/1995 | Matsuzaki et al. | 395/375 |
| 5,566,313 A | 10/1996 | Yamamura | 395/412 |
| 5,568,624 A | 10/1996 | Sites et al. | 395/375 |
| 5,632,029 A | 5/1997 | Bruce et al. | 395/500 |
| 5,634,003 A | 5/1997 | Saitoh et al. | 395/200.1 |
| 5,634,034 A | 5/1997 | Foster | 395/474 |
| 5,680,568 A | 10/1997 | Sakamura | 395/421.1 |
| 5,680,632 A | 10/1997 | Studor et al. | 395/800 |
| 5,685,004 A | 11/1997 | Bruce et al. | 395/800 |
| 5,732,223 A | 3/1998 | Moore et al. | 395/250 |
| 5,751,699 A | 5/1998 | Radke | 370/258 |
| 5,751,991 A | 5/1998 | Leach et al. | 395/421.04 |
| 5,758,195 A | 5/1998 | Balmer | 395/898 |
| 5,761,516 A | 6/1998 | Rostoker et al. | 395/733 |
| 5,778,197 A | 7/1998 | Dunham | 395/284 |
| 5,778,423 A | 7/1998 | Sites et al. | 711/118 |
| 5,787,081 A | 7/1998 | Bennett et al. | 370/388 |
| 5,949,981 A | 9/1999 | Childers | 395/309 |
| 5,996,036 A | 11/1999 | Kelly | 710/110 |
| 6,035,362 A | 3/2000 | Goodrum et al. | 710/128 |
| 6,055,598 A | 4/2000 | Lange | 710/129 |

*Primary Examiner*—Tim Vo
(74) *Attorney, Agent, or Firm*—Thomas Schneck

(57) **ABSTRACT**

A multiprocessor computer system in which each processor being used as a target device has a FIFO (first in first out) buffer for receiving and storing transfer commands from a split transactional global bus for later execution. The transfer commands are put in the FIFO of the target device in the order of their arrival and are taken out of the FIFO and executed by the target device in the same order. This eliminates the wasting of bus time that occurs when busy signals are sent from target devices to master devices and when transfer commands are resent from master devices to target devices. Therefore, the present invention eliminates the wasting of bus time related to transfer commands being rejected.

**30 Claims, 3 Drawing Sheets**





*FIG._1*

Case 1:11-cv-01254-SLR   Document 1-3   Filed 12/16/11   Page 4 of 8 PageID # 37

U.S. Patent       Nov. 11, 2003       Sheet 2 of 3       US 6,647,450 B1

JA00070



FIG._2



FIG._5



*FIG._3*



*FIG._4*

US 6,647,450 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# MULTIPROCESSOR COMPUTER SYSTEMS WITH COMMAND FIFO BUFFER AT EACH TARGET DEVICE

## CROSS-REFERENCE TO RELATED APPLICATION

This application claims priority from U.S. provisional application No. 60/158,184, filed Oct. 6, 1999.

## TECHNICAL FIELD

The present invention relates to multiprocessor computer systems, and more particularly to multiprocessor computer systems implementing techniques for reducing bus contingency issues.

## BACKGROUND ART

In a computer system, a bus is the means by which the electrical signals are communicated back and forth between a central processor, memory, and other devices such as input and output adapters. In a uniprocessor computer system, the bus may simply be a plurality of electrical conductors linking the various components of the system. However, in multiprocessor and other more sophisticated computer systems, the bus may become more complex and play an active role in directing the various signals between the components of the computer system, usually for the purpose of obtaining greater data throughput or speed of operation.

One of the significant restrictions in the operation of a modern high speed computer is the memory access time of main memory. The memory access time is the time required for the memory to retrieve the information from its internal storage after it has received a read address signal. Since a high percentage of data processing activities in a computer system involves reading information from memory, the cumulative amount of memory access time involved in typical data processing activities can be significant. The cumulative effect of the waiting during access time periods is to reduce the data throughput of the computer system. In a uniprocessor computer system, this is not a problem because there is nearly nothing else which the system could be doing during the access time period. However, in multiprocessor systems, the other processors in the system could use the access time periods to conduct other activities through the bus, and thereby increase the efficiency of the system.

The bus that has the above-mentioned problems is called a single transaction bus. When a master device (e.g. processor) requests data from a target device (e.g. memory) through the bus, the bus is unavailable for use by any other devices until the requested data is returned to the requesting master device. This is called a single transaction bus because the entire transaction between two devices through the bus must complete before another transaction starts through the bus. Therefore, if the target device is slow in retrieving requested data, the bus is blocked and unused for a very long time.

This problem has been recognized and, as a result, split transaction buses have been devised. In a split transaction bus, the master device obtains bus use permit from a bus arbiter and sends a read command (a request for data) through the bus to the target device and then releases the bus for use by other devices. The target device, after receiving the read command, retrieves the requested data from its internal memory and then obtains bus use permit from the bus arbiter. After getting the permit, the target device sends the requested data to the requesting master device. This bus is called a split transaction bus because the transaction between the master and target devices is split in time into two transactions so that during the time in between the bus is free for use by other devices. Write transaction are still single transactions in this split transaction bus. In a write transaction, the master device sends a write command followed by write data through the bus to the target device. When the target device signals the receipt completion, the master device releases the bus.

This split transaction bus still has problems. If the target device receives a read command through the bus from a master device A and then, when it (target device) is busy retrieving the requested data from its internal memory, another transfer command (a read or a write command) comes to it through the bus from a second master device B, the target device must returns a busy signal so that master device B can resend the transfer command later. This causes the following problems. First, it costs bus time to send busy signals from the target device through the bus to master device B. This may occur more than once because at the next attempt by master device B, the target device may still be busy. Second, it also costs bus time to resend the transfer command from master device B through the bus to the target device. These two problems can be more significant when many master devices send transfer commands to the busy target device and all of them have to repeatedly resend their transfer commands. Third, the order of execution of transfer commands is not optimal, i.e. not first come first served.

Therefore, an object of the present invention is to provide a multiprocessor computer system in which there is no waste of bus time for sending busy signals from target devices to master devices.

Another object of the present invention is to provide a multiprocessor computer system in which there is no waste of bus time for resending transfer commands from master devices to target devices.

Yet another object of the present invention is to provide a multiprocessor computer system in which the transfer commands from master devices to a target device are executed by the target device in a first come first serve order.

## DISCLOSURE OF THE INVENTION

The present invention achieves the stated objects by providing a FIFO (first in first out) buffer for each target device in the multiprocessor computer system. Transfer commands from master devices through the bus to a target device will be put in the FIFO of the target device in the order of their arrival. The transfer command will be taken out of the FIFO and be executed by the target device in the same order. Write transactions are still single transactions, i.e. in a write transaction, the write command and write data both are sent from the master device through the bus and put in the FIFO of the target device. The target device will take the write command and write data from the FIFO and execute the write command. In a read transaction, the read command is sent from the master device through the bus to the FIFO of the target device. Later, this read command is taken out from the FIFO and executed by the target device, and requested data is sent from the target device through the bus to the requesting master device. If the FIFO is sufficiently deep, all incoming transfer commands will be put in the FIFO for later execution by the target device. Therefore, there is no waste of bus time related to transfer commands being rejected.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a schematic block diagram of a processing system in accord with the present invention.

FIG. 2 shows a schematic block diagram of one of the four quads used in the processing system of FIG. 1.

FIG. 3, shows a schematic block diagram of the Digital Signal Engine used in FIG. 1.

3

FIG. 4, shows the internal structure of the programmable I/O logic of FIG. 1.

FIG. 5, shows a schematic block diagram illustrating the use of a command FIFO in a target bus device according to the present invention.

## BEST MODE FOR CARRYING OUT THE INVENTION

With reference to FIG. 1, Universal Microsystem 100 of the present invention has, for illustrative purposes, four quads 110, a plurality of programmable Input/Output interfaces 120, Dynamic Random Access Memory (DRAM) controller 130, Clock Debug 140, Nonvolatile Random Access Memory (NVRAM) 150, Dynamic Random Access Memory (DRAM) 160, and Global Bus 170.

Universal Microsystem 100 of the present invention has its function defined by software, its Input/Outputs defined by software, mix and match non-blocking I/P (internet protocol). In Universal Microsystem 100, coarse-grain parallelism is the key; and there is no need for parallelizing compiler. Moreover, memory bandwidth scales with processing power. The processing, software, and I/O are all scalable. Each application in Universal Microsystem 100 runs on its own pool of processors. Each quad 110 has, for illustrative purpose, four Media Signal Processors (MSP) 112 and quad memory 114. Each quad 110 is coupled to Global Bus 170. The internal structure of each quad 110 will be described later. Each Input/Output interface 120 of Universal Microsystem 100 can be programmed to interface with an Intel (Universal Serial Bus), an IEEE 1394 FireWire bus, a PCI bus, a SCSI bus, a MAC interface, I2C bus, or other customized interfaces. Peripherals connected to Input/Output interfaces 120 are independent; and there is not mutual interference among them. DRAM controller 130 is coupled to NVRAM 150, DRAM 160, and Global Bus 170.

With reference to FIG. 2, a more detailed view of a quad 110 includes four Media Signal Processors (MSD) 112, quad memory 114, Global Bus interface 320, Programmable Direct Memory Access (DMA) 340, Utility 260, ECC 360, instruction bus 380, and data bus 400. Each MSD 112 includes, for illustrative purposes, a RISC Processing Engine (PE) 200, two Digital Signal Engines (DSE) 220 used for inner loops, and two MSD memory memories 240. PE 200 is coupled to instruction bus 380 and data bus 400. Each DSE 220 is coupled to data bus 300 and MSD memory 240. Quad memory 114 includes program memory/cache 280 and data memory/cache 300, which are coupled to instruction bus 380 and data bus 400, respectively. Program memory/cache 280 is 64 bits wide and runs at higher than 320 MHz (4xPE) and can be configured as cache and/or scratchpad. The Pes 200 use less than 35% of the memory bandwidth. Memory bandwidth scales with processing power. Global Bus interface 320 couples instruction bus 380 and data bus 400 to Global Bus 170. Programmable DMA 340 is coupled to instruction bus 380, data bus 400, and ECC 360. Utility Unit 260 is coupled to instruction bus 380 and data bus 400 and performs utility functions. Each PE 200 has RISC-like instruction set, 32-bit integer and IEEE floating point units, multiple addressing modes (indexed, increment/decrement, 8, 16, 32, and 64 bit), 32 registers, 16-bit instructions, shared data and program memory.

With reference to FIG. 3, each DSE 220 includes Register Bank 500, integer Arithmetic Logic Unit (ALU) 510, Floating Point Unit (FPU) 520, a plurality of Accumulators 600, Sum of Absolute Differences unit 530, input DMA 540, output DMA 550, input FIFO 560, output FIFO 570, a plurality of index registers 590, and programmable memory 580. Index registers 590 are coupled to Register Bank 500 and hold the addresses of data stored in Register Bank 500.

4

ALU 510, Accumulators 600, SAD 530, DMA 540, and FIFO 570 are all coupled to and receive data input from Register Bank 500. ALU 510, Accumulators 600, SAD 503, and FIFO 560 can use path 610 to load data to Register Bank 500. FIFO 560 can use path 620 to load data from external memories to other components of DSE 220. Program memory 580 stores the instructions, floating point and integer units 520, DMAs 540, 550 to other memories, 96 registers 500, and floating point MAC (Multiply Accumulate) instructions. Each DSE 220 also has 324 MHz clock, 2 and 3 operand instructions, 1 CPI, memory bandwidth provided by local memories, IEEE floating point and integer operands, floating point operations being dispatched once per clock with capability of performing multiple operations some special instructions, field access, SAD (sum of absolute differences).

With reference to FIG. 4, the programmable Input/Output interface 120 includes Input/Output processors (IOP) 710, Complex Programmable Logic Device (CPLD) 720, FIFOs 730 and 740, Pattern Recognizer 750, Bus Interface Unit (BIU) 760, and Input/Output Bus 700. Each Programmable Input/Output interfaces 120 has an independent peripheral (there is no mutual interference among peripherals), clock rate up to 125 MHz, total data rate greater than 1 Gbyte/sec, 2.5 Gips of processing power. CPLD 720 is coupled to I/O Bus 700 and generates control signals. FIFOs 730 and 740 buffer data. Input/Output processors (IOP) 710 are coupled to I/O Bus 700 and perform additional processing and set-up. Pattern Recognizer 750 is coupled to I/O Bus 700, FIFOs 730, 740, and CPLD 720. Pattern Recognizer 750 is controlled by CPLD 720. BIU 760 couples I/O Bus 700 and Global Bus 170.

With reference to FIG. 5, function of command FIFO 705 can be described in an illustrating case as follow. Master device 710 gets a bus use permit from bus arbiter 730 and sends a first read command through Global Bus 170 to target device 700. The first read command is put in command FIFO 705 to be executed by target device 700. Target device 700 sends back to master device 710 an acknowledgment of command receipt. Upon receiving this acknowledgment, master device 710 releases Global Bus 170 for use by other bus devices. Right after that, assuming, another master device 720 gets a bus use permit from bus arbiter 730 and sends a second transfer command (read and write commands) through Global Bus 170 to target device 700. The second transfer command is put in command FIFO 705 to be executed by target device 700 after the execution of the first read command. Target device 700 sends back to master device 700 an acknowledgment of command receipt. Upon receiving this acknowledgment, master device 720 releases Global Bus 170 for use by other bus devices. When target device 700 retrieves requested data from its internal memory in response to the first read command, it gets a bus use permit from bus arbiter 730 and sends the requested data through Global Bus 170 to master device 710. After that, target device 700 executes the second transfer command in a similar manner.

Each master device in the system can have only one outstanding transaction, meaning when a master device sends a transfer command and gets an acknowledgment, it cannot send another transfer command until it receives the acknowledgment that the transaction is complete. Therefore, if command FIFO 705 is sufficiently deep to accommodate all possible transfer commands from all master devices in the system, there will be no command rejection. If for some reason, command FIFO 705 is full, the next incoming transfer command will be rejected and a busy signal is sent to master device that sent the command so that it can resend the command at a later time.

Write transactions are still single transactions, i.e. in a write transaction, the write command and write data both are

5

6

sent from the master device through global bus **170** and put in the FIFO **705**. Target device **700** will take the write command and write data from the FIFO **705**, execute the write command, and send an acknowledgment that write transaction is complete. Upon receipt of this acknowledgment, the master device can send another transfer command to target device **700**.

Without any command rejection, there is no waste of bus time related to sending busy signals, repeated resending of transfer commands. In addition, commands in command FIFO will be executed in first come first served order.

What is claimed is:

1. A multiprocessor computer system comprising:

a) a split transaction global bus;

b) at least one target device connected to the split transaction global bus, the at least one target device having a command FIFO buffer for storing a command issued by the split transaction global bus to the target device such that the at least one target device may accept the issued command both while it is executing a previously-issued command and while it is not executing any command; and

c) a plurality of master devices connected to the split transaction global bus and having means for releasing the split transaction global bus for use by another device connected to the split transaction global bus after receiving an acknowledgment of command receipt from the at least one target device.

2. The multiprocessor computer system of claim 1 further comprising the at least one target device having means for issuing an acknowledgment of command receipt to the master device issuing a command.

3. The multiprocessor computer system of claim 1 further comprising a global interface unit intermediating between the split transaction global bus and any device communicating with the split transaction global bus.

4. The multiprocessor computer system of claim 1 wherein a first master device using the split transaction global bus does not block a second master device using the split transaction global bus.

5. The multiprocessor computer system of claim 1 wherein each master device can only have one outstanding transaction.

6. The multiprocessor computer system of claim 1 wherein each command stored in the command FIFO buffers is executed in a first come first served order.

7. The multiprocessor computer system of claim 1 further comprising a bus arbiter connected to the global bus, the bus arbiter determining which of the devices connected to the split transaction global bus may access the split transaction global bus.

8. The multiprocessor computer system of claim 1 wherein the master device includes a plurality of media signal processors.

9. The multiprocessor computer system of claim 1 wherein the master device includes a memory.

10. The multiprocessor computer system of claim 1 wherein the master device includes a global bus interface.

11. The multiprocessor computer system of claim 1 wherein each digital signal engine is connected to a data bus.

12. The multiprocessor computer system of claim 1 wherein the global bus interface couples an instruction bus and a data bus.

13. The multiprocessor computer system of claim 1 wherein the master device is an input/output interface.

14. The multiprocessor computer system of claim 1 wherein the target device is a DRAM controller.

15. The multiprocessor computer system of claim 1 further comprising the target device having means for sending an acknowledgment of a completed write transaction to the requesting master device.

16. The multiprocessor system of claim 1 wherein each command FIFO buffer is of a size large enough to accommodate all possible transfer commands from all master devices in the system.

17. The multiprocessor computer system of claim 2 further comprising the at least one target device having means for sending requested data to the master device issuing a command.

18. The multiprocessor computer system of claim 8 wherein each of the plurality of media signal processors includes a processing engine.

19. The multiprocessor computer system of claim 8 wherein each of the plurality of media signal processors includes at least one digital signal engine.

20. The multiprocessor computer system of claim 8 wherein each of the plurality of media signal processor includes at least one media signal processor memory.

21. The multiprocessor computer system of claim 18 wherein each processing engine is connected to an instruction bus and a data bus.

22. A method of preventing a bus in a multiprocessor computer system from being blocked comprising:

a) sending a command from a master device to a split transaction global bus;

b) placing the command in a command FIFO of a target device;

c) sending the master device an acknowledgement of command receipt;

d) releasing the split transaction global bus for use by other bus devices, where such use includes another master device issuing a command accepted by the target device while the target device is executing a previously-issued transaction; and

e) repeating steps a)–d) as necessary.

23. The method of claim 22 further comprising obtaining a bus use permit from a bus arbiter to send a command to the split transaction global bus.

24. The method of claim 22 wherein the command is a read command.

25. The method of claim 22 wherein the command is a write command.

26. The method of claim 22 further comprising executing commands stored in a command FIFO on a first come first served basis.

27. The method of claim 24 further comprising retrieving requested data.

28. The method of claim 25 further comprising executing the write command.

29. The method of claim 27 further comprising sending the requested data to the master device through the split transaction global bus.

30. The method of claim 28 further comprising sending an acknowledgment of completion of the write command.

* * * * *

Form 30

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on
by:

December 19, 2014

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

| Charles W. Saber | /s/ Charles W. Saber |
|---|---|
| Name of Counsel | Signature of Counsel |

Law Firm     Dickstein Shapiro LLP

Address     1825 Eye Street NW

City, State, ZIP     Washington, DC 20006

Telephone Number     (202) 420-2200

FAX Number     (202) 420-2201

E-mail Address     saberc@dicksteinshapiro.co

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

## <u>CERTIFICATE OF COMPLIANCE</u>

This Brief for Plaintiff-Appellant is submitted in accordance with Rule

32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure.  The Brief contains

13,352 words, as determined by Microsoft Word.


Dated:  December 19, 2014          By:  /s/ Charles W. Saber

Charles W. Saber
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006-5403
Tel.: (202) 420-2200
Fax: (202) 420-2201
SaberC@dicksteinshapiro.com

Counsel for Defendant-Appellant