2014–1193

# United States Court of Appeals for the Federal Circuit

---

## CRADLE IP, LLC,

*Plaintiff-Appellant,*

v.

## TEXAS INSTRUMENTS INCORPORATED,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
District of Delaware in Case No. 11-cv-01254, Hon. Sue L. Robinson

---

## CORRECTED BRIEF OF DEFENDANT-APPELLEE

---

Robert T. Haslam
Anupam Sharma
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
Telephone: (650) 632-4700

*Counsel for Defendant-Appellee
Texas Instruments Incorporated*

# CERTIFICATE OF INTEREST

Counsel for the Defendant-Appellee certifies the following:

1.     The full name of every party or amicus represented by me is:

Texas Instruments Incorporated.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

The party named above in (1) is the real party in interest.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

Covington & Burling LLP: Robert T. Haslam, Anupam Sharma, Thomas E. Garten, Charlin C. Lu, Hyun Byun, Patrick N. Flynn

Richards, Layton & Finger, P.A.:  Jeffrey L. Moyer, Kelly E. Farnan, Jason J. Rawnsley

Texas Instruments:  John Patti, Sarah Vollbrecht

Dated:  December 19, 2014

/s/  *Robert T. Haslam*
Robert T. Haslam
*Counsel for Defendant-Appellee*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ....................................................... i

TABLE OF CONTENTS ........................................................... ii

TABLE OF AUTHORITIES .................................................... vi

TABLE OF ABBREVIATIONS AND CONVENTIONS .......................... x

STATEMENT OF RELATED CASES ..................................... xi

JURISDICTIONAL STATEMENT ......................................... 1

COUNTERSTATEMENT OF THE ISSUES ............................ 1

COUNTERSTATEMENT OF THE CASE.................................. 4

I.   The '049 Patent.......................................................... 4

     A.   Overview of the '049 Patent..................................... 4

     B.   Products Accused of Infringing the '049 Patent ..................... 9

     C.   The District Court Ruled That Cradle Failed to
          Produce Evidence of Infringement ........................ 10

II.  The '259 Patent.......................................................... 12

     A.   Overview of the '259 Patent.................................... 12

     B.   TI Moved for Summary Judgment Because Cradle
          Failed to Show That the Accused Products Have
          Practiced the Claimed Method .............................. 14

          1.   The PRCM-Based Clock Gating Strategy is
               Disabled by Default ..................................... 17

          2.   The Internal Clock Gating Strategy is Disabled
               by Default .................................................. 19

     C.   Cradle Failed to Adduce Evidence That TI's Customers
          Practice the Method Claims ................................. 20

SUMMARY OF THE ARGUMENT ........................................................... 22

ARGUMENT .......................................................................................... 24

I.    Standard of Review ..................................................................... 24

II.   The District Court Correctly Granted Summary Judgment of
      Non-Infringement of the '049 Patent ........................................ 24

      A.    The District Court Correctly Construed the Apparatus
            Claims to Require That the Apparatus be Configured
            to Perform the Recited Function ........................................... 25

      B.    The Asserted Apparatus Claims Specify a Particular
            Configuration That is Lacking in TI's DSP Chips and
            Can be Achieved Only by Adding Software .......................... 27

            1.    TI's DSP chips are not "configured to monitor
                  shared resource accesses" .............................................. 27

            2.    TI's DSP chips are not "configured to change back
                  to . . . third and fifth states" ........................................ 29

            3.    TI's DSP chips are not "configured to generate a
                  semaphore interrupt signal to any processor" ............. 29

      C.    Cradle Failed to Provide Evidence That TI's DSP Chips
            Have Been Placed in the Infringing Configuration, or
            That the Accused Feature has Been Used ............................ 30

            1.    The demonstration to Motorola is not evidence of
                  infringement because it did not employ the
                  "entire patented invention" and did not practice
                  the asserted claims ........................................................ 31

            2.    Cradle's circumstantial evidence fails to show
                  that infringement necessarily occurred ...................... 33

                  a)    Use of the semaphore peripheral is optional, and
                        the semaphore peripheral includes several non-
                        infringing modes ..................................................... 34

D.    Cradle Does Not Offer any Compelling Reason to Disturb the District Court's Ruling ....................................... 35

III.   The District Court Correctly Granted Summary Judgment of Non-Infringement of the '259 Patent ............................................ 37

A.    Cradle Failed to Show That the EMIF and DMM Modules Will Automatically Practice the Accused Feature ................................................................................. 38

1.    EMIF ................................................................. 38

2.    DMM .................................................................. 42

B.    Cradle Failed to Show That Anyone has Altered the Default Settings of the Accused Products to Practice the Claimed Method ................................................... 43

1.    GPMC ............................................................... 44

2.    "Smart Idle" Feature (Feature of PRCM-Based Clock Gating Strategy) .................................... 45

C.    Cradle Fails to Offer a Legal Framework That Warrants Disturbing the District Court's Rulings .............. 48

IV.   The District Court Correctly Construed the "Idle Memory Transfer Controller" Limitation ..................................................... 49

A.    The Run Bit Determines Whether the MTC is Ready to Execute Instructions ............................................... 53

B.    The District Court's Construction Clarified Ambiguity in the Constructions Proposed by Cradle and TI ................ 54

C.    Cradle's Construction is Inconsistent With the Preferred Embodiment ........................................................ 55

V.   TI's OMAP 3 Products Do Not Infringe Under the Internal Clock Gating Strategy ................................................................... 57

VI.   The District Court Correctly Construed the Disputed Terms in the '049 Patent ......................................................................... 58

A.    "A System Bus, the Bus Allowing Only One Bus Transaction in any One Clock Cycle" / "One Bus Transaction" ........................................................................ 58

    1.    The district court correctly held that a "system bus" is shared by all devices that are connected to it and used for transactions among them .................... 60

    2.    By requiring that interrupts be conveyed over the system bus, the district court did not exclude the preferred embodiment ................................. 61

    3.    The district court correctly held that the "system bus" permits transactions from only one device at a time ......................................................................... 63

    4.    The district court correctly held that the "system bus" handles all transactions among the devices connected to the bus ..................................................... 65

B.    "Any Processor Requesting Access to the Shared Resource" ................................................................. 68

C.    "The Shared Resource is Available / Unavailable for Access" and "The Shared Resource Has Just Been Made Available for Access" .................................... 71

D.    "Cell" ............................................................................ 74

CONCLUSION ..................................................................... 76

## TABLE OF AUTHORITIES

Page(s)

<u>CASES</u>

*Abbot Labs. v. Sandoz, Inc.*,
    566 F.3d 1282 (Fed. Cir. 2009) ......................................... 54

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*,
    501 F.3d 1307 (Fed. Cir. 2007) ......................................... 38

*American Piledriving Equip., Inc. v. Geoquip, Inc.*,
    637 F.3d 1324 (Fed. Cir. 2011) ......................................... 54

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) (en banc) ........................... 71

*Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*,
    555 F.3d 984 (Fed. Cir. 2009) ......................................... 27

*Bally Techs., Inc. v. Bus. Intelligence Sys. Solutions, Inc.*,
    Nos. 2:10-CV-440-PMP, 2012 WL 3656495 (D. Nev. Aug. 23, 2012)
    *aff'd*, 540 F. App'x 997 (Fed. Cir. 2013) ............................ 25

*Beedle v. Bennett*,
    122 U.S. 71 (1887) ......................................................... 49

*Bell Comm'ns Research, Inc. v. Vitalink Comm'ns Corp.*,
    55 F.3d 615 (Fed. Cir. 1995) ............................................ 49

*BMC Res., Inc. v. Paymentech, L.P.*,
    498 F.3d 1373 (Fed. Cir. 2007) ......................................... 30

*Brocade Communication Sys., Inc. v. A10 Networks, Inc.*,
    873 F. Supp. 2d 1192 (N.D. Cal. 2012) ............................... 36

*Dealertrack, Inc. v. Huber*,
    674 F.3d 1315 (Fed. Cir. 2012) ......................................... 57

*C.R. Bard, Inc. v. United States Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004) ......................................... 51

*Chimie v. PPG Indus., Inc.,*
    402 F.3d 1371 (Fed. Cir. 2005) .......................................................... 49

*Convolve, Inc. v. Compaq Computer Corp.,*
    527 Fed.Appx. 910 (Fed. Cir. 2013) .................................................... 48

*Digital-Vending Services Int'l, LLC v. The Univ. of Phoenix,*
    672 F.3d 1270 (2012) ........................................................................... 66

*Dynacore Holdings Corp. v. U.S. Philips Corp.,*
    363 F.3d 1263 (Fed. Cir 2004) ............................................................ 48

*E-Pass Techs. v. 3Com Corp.,*
    473 F.3d 1213 (Fed. Cir. 2007) .................................................... 35, 48

*Edwards Lifesciences LLC v. Cook Inc.,*
    582 F.3d 1322 (Fed. Cir. 2009) ..................................................... 54, 55

*Fantasy Sports Props., Inc. v. Sportsline.com, Inc.,*
    287 F.3d 1108 (Fed. Cir. 2002) ........................................................... 25

*Finjan, Inc. v. Secure Computing Corp.,*
    626 F.3d 1197 (2010) ........................................................................... 36

*Fujitsu Ltd. v. Netgear Inc.,*
    620 F.3d 1321 (Fed. Cir. 2010) .................................................... 37, 38

*Glaxo Group Ltd. v. Torpharm, Inc.,*
    153 F.3d 1366 (1998) ........................................................................... 57

*Golden Blount, Inc. v. Robert H. Peterson Co.,*
    438 F.3d 1354 (Fed. Cir. 2006) ........................................................... 34

*Hilgraeve Corp. v. Symantec Corp.,*
    265 F.3d 1336 (Fed. Cir. 2001) ........................................................... 36

*Honeywell Int'l, Inc. v. ITT Indus., Inc.,*
    452 F.3d 1312 (Fed. Cir. 2006) ..................................................... 55, 70

*ICU Med., Inc. v. Alaris Med. Sys. Inc.,*
    558 F.3d 1368 (Fed. Cir. 2009) ........................................................... 56

*Intel Corp. v. United States Int'l Trade Comm'n*,
  946 F.2d 821 (1991)...................................................................... 36

*Joy Techs., Inc. v. Flakt, Inc.*,
  6 F.3d 770 (Fed. Cir. 1993) .................................................... 31

*Kumar v. Ovonic Battery Co., Inc.*,
  351 F.3d 1364 (Fed. Cir. 2003) .......................................... 67

*Lucent Technologies, Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. 2009) ...................................... 34, 35, 49

*Moleculon Research Corp. v. CBS, Inc.*,
  793 F.2d 1261 (Fed. Cir. 1986) .......................................... 49

*Mosel Vitelic Corp. v. Micron Tech., Inc.*,
  No. 98-449-GMS, 2000 WL 1728346 (D. Del. Mar. 14, 2000) ........... 38

*Nazomi Communications., Inc. v. Nokia Corp.*,
  739 F.3d 1339 (Fed. Cir. 2014) ...................................... 26, 31

*North American Container, Inc. v. Plastipak Packaging, Inc.*,
  415 F.3d 1335 (Fed. Cir. 2005) ...................................... 59, 63

*Nystrom v. TREX Co., Inc.*,
  424 F.3d 1136 (Fed. Cir. 2005) .......................................... 56

*Phillips Petroleum Co. v. Huntsman Polymers Corp.*,
  157 F.3d 866 (Fed. Cir. 1998) ............................................. 43

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .......................................... 70

*Retractable Technologies, Inc. v. Becton, Dickinson & Co.*,
  653 F.3d 1296 (Fed. Cir. 2011) .......................................... 74

*Southwest Software v. Harlequin Inc.*,
  226 F.3d 1280 (Fed. Cir. 2000) .......................................... 38

*SRI Intern. Inc. v. Internet Sec. Systems, Inc.*,
  647 F. Supp. 2d 323 (D. Del. 2009)...................................... 33

*Symantec Corp. v. Computer Assocs. Int'l., Inc.*,
  522 F.3d 1279 (Fed. Cir. 2008) ........................................................ 34

*TecSec, Inc. v. Int'l Bus. Machines Corp.*,
  769 F. Supp. 2d 997 (E.D. Va. 2011) ................................................ 35

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
  247 F.3d 1316 (Fed. Cir. 2001) ........................................................ 27

*Toshiba Corp. v. Imation Corp.*,
  681 F.3d 1358 (Fed. Cir. 2012) ........................................................ 48

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
  659 F.3d 1376 (Fed. Cir. 2011) .................................................. 26, 31

*Wireless Agents LLC v. Sony Ericsson Mobile Commc'ns AB*,
  189 Fed. Appx. 965 (Fed. Cir. 2006) ........................................... 50, 69

## TABLE OF ABBREVIATIONS AND CONVENTIONS

Cradle                    Cradle IP, LLC

TI                        Texas Instruments Incorporated

'049 patent               U.S. Patent No. 6,974,049

'259 patent               U.S. Patent No. 6,708,259

Br.                       Brief for Plaintiff-Appellant Cradle IP, LLC

ALU                       Alcatel-Lucent

DSP                       Digital Signal Processor

DMM                       Dynamic Memory Manager

EMIF                      External Memory Interface

GPMC                      General Purpose Memory Controller

MTC                       Memory Transfer Controller

MTE                       Memory Transfer Engine

NSN                       Nokia Siemens Networks

PRCM                      Power, Reset and Clock Management

$x{:}y{-}z$               column $x$ of a patent, lines $y$ through $z$

## STATEMENT OF RELATED CASES

No appeal has previously been taken in this action in any court of appeals.  Defendant-Appellee is not aware of any case pending in this or any other court that will directly affect, or be directly affected by, this Court's decision in the pending appeal.

# JURISDICTIONAL STATEMENT

The jurisdictional statement appearing in Cradle's opening brief is complete and correct.

# COUNTERSTATEMENT OF THE ISSUES

1.    Did the district court correctly determine that apparatus claims 1–3 of the '049 patent, which specify an apparatus "configured to" perform to certain functions, require that the accused devices be configured to perform the recited functions, rather than merely having the capability to be so configured?

2.    Did the district court correctly grant summary judgment of non-infringement of claims 1–3 and method claim 6 of the '049 patent where:

    a)    the accused chips are shipped by TI without being configured as required by the claims;

    b)    there is no evidence that anyone has configured the accused chips to perform the recited functions or has used the accused features;

    c)    affirmative evidence from TI's customers indicates that

they have neither configured the accused chips as required by the claims, nor used the accused features; and

    d)    use of the accused module in the chips is optional, and even if used, a customer may use one of several non-accused features?

3.    Did the district court correctly grant summary judgment of non-infringement of asserted method claims 1, 2, 3, 10 and 11 of the '259 patent based on the PRCM-based clock gating strategy where:

    a)    the PRCM-based strategy must be enabled, and static dependency must be disabled, to invoke the accused feature; and

    b)    there is no admissible evidence that anyone has changed the default settings in the TI chips as sold to enable the PRCM-based strategy and disable the static dependency?

4.    Did the district court correctly grant summary judgment of non-infringement of asserted method claims 1, 2, 3, 10 and 11 of the '259 patent based on the internal clock gating strategy where:

    a)    the internal clock gating strategy (if implemented) is disabled by default in the EMIF and the GPMC modules; and

    b)    there is no admissible evidence that anyone has

changed the default settings in either module to enable the strategy, nor evidence that the strategy was implemented in the DMM module?

5.    Did the district court correctly construe the term "idle memory transfer controller" in the '259 patent, and does the court's construction provide an alternative basis on which to sustain the judgment of non-infringement of the asserted claims?

6.    Did the district court correctly construe the disputed terms in the '049 patent?

## COUNTERSTATEMENT OF THE CASE

### I.   The '049 Patent

Cradle has accused TI's multicore digital signal processor ("DSP") chips of infringing apparatus claims 1–3 and method claim 6.  The district court determined that the apparatus claims specify a particular configuration, and thus held that an accused device must be configured to perform the recited functions in order to infringe.  JA00024–26.  Because Cradle failed to offer any credible evidence that TI's chips have been placed in the claimed configuration, or that anyone has invoked the accused features, the district court granted TI's motion for summary judgment of non-infringement.  *Id.*  The district court also construed several disputed claim terms and largely adopted TI's proposed constructions.  JA00016–24.  Cradle appeals the district court's summary judgment ruling and challenges the court's claim constructions.

### A.   Overview of the '049 Patent

In a multiprocessor system containing shared resources (*e.g.*, memory), problems arise when two or more processors are permitted to access the same shared resource simultaneously.  To avoid these problems, a "semaphore" is associated with each shared resource.  JA00053

—4—

1:25–45.  The association between the semaphore and shared resource may be hardwired (*i.e.*, implemented in hardware) or programmed through software that is installed on the chip.

A semaphore is a flag that indicates whether an associated shared resource is in use by a processor.  *Id.* 1:20–28.  Before using a shared resource, a processor checks the associated semaphore to determine whether the resource is available.  *Id.* 1:28–62.  If the shared resource is available, the processor changes the state of the semaphore to indicate that the resource is in use, and the processor then accesses the resource.  *Id.*  When the processor finishes using the resource, it changes the state of the semaphore to indicate that the resource is no longer in use.  *Id.*  If another processor wants to access the same shared resource while the semaphore indicates that it is in use, it will refrain from accessing the resource until the semaphore has been released.  *Id.*  In this manner, the semaphore manages access to the shared resource.

Figure 1 depicts a prior art multiprocessor system containing multiple processors, a shared resource, a semaphore, and a system bus that connects all of the components.



**FIG._1**

JA00050; *see also* JA00053 1:14–24. When the shared resource (150) is in use by a first processor (120a), and a second processor (120b) wants to use the same resource, the second processor must repeatedly check the state of the semaphore (140) through the system bus (110), until the semaphore indicates that the resource is available. JA00053 1:50–2:16.

Figure 2 illustrates the alleged invention of the '049 patent. JA00051. It retains the overall structure of the prior art system, but replaces the semaphore in the main memory with a hardware semaphore circuit that includes an interrupt mechanism. The figure below depicts three semaphore cells (220a, 220b, 220c) in the hardware semaphore register (220), and three corresponding shared resources (206a,

206b, 206c). Each semaphore cell indicates whether its corresponding shared resource is in use. JA00053 2:28–33. The association between a semaphore cell and a particular shared resource is hardwired, as depicted by the color coding below.



FIG._2

JA00051. When a processor wants to use a shared resource, it checks the associated semaphore cell. JA00054 4:4–21. If that shared resource is in use, the processor updates the corresponding cell in the "semaphore interrupt enable register" to indicate that it wishes to use the resource when the resource becomes available. *Id.*

When the shared resource becomes available, an interrupt is sent

to all processors that have attempted to use the resource. JA00053 2:33–36. Use of the interrupt mechanism eliminates the need to repeatedly check the status of the semaphore through the system bus. *Id.* 2:10–22; JA00054 4:59–63; JA00055 6:25–28.



FIG._2

JA00051. Annotated Figure 2, above, depicts the chain of events that trigger interrupts to waiting processors 202a and 202b—assuming both desire to use same shared resource 206a—when a third processor (not shown) releases the semaphore 220a. In Figure 2, interrupt signals are conveyed to the processors through dedicated interrupt lines 281 and 291, which are separate from the system bus 210. The claims specify,

however, that interrupt signals are conveyed over the system bus.
JA00055 6:66–67; JA00056 8:62–65; JA00733–737.

## B. Products Accused of Infringing the '049 Patent

Each accused DSP chip has two or more processing cores, numer-ous on-chip peripheral modules, and a "crossbar" network that connects all of the components. JA06272–77; JA06413; JA06430–36; JA06478; JA06486–95; JA06505; JA06513.

One of the on-chip peripherals is a semaphore peripheral module that provides semaphores for the processing cores. JA06278; JA06524; JA06500; JA06519. Use of the semaphore peripheral is optional. To use the semaphore peripheral, a customer must install software on the chip. JA06585 32:10–17; JA06279–84; JA02242; JA02270; JA02273. When appropriately configured with software, a processor can acquire a semaphore by invoking one of the three access modes: (i) direct mode, (ii) indirect mode; or (iii) combined mode. JA06279–86; JA02244; JA02275–79.

Cradle alleges that TI's DSP chips alone, without any installed software, infringe claims 1–3. Cradle also alleges that claim 6 is in-fringed when software executing on the DSP chips acquires a

semaphore using (i) the combined mode, or (ii) the direct mode followed by the indirect mode (collectively, "the accused modes"). TI disputes Cradle's allegation that the hardware in TI's chips, by itself, falls within the scope of the apparatus claims, and that invocation of the accused modes results in the practice of the method claim.

### C.   The District Court Ruled That Cradle Failed to Produce Evidence of Infringement

The accused DSP chips are sold primarily to large wireless infrastructure vendors, the three largest vendors being Alcatel-Lucent, Ericsson, and Nokia Siemens Networks. JA06570 32:7–18. Out of the seven customers identified by TI during discovery, Cradle issued subpoenas to the three vendors mentioned above, seeking documents and testimony regarding the programming or use of the semaphore peripheral in TI's DSP chips. JA06193–200; JA06202–08; JA06210–17.

Cradle was unable to uncover any evidence that the semaphore peripheral is used in any product in the United States. Alcatel-Lucent (ALU) informed Cradle that it "found *no evidence of use of hardware semaphores* in TI's [DSP chips] incorporated in ALU's products." JA06219–23. Similarly, Ericsson provided a declaration stating that it has "investigated the software programming" of the relevant TI DSP

chip and determined that "the hardware semaphore peripheral in the [TI] multicore DSP chip is not used." JA06225–26 ¶¶2, 4. Finally, Cradle issued a subpoena to Nokia Siemens Networks (NSN) and filed a motion to compel NSN to perform a further search for responsive information. JA06165–66. NSN subsequently notified Cradle that it did not locate any responsive information in the United States. JA06606.

Faced with this record, Cradle's only "evidence" of infringement was the testimony of its expert, Dr. Albonesi, who nevertheless opined that "the only rational conclusion is that the use of hardware semaphore peripheral module must be substantial." JA04254 ¶204.[1] But as the district court noted, "Dr. Albonesi did not review any customer software, or inspect or test any product incorporating the '049 accused products to determine whether the semaphore peripheral was used." JA00027. After drawing all inferences in Cradle's favor, the district court correctly concluded that Cradle failed to raise a genuine issue of

---

[1] The record before the district court supported rejection of Dr. Albonesi's opinions. For example, when confronted with ALU's declaration of non-use, Dr. Albonesi insisted that "they may" still use the peripheral because ALU "is a big company and has lots of products." JA06593 57:5–59:18.

material fact as to infringement.  *Id*.

## II.   The '259 Patent

Cradle has accused TI's OMAP 3, OMAP 4, OMAP 5, Centaurus, and Netra chips of infringing method claims 1, 2, 3, 10, and 11.  The accused features in the OMAP 4, OMAP 5, Centaurus, and Netra (collectively, "OMAP 4+ chips") are disabled by default.  Because Cradle could not offer any credible evidence that anyone has altered the default configuration of the OMAP 4+ chips, the district court ruled that Cradle failed to show infringement of the method claims.  JA00029–33.  Cradle stipulated that it could not show infringement by the OMAP 3 chips under the district court's construction of "idle memory transfer controller."  JA00047.  Cradle appeals the district court's summary judgment ruling regarding the OMAP 4+ chips, and challenges the court's construction of the disputed term.

### A.   Overview of the '259 Patent

The '259 patent relates to memory transfer engines (MTEs) in semiconductor chips.  JA00064 1:13–14.  As depicted in Figure 1, an MTE 10 consists of several memory transfer controllers (MTCs) 14, which move data from a source address to a destination address.

JA00058; JA00064 2:38–39.  The MTE also contains hardware registers 16, an arbiter 12, and a hardware processor that is shared among the MTCs in a round-robin, time-sliced manner.  JA00064 1:49–54.



FIG._1

Each MTC can be in one of the following five states:  executing, waiting for data, ready, idle, or inactive.  JA00065 4:44–46; JA00061 Fig. 4.  When an MTC is not available to assist an "external agent" (*e.g.*, a processor) it is placed in the "inactive" state.  JA00065 4:50–52.  When an MTC is available but has not been activated by an "external agent," it is in the "idle" state.  When an "external agent" needs to move data, it wakes up (*i.e.*, activates) an "idle" MTC.  JA00065 4:57–60.  That MTC

—13—

is then placed in the "ready" state and is eligible to execute instructions. When the arbiter selects a "ready" MTC, that MTC enters the "executing" state and moves data by executing instructions on the shared processor.   JA00064 1:49–54; JA00065 4:53–56.   When an MTC executes a READ, HALT or PAUSE instruction, it transitions to either the "waiting for data," "idle," or "ready" state.  The arbiter then assigns the shared processor to another "ready" MTC.  JA00064 1:49–54.

Claim 1 recites a method of waking up an idle MTC in two steps: first, an external agent writes to a hardware register; second, the writing step activates an idle MTC so that it can execute instructions. JA00066 6:8–17.

## B.   TI Moved for Summary Judgment Because Cradle Failed to Show That the Accused Products Have Practiced the Claimed Method

TI's chips contain initiator modules, which initiate read and write commands, and target modules, which respond to read and write commands by retrieving or storing data.   The modules communicate through an L3 Interconnect.  JA06313–14 ¶5; JA06341–43; JA06346.



JA06341 (annotated).

Cradle's infringement allegations are directed to two different ways of clock gating in TI's chips—*i.e.*, ways in which clocks can be enabled or disabled. First, the chips include a Power, Reset and Clock Management ("PRCM") module that, if appropriately configured, automatically controls whether clocks to various modules in the chip are enabled or disabled. JA06313–14 ¶5; JA06377. This feature is called the PRCM-based clock gating strategy. Second, some of the target modules, if appropriately configured, are capable of enabling or disabling their *internal clock* branches to internal sub-modules. JA06316 ¶10; JA01917–18 131:5–133:20; JA01919–20 140:25–141:6; JA01926–27

168:16–171:8; JA01928 173:2–16.   This feature is called the internal clock gating strategy.

Cradle alleges that the initiator modules correspond to the "external agent" in claim 1, and the following target modules correspond to the claimed MTCs:

- GPMC (general purpose memory controller);
- DMM (dynamic memory manager); and
- EMIF (external memory interface).

JA01294.  The GPMC and EMIF interface with memory chips that are external to TI's chips.  JA06341.  The DMM is situated between the L3 Interconnect and the EMIF, and assists with memory accesses.  *Id.*

Cradle alleges that the claimed method is practiced when an "idle" target is activated—*i.e.*, the target's clocks are enabled through either the PRCM-based or the internal clock gating strategy—in response to a command from an initiator.  Because both strategies are optional and disabled by default, Cradle had to show that the accused features in TI's chip had been enabled.[2]

_____

[2] Cradle seeks to obscure the distinction between its two infringement theories in the present appeal.  Br. at 50 n.16.  A separate treatment of

### 1.  The PRCM-Based Clock Gating Strategy is Disabled by Default

Because Cradle has conceded that the OMAP 3, Centaurus, and Netra chips do not infringe under PRCM-based strategy, only OMAP 4 and OMAP 5 are at issue under the PRCM-based infringement theory. JA06260.  In the OMAP 4 and OMAP 5 chips, the PRCM-based strategy is disabled by default before the chips are sold.   JA06323 ¶¶27–28; JA06327 ¶¶43–44; JA06536; JA06363; JA06542–43.   In the disabled configuration, the PRCM does not automatically control the clocks to any module. *Id.*

TI's customers may choose to enable the PRCM-based strategy.  If enabled, the PRCM controls the clocks to the accused modules through either the "dynamic dependency" or the "static dependency" features. These features define how the status of the clocks of an initiator affects the clocks of a target for an initiator/target pair.  JA06315 ¶8; JA06377. Cradle's infringement allegation relies solely on the dynamic dependency feature in OMAP 4 and OMAP 5.  This feature is absent in OMAP 3, while the Centaurus and Netra chips lack the PRCM-based strategy.

---

each theory, however, is helpful to place Cradle's infringement allegations and its failure of proof in context.

JA06260; JA06561; JA01892 30:11–31:2.

When an initiator has a *dynamic* dependency relationship with a target, the PRCM monitors commands from the initiator to that target. *Id.* If the initiator sends a command to the target and the target's clocks are disabled, the PRCM automatically enables the clocks. *Id.* In contrast, if an initiator has a *static* dependency relationship with a target, the PRCM ensures that the target's clocks are always enabled whenever the initiator's clocks are enabled. *Id.* Thus, use of the static dependency feature between an initiator/target pair effectively disables the dynamic dependency feature between that pair. When an initiator sends a command to a target, the PRCM cannot enable the target's clocks because they would already have been enabled pursuant to the static dependency relationship. *Id.* In OMAP 4 and OMAP 5, the static dependency between the accused initiator and target modules is enabled by default, meaning that the dynamic dependency is disabled by default. JA06323–26 ¶¶29–42; JA06327–28 ¶¶45–50; JA06379–80; JA06363; JA06336; JA06390; JA06529–30.

To sustain its infringement allegations, Cradle must show that an accused chip has been configured to invoke the dynamic dependency

feature. Br. at 56–57. This feature can be invoked only if the default configuration has been altered to (i) enable the PRCM-based strategy, *and* (ii) disable the static dependency feature. JA00031; Br. at 55–57. The district court correctly concluded that Cradle failed to offer any evidence that the dynamic dependency feature has been enabled in OMAP 4 or OMAP 5. JA00031–33.

## 2. The Internal Clock Gating Strategy is Disabled by Default

The OMAP 4+ chips—particularly, the GPMC, DMM, and EMIF modules—are at issue under the internal clock gating infringement theory. The clock signals into a target are further split into branches that supply clocks to various internal sub-modules. JA06316 ¶10; JA01917–18 131:5–133:20; JA01919–20 140:25–141:6; JA01926–27 168:16–171:8; JA01928 173:2–16. Under this strategy, some targets can be configured to disable some of their internal clock branches when faced with a long period of inactivity. *Id.* This strategy, if implemented in a module, can be enabled or disabled. It is disabled by default in both the GPMC and the EMIF modules. JA06330 ¶¶56–58; JA06350–51; JA06331 ¶¶63–69; JA01953 270:19–271:14; JA06561; JA01892 30:11–31:2. And, Cradle has failed to offer any evidence that this strategy has been implemented

in the DMM.  JA06330 ¶¶59–62; JA06547; JA01951 261:14–18.

To sustain its infringement allegations, Cradle must show that an accused chip has been configured to enable the internal clock gating strategy for the GPMC and EMIF, or that this strategy has been implemented in the DMM module.  The district court concluded that Cradle failed to offer such evidence.  JA00031–33.

### C.    Cradle Failed to Adduce Evidence That TI's Customers Practice the Method Claims

Cradle issued subpoenas to TI's customers, including Motorola Mobility and Motorola Solutions, seeking information relating to "the programming or use of the PRCM module to wake up" target modules. JA06227–35; JA06236–44.

Cradle relies only on three pages of source code from Motorola Mobility that allegedly enable the PRCM-based strategy.  JA02906; JA02921; JA02931.  There is no evidence, however, that this source code was used in any product that was sold in the United States. JA06595 230:17–231:20.  Even Cradle's expert admitted that he could only guess or speculate how the source code worked.  JA06594–95 228:2–230:16; JA06598–99; JA06600; JA06323 ¶28.

Cradle also relies on a declaration from Motorola Solutions re-

garding TI's OMAP 3 chips. JA02680–83. The district court struck the declaration from evidence, noting that "there is no averment (despite clear opportunity to offer one) that such capability was ever utilized by Motorola Solutions, Inc." JA00026 n.10. Cradle did not appeal this ruling. Moreover, the declaration did not establish that Motorola Solutions has altered the default configuration of any accused TI chip sold in the United States. JA02680–83.

Lacking any evidence of actual use, Cradle relies solely on Dr. Albonesi's subjective belief that TI's customers have altered the default configuration:

> It is my opinion that large numbers of users of the OMAP 4 and OMAP 5 chips **will disable the default** static dependencies to reduce power consumption via the dynamic dependency mechanism.

JA05926 (emphasis added). When opining regarding the same chips, Dr. Albonesi asserted that "[i]n the semiconductor industry, most users typically **keep the default** setting." JA04273 (emphasis added).

The district court observed that Dr. Albonesi's declaration "primarily cites to itself as authority" (JA00014), and noted that "[i]ssues of fact are raised by conflicting evidence, not by attorney argument or con-

clusory expert opinions" (JA00012). After drawing all inferences in favor of Cradle, the district court concluded that Cradle did not provide evidence of an infringing use and granted TI's summary judgment motion. JA00032–33.

## SUMMARY OF THE ARGUMENT

**'049 Patent**: Under the precedent of this Court, "configured to" elements in an apparatus claim require a device that is programmed to perform the function, not a device that might be later modified to perform that function. Thus, the district court determined that an accused device must be *configured to* perform the claimed functions to infringe. Cradle, on the order hand, argued that TI's chips infringe because they are "capable of performing the functions recited in the apparatus claim." JA00025. The court did not, as Cradle incorrectly argues, convert the apparatus claims into method claims. Because Cradle failed to show that anyone has configured a TI chip with the requisite software to perform the recited functions, the court granted summary judgment as to all claims.

Although not necessary to sustain the district court's judgment, the claim constructions adopted by the district court also are correct.

To overcome a rejection during prosecution, Cradle narrowed its claims by adding additional limitations "to particularly point out the distinguishing features of the invention." JA00271–90. The adopted constructions appropriately reflect those concessions. The remainder of the constructions capture the meaning that Cradle consistently ascribed to the terms in the specification.

**'259 Patent**: The accused features in TI's chips can be enabled or disabled, and they are disabled by default. Cradle failed to show that anyone has enabled the accused features. The district court ruled that Cradle was only able to show that TI's chips are "at best, capable of infringement," and therefore appropriately granted summary judgment of non-infringement.

The sole claim construction dispute centers around the meaning of the term *idle* in the claim term "idle memory transfer controller." Because the term *idle* lacks a plain and ordinary meaning, the district court correctly construed the term based on the description of the term in the specification, and incorporated features that Cradle admitted were "of particular interest" to the invention.

# ARGUMENT

## I.     Standard of Review

The standard of review in Cradle's opening brief is complete and correct.

## II.     The District Court Correctly Granted Summary Judgment of Non-Infringement of the '049 Patent

The district court determined that apparatus claims 1–3 require an apparatus that is *configured to* perform certain functions recited in the claims, and not an apparatus that is merely *capable of* performing those functions.  JA00025.  TI's DSP chips can achieve the claimed configuration (under Cradle's theory) only if configuring software is installed on those chips.  Cradle failed to show that anyone has installed that software on TI's chips, or that anyone has invoked the accused modes.  Consequently, the district court correctly ruled that Cradle failed to raise a genuine issue of material fact as to the infringement of the apparatus and the method claims.  JA00026–27.

Cradle incorrectly argues that the district court converted the apparatus claims into method claims by requiring that software be installed to achieve the infringing configuration.  The court did not rule that performance is needed to infringe the apparatus claims.  It simply

construed the apparatus claims to require a particular *configuration*, rather than the *capability* of achieving that configuration.

## A. The District Court Correctly Construed the Apparatus Claims to Require That the Apparatus be Configured to Perform the Recited Function

"[I]n every infringement analysis, the language of the claims, as well as the nature of the accused product, dictates whether an infringement has occurred." *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002). The asserted apparatus claims of the '049 patent recite a device that is *configured to* perform the recited functions.

Claims that recite "configured to" require a particular configuration for an accused device to infringe. *Bally Techs., Inc. v. Bus. Intelligence Sys. Solutions, Inc.*, 2:10-CV-440-PMP, 2012 WL 3656495, at *10–11 (D. Nev. Aug. 23, 2012) *aff'd*, 540 F. App'x 997 (Fed. Cir. 2013) (when a claim is drawn "to a particular configuration," as opposed to capability, that a device is "reasonably capable of being put into the claimed configuration is insufficient for finding of infringement").

Moreover, when a claim recites an apparatus configured to perform particular functions, the accused device must be "structured to

perform that stated function as sold." *Nazomi Communications, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014); *see also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1380 (Fed. Cir. 2011) (infringement does not occur in a "situation in which an apparatus does not perform the function stated in the claim unless the apparatus is specifically so programmed or configured").

A number of recent district court cases are in accord. In *Radware Ltd. v. A10 Networks, Inc.*, the court construed "configured to" as "programmed to perform a specific function." Nos. C-13-2021 RMW, C-13-0204-RMW, 2014 WL 1572644, *13 (N.D. Cal. 2014) ("merely being 'capable of' performing a function is not enough, but if a device comes programmed with specific claimed functions it falls within the claims"). Similarly, in *SIPCO, LLC v. Abb, Inc.*, the court construed "configured to" as "actually programmed or equipped with hardware or software." No. 6:11-CV-0048 LED-JDL, 2012 WL 3112302, *7, 11 (E.D. Tex. 2012).

Cradle argued below that TI's chips infringe the apparatus claims "because the accused products include a hardware circuit, [so] they are capable of performing the functions recited in the apparatus claim." JA00025. This Court has distinguished apparatus claims "drawn to ca-

pability" from those that "specif[y] a particular configuration." *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 994 (Fed. Cir. 2009); *see also Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001) ("that a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement."). Because the claims are not drawn to capability, the law does not support Cradle's view.

## B.   The Asserted Apparatus Claims Specify a Particular Configuration That is Lacking in TI's DSP Chips and Can be Achieved Only by Adding Software

In at least three places, apparatus claim 1 specifies a particular configuration that is absent in the accused DSP chips. These chips can be in the claimed configuration, as construed by the court, only if one adds certain software.

### 1.   TI's DSP chips are not "configured to monitor shared resource accesses"

Claim 1 recites a hardware semaphore circuit that is "***configured to*** monitor shared resource accesses" by processors, JA00055 6:54–65, and a semaphore cell that is configured to indicate whether a *particular* shared resource is available for access:

> a semaphore cell . . . ***configured to*** have a first
> state and a second state, the first state indicating

> that ***the*** shared resource is available for access
> and the second state indicating that ***the*** shared
> resource is unavailable for access, and configured
> to . . . change back to the first state after ***the***
> shared resource is again made available for ac-
> cess;

*Id.* 6:57–65 (emphases added).[3]  The claimed semaphore circuit is hardwired to ensure a one-to-one mapping of the semaphore cell to the particular shared resource.  In contrast, TI's DSP chips, as shipped, do not have a one-to-one correspondence between the semaphores and shared resources.  JA06283 ¶21; JA06308 ¶85; JA06587 37:15–38:6.

Software is required to create such an association in the accused chips:

> Semaphore resources are not directly connected
> within the module. Through software program-
> ming hardware resources can be allocated to any
> of the semaphore resources.

JA02242; *see also* JA02273.  Without the software, TI's chips are nei-ther configured to monitor shared resources, nor configured to indicate whether a particular shared resource is available for access.

---

[3] Cradle's argument that the claims "make no reference to a 'particular' shared resource" is incorrect.  Br. at 27 n.9.  Claim 1 specifies that the semaphore cell is configured to indicate whether "*the* shared resource" is available for access.  JA00055 6:59–60.  Furthermore, claim 2 speci-fies that certain components must be "dedicated to . . . a particular shared resource."  JA00056 7:39–40.

### 2.    TI's DSP chips are not "configured to change back to . . . third and fifth states"

Claim 1 requires that the "semaphore interrupt cell" and the "semaphore interrupt enable cell" of the hardware circuit be "***configured to*** change back to their respective third and fifth states after the semaphore interrupt signal is sent to its corresponding processor." JA00056 7:28–33 (emphasis added); *see also* JA00055 6:13–16.

TI's DSP chips require software to program the processors to respond to interrupt signals sent from the semaphore peripheral. JA06285 ¶26; JA6309–10 ¶¶87–88; JA06563.  Without the software, the chips are not configured to change the accused cells back to the accused *third* and *fifth* states after the interrupt signal is sent.  JA6309–10 ¶87; JA06588 82:11–17; JA06589 85:12–86:1; JA06356.

### 3.    TI's DSP chips are not "configured to generate a semaphore interrupt signal to any processor"

Claim 1 requires the interrupt generation circuit to be "***configured to*** generate a semaphore interrupt signal to any processor requesting access to the shared resource . . . ."  JA00056 7:1–3 (emphasis added).  In TI's DSP chips, interrupts are sent to processing cores only if a semaphore has been acquired using the indirect mode or the combined mode.  JA06283–86 ¶¶22–27.

The processing cores are incapable of invoking any of the access modes unless instructed by software to do so. Cradle admits that "the addition of the appropriate software is what permits the chip to actually operate in these modes." Br. at 24 n.8. Without that software, the chips are not configured to generate the interrupt signal. JA06279–80 ¶16; JA06283–86 ¶¶21–27; JA06583 13:1–16.

## C. Cradle Failed to Provide Evidence That TI's DSP Chips Have Been Placed in the Infringing Configuration, or That the Accused Feature has Been Used

Cradle bears the burden to show that TI has made or sold "the patented invention, meaning the entire patented invention." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1380 (Fed. Cir. 2007).

In the case of apparatus claims 1–3, Cradle thus had to put forward evidence that someone has installed software on the accused chips to achieve the claimed configuration. TI does not install any software on the accused DSP chips, nor does it provide any software to its customers that configures the semaphore peripheral and then invokes the accused modes. Without the requisite software, TI's chips remain, at best, capable of infringement under Cradle's theory. Infringement requires an accused device that is configured to perform the function as

—30—

provided, "not that it might later be modified to perform that function." *Typhoon Touch*, 659 F.3d at 1380. If a chip cannot perform the recited functions in the absence of enabling software, then the chip is not configured to infringe. *Nazomi*, 739 F.3d at 1346. Thus, TI's chips cannot infringe the apparatus claims because they are not "structured to perform that stated function as sold." *Id*.

Regarding method claim 6, Cradle had to put forth additional evidence that someone has performed the claimed method by, *inter alia*, acquiring a semaphore in one of the accused modes and accessing a shared resource. *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993). Because there is no evidence that anyone has assembled the "entire patented invention" or used the accused modes, the district court correctly granted summary judgment of non-infringement.

### 1.    The demonstration to Motorola is not evidence of infringement because it did not employ the "entire patented invention" and did not practice the asserted claims

Despite extensive discovery below, Cradle points to only one piece of evidence of alleged use, even though its expert opined that "the use of hardware semaphore peripheral module must be substantial." JA04254 ¶204. Cradle points to a PowerPoint presentation that a TI

employee, Mr. Randy Preskitt, presented to Motorola at a customer workshop in 2008. Br. at 30; JA02776–80. It was a day-long workshop covering various aspects of TI's DSP chips, and one of the sessions pertained to the semaphore peripheral. JA06612 37:5–38:19. Mr. Preskitt displayed excerpts of source code that repeatedly acquired and released semaphores in various modes to test their performance. JA02777–79. Notably, Cradle makes no attempt to map the claim limitations to the steps that the attendees allegedly undertook at the workshop. Yet, Cradle insists that the workshop "included instruction on, and actual use of, the semaphore peripheral in the infringing mode." Br. at 30. In reality, the evidence indicates that the demonstration did not cover each and every limitation of the asserted claims.

*First*, Cradle cannot identify any evidence that the attendees configured the chip to "monitor shared resource accesses" and mapped the semaphores to particular shared resources, as required by apparatus claims 1–3. JA02795 39:13–40:19.

*Second*, Cradle cannot identify any evidence that the attendees— **after** appropriately configuring the chips in the manner described above—performed the step of "accessing the shared resource," as re-

quired by method claim 6. Indeed, there is no evidence that the example code provided to workshop attendees included instructions to configure the semaphore peripheral to access a shared resource.

Accordingly, Cradle failed to show that any of the workshop attendees practiced each and every step of method claim 6.

### 2. Cradle's circumstantial evidence fails to show that infringement necessarily occurred

Cradle contends that because TI allegedly "recommends" use of the semaphore peripheral in the accused "combined mode," the Court should infer that some customer in the United States has followed TI's "recommendation." Br. at 30. While circumstantial evidence may be used to demonstrate direct infringement in "compelling circumstances," "the evidence must still indicate that infringement actually occurred." *SRI Intern. Inc. v. Internet Sec. Systems, Inc.*, 647 F. Supp. 2d 323, 336–37 (D. Del. 2009). Here, Cradle's circumstantial evidence is far from compelling because it is undisputed that use of the semaphore peripheral is optional, and that it may be used in several non-infringing modes. Moreover, there is affirmative evidence of non-use of the accused modes.

> **a)** **Use of the semaphore peripheral is optional, and the semaphore peripheral includes several non-infringing modes**

Cradle does not dispute that TI's customers can successfully use the accused chips without ever using the semaphore peripheral. JA06584 21:5–9; 24:11–15. Likewise, there is no dispute that if a customer does decide to use a semaphore, it has at least three non-infringing options: (i) direct mode only; (ii) indirect mode only; or (iii) software-based semaphores. JA06585 31:6–15; JA06586 36:2–10; JA00055 6:28–37. Circumstantial evidence may be sufficient to establish direct infringement when the accused product has no non-infringing uses, but that is not the case with the accused DSP chips. *See Symantec Corp. v. Computer Assocs. Int'l., Inc.*, 522 F.3d 1279, 1293 (Fed. Cir. 2008); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1361 (Fed. Cir. 2006).

Cradle's reliance on *Lucent* is misplaced. Unlike the date picker feature in *Lucent,* the accused semaphore peripheral can be used in non-infringing ways, and TI's documentation instructs users how to use *both* the accused modes and non-accused modes. *C.f. Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. 2009). Furthermore,

*Lucent* involved a feature in Microsoft Outlook that any one of millions of customers could practice, and was in fact practiced by Lucent's expert and his wife. *See Lucent*, 580 F.3d at 1318. In contrast, the accused feature in TI's DSP chips is accessible to only to a handful of TI's customers. Whereas the evidence in *Lucent* was "just barely sufficient," *id.* at 1318, the evidence cited by Cradle here falls well short of that mark.

Finally, Cradle's subpoenas establish that TI's customers *did not* follow the alleged "recommendation" on which Cradle relies. Part I.C., *supra*. Cradle cannot now credibly argue that those customers might practice the method. *See TecSec, Inc. v. Int'l Bus. Machines Corp.*, 769 F. Supp. 2d 997, 1013 (E.D. Va. 2011). If the use of the accused semaphore peripheral is indeed substantial, as Dr. Albonesi opines, then Cradle "should have had no difficulty in meeting its burden of proof." *E-Pass Techs. v. 3Com Corp.*, 473 F.3d 1213, 1222–23 (Fed. Cir. 2007).

### D. Cradle Does Not Offer any Compelling Reason to Disturb the District Court's Ruling

The cases upon which Cradle relies are inapposite because they do not involve apparatus claims that specify a particular configuration. Br. at 28–29. For example, in *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204–05 (2010), unlike the present situation, the soft-

ware needed to practice the claimed limitations was already present on the accused devices at the time of sale. *See also Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001) (reversing summary judgment of non-infringement of method claims, and holding that tests of an accused device under unusual conditions are not relevant to an infringement analysis); *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 832 (1991) (when claim refers to "*programmable* selection means," the accused device "need only be capable of operating" in the infringing mode).

Similarly, Cradle's reliance on *Brocade Communication Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192 (N.D. Cal. 2012) is misplaced. Br. at 31. When denying summary judgment, the court determined that the apparatus claims at issue were either drawn to capability, or if drawn to a particular configuration, the claimed configuration was the "standard implementation" and the defendant had tested the accused configuration in the United States. *Id*. at 1202, 1210. Here, Cradle has not alleged that the accused configuration is the "standard implementation" of TI's DSPs, and Cradle failed to identify any evidence of testing.

## III.  The District Court Correctly Granted Summary Judgment of Non-Infringement of the '259 Patent

Cradle's infringement allegations rest on both the PRCM-based strategy (specifically, the dynamic dependency feature) and the internal clock gating strategy.  The PRCM-based strategy is disabled by default in TI's chips.  Part II.B.1, *supra.*  Even if the PRCM-based strategy is enabled by a customer, the dynamic dependency will not be invoked unless the static dependency is also disabled.  Similarly, the internal clock gating strategy—if implemented in the module at all—is disabled by default.  Cradle was therefore obligated to come forward with proof of at least one instance in which the default configuration of the accused chips had been altered to enable the accused features.  The district court correctly held that Cradle failed to meet this burden.

In reaching its ruling, the district court correctly applied the law as articulated in *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010) and similar cases.  In *Fujitsu*, the accused product had two modes of operation, and the allegedly infringing mode was disabled by default. *See id.* at 1326, 1329.  This Court held that the description of the infringing mode of operation in the manuals only showed that the products were capable of infringement, and did not provide evidence of

use.  *See id.* at 1329.  Likewise, in *ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307 (Fed. Cir. 2007), the accused product had an infringing and a non-infringing mode of operation.  In spite of instructions showing how to use the infringing mode, and expert testimony that the infringing mode was "the most natural and intuitive way to employ the device," this Court held that such evidence was insufficient to establish infringement.  *See id.* at 1312–13; *see also Southwest Software v. Harlequin Inc.*, 226 F.3d 1280, 1291 (Fed. Cir. 2000); *Mosel Vitelic Corp. v. Micron Tech., Inc.*, No. 98-449-GMS, 2000 WL 1728346, at *2 (D. Del. Mar. 14, 2000).

## A.   Cradle Failed to Show That the EMIF and DMM Modules Will Automatically Practice the Accused Feature

Cradle alleges that the mere use of the EMIF and DMM modules in TI's OMAP 4 and OMAP 5 chips results in infringement of the method claims because these two modules are designed to automatically operate only in the allegedly infringing mode.  Cradle's argument is not supported by the evidence.  The accused feature in the EMIF is disabled by default, and Cradle has failed to show that the feature is implemented in the DMM module.

### 1.   EMIF

Regarding the PRCM-based strategy, Cradle failed to show that a TI chip had been configured to practice the claimed method. Counter Statement of the Case, Part II.B–C, *supra*. The district court concurred. JA00031–33.

Regarding the internal clock gating strategy, Cradle argues that the EMIF module is designed so that it will automatically practice the claimed methods. Specifically, Cradle argues that the EMIF is "hardwired to be idle and wake itself up," and that the mere presence of the internal clock gating strategy evidences infringement. Br. at 50. As the district court noted, Cradle's evidence indicates at best that the EMIF module is **capable** of enabling and disabling some of the internal clocks if the feature is enabled: "The EMIF **can** gate off the EMIF_FCLK. There is an internal mechanism which **can** stop the EMIF_FCLK automatically." *Id.* (emphases added). TI does not dispute that the EMIF is **capable** of disabling and enabling some of its internal clocks. The issue is whether that functionality has ever been used, and Cradle has failed to show that it has.

There is no dispute that the internal clock gating strategy for EMIF is controlled by the PRCM. JA01953 270:19–271:5; JA06567–68

—39—

¶459. The PRCM may not only enable or disable the clocks to the EM-
IF, it also instructs the EMIF to enable or disable its internal clocks.
*Id.* Contrary to Cradle's suggestion, the EMIF does not independently
decide whether to activate or deactivate its clocks. *Id.* Because the
PRCM-based strategy is disabled by default (to the extent it is imple-
mented), the internal clock gating strategy for EMIF is also disabled by
default. Cradle has failed to put forth any evidence that this functional-
ity has been enabled.

Cradle provides numerous citations to argue that mere use of the
EMIF results in infringement, but those citations are not helpful. Br.
at 50–51. Cradle relies upon a third-party declaration from Motorola
Solutions that the district court struck from evidence.[4] The declaration
is irrelevant because it pertains solely to OMAP 3 chips, which do not
even contain the EMIF module. JA03002–04. Cradle also relies upon
evidence that is unhelpful because it either does not address the EMIF's
internal clock gating strategy[5], or merely confirms that the EMIF's in-

_____

[4] JA02680–83 (Declaration); JA00045 (Order Striking Declaration).

[5] JA01678 (static dependency and dynamic dependency); JA02999
(same); JA01951 (deposition testimony stating that the feature in ques-

ternal clocks are governed by the PRCM[6].  Importantly, Cradle's cites to Dr. Albonsei's report fail to provide any evidence that the EMIF has been "hardwired to be idle and wake itself up."[7]  Documents indicating sales of TI's products do not provide any insight regarding the practice of the asserted method claims.[8]  Finally, Cradle undermines its argument by citing testimony confirming that the EMIF does not independently control its own clocks.[9]

---

tion "has nothing to do with" the internal clock gating strategy of the EMIF); JA03004 (OMAP 3 document); JA01879 (OMAP 3 GPMC); JA01882 (OMAP 3 SMS, SDRC); JA01919–20 (deposition transcript re OMAP 3 GPMC); JA01926–28 (deposition transcript re OMAP 3 GPMC, SMS, SDRC); JA01761 (GPMC); JA01954 (GPMC); JA01841 (DMM); JA01843 (EMIF's MODULEMODE bits that are unrelated to internal clock gating); JA01844 (same); JA01850 (GPMC); JA01920 (OMAP 3 GPMC); JA01620 (OMAP 3 SMS, SDRC); JA01938 (OMAP 3 GPMC, SMS, SDRC, SDMA); JA01962 (GPMC); JA01968 (SDRC); JA01969 (same); JA01979 (GPMC); JA01983–86 (GPMC); JA01995–97 (source code for "ipghpwridle_rtl.vhd"); JA02005 (same).

[6] JA01691; JA01869; JA01714; JA01735; JA01847.

[7] JA05927–29; JA04225–27; JA04269; JA04266; JA04272.

[8] JA02489–92 (sales); JA02504 (same); JA02520 (same); JA02533–34 (same); JA02557–58 (deposition testimony re sales); JA02617–20 (same), JA02624–26 (same), JA02628 (same); JA02678 (sales); JA02608 (same); JA02678 (same).

[9] JA01950 (the EMIF does not "gat[e] the clocks itself by sensing some hardware conditions.").

### 2.  DMM

Cradle failed to show that the DMM module is capable of infringement under the internal clock gating theory of infringement. After substantial discovery, including access to the source code for the DMM, Cradle's allegations rest solely on speculation about how TI may have designed the module—noting that the internal clock gating strategy "***can*** be hardwired into the chip" and "[***w***]***hen*** hardwired into the chip," the chip will infringe.  Br. at 52 (emphases added).

Evidence marshaled by Cradle to argue that mere use of DMM will result in infringement is unpersuasive.  *Id*.  Cradle again relies upon a third-party declaration that was struck by the district court.  The declaration is irrelevant because it pertains to TI's OMAP 3 chip, which lacks the DMM module.  Cradle's citations to TI's manuals are unhelpful because they do not pertain to the DMM module or its internal clock gating strategy.[10]  Cradle's citations to Dr. Albonesi's opinion fail to establish that the DMM has the relevant functionality.[11]

---

[10]  JA01678 (EMIF); JA02999 (MPU dependencies); JA01951 (same); JA01691 (EMIF); JA01869 (same); JA01714 (same); JA01735 (same); JA03004 (GPMC, SMS, SDRC).

[11]  JA05927–29.

Finally, Cradle argues for the first time on appeal that the DMM must be hardwired in an allegedly infringing way because "the corresponding MTC" in OMAP 3 is so hardwired. Br. at 52–53. To support this assertion, Cradle relies on an OMAP 3 manual that describes a different module—the SDRAM Memory Scheduler (SMS)—and argues without any factual basis that TI might have incorporated the SMS functionality in the DMM. Such speculation is insufficient to overturn the district court's ruling.

Although Cradle attempts to portray the issue as a factual dispute, it ignores that it failed to carry its burden to identify genuine issues that preclude summary judgment. *See Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 876 (Fed. Cir. 1998) (affirming summary judgment of non-infringement and noting that statements from plaintiff's expert regarding the presence of the infringing feature were "wholly conclusory, devoid of facts upon which the affiant[s'] conclusions, as experts, were reached"). There is no factual dispute, as Cradle has failed to show that the DMM is capable of infringement.

### B.   Cradle Failed to Show That Anyone has Altered the Default Settings of the Accused Products to Practice the Claimed Method

Cradle alleges that, to the extent TI's chips need to be configured to invoke the accused functionality, it offered sufficient evidence of that fact. Cradle specifically points to the "autoidle" feature in the GPMC module and the "smart idle" feature in the OMAP 4+ chips. Cradle's allegations are incorrect.

### 1. GPMC

The "autoidle" feature refers to the internal clock gating strategy in the GPMC. Whether that feature is enabled or not is determined by the AUTOIDLE bit in the GPMC_SYSCONFIG register, a register that maintains configuration data for the GPMC. JA06330 ¶56; JA06350–51. The default value of the AUTOIDLE bit for GPMC is '0', which indicates that the "autoidle" feature has been disabled. *Id.* Unless the default value of the "autoidle" bit is altered, the GPMC cannot invoke the internal clock gating feature to enable or disable its internal clocks. Cradle failed to offer any credible evidence that anyone has enabled the "autoidle" feature in the GPMC.

Cradle relies solely on TI's alleged recommendation regarding the use of "autoidle" in an OMAP 3 architecture document. Br. at 54 n.18; JA03004; JA00032. The district court found that the alleged recom-

mendation regarding the OMAP 3 products does not provide evidence of use of the infringing mode by OMAP 4+ chips.  JA00032.  In fact, there is no evidence that any customer of OMAP 4+ chips received this OMAP 3 document.  Furthermore, even if such a customer received this document, Cradle's failure to uncover use of the "autoidle" feature indicates that TI's customers have ignored the alleged "recommendation."

### 2.    "Smart Idle" Feature (Feature of PRCM-Based Clock Gating Strategy)

Cradle points to the presence of the "smart idle" feature as evidence that the dynamic dependency has been enabled, and consequently, the claimed method has been practiced.  Br. at 55–57.

"Smart idle" is a minor feature within the PRCM-based clock gating strategy.  It is one of three modes that govern the manner in which the clocks of a module can be disabled under that strategy. JA01897 50:12–51:18; JA01950 260:12–23; JA01954–55 276:22–278–7.  When a module is in the "smart idle" mode, the PRCM disables the clocks to the module only after the module has completed all pending transactions. The "smart idle" feature is not synonymous with the PRCM-based strategy.  JA01897 50:12–51:18.

Cradle's expert speculates that "it would make no sense to enable

the 'smart idle' . . . feature, but not enable dynamic dependency.'" Br. at 56–57. Dr. Albonesi's subjective beliefs lack factual support. First, Cradle has no evidence that anyone has disabled the static dependency feature. Second, Cradle again relies on three pages of source code from Motorola Mobility that lack probative value. JA02906; JA02921; JA02931. As noted above, Dr. Albonesi could only speculate or guess as to what that code accomplished. JA06594–95 228:2–230:16 ("it seems to be something to do with initializing …. but, again, I'm speculating …. [A]gain, I'm guessing"); JA06598; JA06599; JA06600. Finally, the "smart idle" mode can be employed with either static dependency or dynamic dependency. JA01897 50:12–51:18. Therefore, contrary to Dr. Albonesi's assertion, the use of the "smart idle" feature does not necessarily imply that dynamic dependency has been enabled.

Dr. Albonesi speculates that the power savings accruing from dynamic dependency will motivate TI's customers to leverage that feature. Dr. Albonesi ignores the fact that customers would have an equal (or greater) motivation to keep static dependency enabled because it improves performance by minimizing access latencies. JA06315 ¶8; JA06387. Dr. Albonesi also ignores that a customer may choose to lev-

erage one of the numerous other power management techniques present in the accused chips—such as voltage scaling, frequency scaling, dynamic power switching, and standby leakage management—to conserve power, rather than dynamic dependency.

Cradle also mischaracterizes the district court's opinion when it states that "[a]s the district court acknowledged, Cradle identified source code from a TI customer showing that customers in fact set an MTC to the 'smart idle' setting." Br. at 55. The district court was discussing the PRCM-based clock gating strategy, not the "smart idle" feature. JA00031–32. In addition, Cradle's expert discussed the three pages of source code in the context of the PRCM-based strategy, not the "smart idle" feature. JA05920–21.

Cradle's citations to its own expert's testimony[12] are to no avail because Dr. Albonesi does not discuss the implications that enabling smart idle might have on the static dependency feature.[13] The district

---

[12] When Cradle cites to deposition transcripts and product manuals, it is only to support the undisputed fact that OMAP 4 and OMAP 5 have the dynamic dependency feature. Br. at 57; JA05924–27; JA01955; JA01899, JA01946; JA01679; JA03000.

[13] JA05920–21, JA05925–27; JA04272–73.

court correctly ignored Dr. Albonesi's speculative testimony, and found

that Cradle failed to show infringement.  *See Dynacore Holdings Corp.*

*v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir 2004).  If, as Cradle

argues, "it simply would not make sense" to forego use of the dynamic

dependency feature (Br. at 57), Cradle "should have had no difficulty in

meeting its burden of proof and in introducing testimony of even one

such user."  *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1223

(Fed. Cir. 2007).

### C.    Cradle Fails to Offer a Legal Framework That Warrants Disturbing the District Court's Rulings

The few cases cited by Cradle are inapposite, because the infring-

ing features in the accused products were enabled by default or the

accused products did not provide a non-infringing option.  *See Convolve,*

*Inc. v. Compaq Computer Corp.*, 527 Fed.Appx. 910, 929 (Fed. Cir.

2013); *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365 (Fed. Cir.

2012); *Lucent Techs.*, 580 F.3d at 1318; *Moleculon Research Corp. v.*

*CBS, Inc.*, 793 F.2d 1261 (Fed. Cir. 1986); *Beedle v. Bennett*, 122 U.S. 71

(1887).  Cradle also cites to *Bell Comm'ns Research, Inc. v. Vitalink*

*Comm'ns Corp.*, 55 F.3d 615, 622–23 (Fed. Cir. 1995) for the unremark-

able proposition that a product that "sometimes, but not always"

infringes a claimed method nevertheless infringes.  Br. at 49.  But that does not help Cradle because, in the instant case, Cradle has no evidence of *any* use.

## IV.    The District Court Correctly Construed the "Idle Memory Transfer Controller" Limitation

| Cradle's Proposal | TI's Proposal | District Court's Construction |
|---|---|---|
| A memory transfer controller that is not ready to execute instructions. | A memory transfer controller whose clock is stopped. | A memory transfer controller that is not ready to execute instructions because its clock is stopped, i.e., the run bit is set to '0', and either the wake-up bit or the External WakeUp (XW) bit is set to '1.'. |

The term "idle" does not have a consistent meaning in the art.  JA06183 ¶35.  The intrinsic evidence, however, supports the district court's construction.  *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1378–79 (Fed. Cir. 2005) (reconciling amorphous claim language with specification).  Figure 4 of the '259 patent depicts a state diagram that conveys to a skilled artisan the five possible states of an MTC, and how an MTC transitions from one state to another.  JA00061.  In claim 1, the activation causes an MTC to transition from the "idle" state to the "ready" state.



FIG._4

The patent discloses that two mechanisms (External Wake Up and PLP FIFO Wake Up) are "used to make  idle MTC ready to execute instructions in response to a wake-up event from an external source." JA00065 4:57–60; JA00057 Abstract; JA00064 1:55–56 Summary of the Invention; *Wireless Agents LLC v. Sony Ericsson Mobile Commc'ns AB*, 189 Fed. Appx. 965, 967 (Fed. Cir. 2006) ("as part of the 'Summary of the Invention,' it is 'commensurate with the invention as claimed.'");

*C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 863–64 (Fed. Cir. 2004) (statements describing the invention as a whole are more likely to support a limiting definition of a claim term).

An MTC transitions from the idle to the ready state through the first mechanism (PLP FIFO Wake Up), annotated as option (2), when its run bit changes from a '0' to a '1':

> The first mechanism, Parameter List Pointer (PLP) FIFO Wake Up, wakes up an MTC after an external agent writes to an MTC's PLP FIFO. This activates the MTC's run bit, making the MTC eligible to execute instructions . . . .

JA00057 Abstract. This mechanism is controlled by the wake-up bit. JA00065 4:5–6. "If the wake-up bit is set to '1' and the run bit is '0,' the MTC is idle 72 (however, . . . it will become ready if a wake-up event occurs)." *Id.* 4:47–50. When a wake-up event occurs (*e.g.*, when the PLP FIFO is no longer empty), the run bit of the MTC is set—*i.e.*, run bit changes from '0' to '1')—thereby transitioning the MTC from the idle state to the ready state. JA00065 4:5–12.

An MTC makes the same transition through the second mechanism (External Wake Up), annotated as option (1), when value of the run bit changes from a '0' to a '1':

> The second mechanism wakes up an MTC after an external agent writes to an MTC's external wake-up address. This sets the MTC's run bit, making the MTC eligible to execute instructions.

JA00057 Abstract. This mechanism is controlled by the External Wake Up (XW) bit. JA00065 4:13–15. "If the XW bit is set and the run bit 102 . . . is cleared," the MTC is in the idle state. *Id.* 4:15–17; *see also* JA00066 5:47–48. An external write to register 27 will set the run bit 102, transitioning the MTC from the idle state to the ready state.[14] JA00065 4:17–18.

The table below summarizes the relevant states and associated bit values described in the '259 patent:

---

[14] Although both the Summary and the Abstract mention that an "idle" MTC can be activated through two mechanisms, the specification discloses a third mechanism. The patent mentions that an MTC enters the ready state from the idle state when an external write sets the run bit to '1'. JA00065 4:60–62. The third mechanism is depicted in Figure 4 as elements 178 and 182. The apparent contradiction does not impact the present analysis because the third mechanism is consistent with the district court's determination that the run bit—which in turn controls the clock—dictates how an MTC enters the ready state from the idle state.

| States | Status of Wake-Up and External WakeUp (XW) bits | Status of Run bit |
|---|---|---|
| Idle | Either Wake-up or XW bit is 1 | 0 |
| Ready | Either Wake-up or XW bit is 1 | 1 |
| Inactive | Both Wake-up and XW bits are 0 | 0 or 1 |

## A.    The Run Bit Determines Whether the MTC is Ready to Execute Instructions

The specification consistently states that an MTC is activated by setting its run bit to a value of '1' so that the MTC is eligible to execute instructions. JA00057 Abstract; JA00064 1:59–62; 2:1–3. The value of the run bit specifies whether the clocks of the MTC are enabled (*i.e.*, MTC is activated) or disabled (*i.e.*, MTC is idle and cannot execute instructions):

> The run 102 bit helps control the MTC clock. When the run bit 102 is one, the MTC clock runs and the MTC executes instructions. When the run bit 102 is zero, the MTC clock is stopped and the MTC is stalled.

JA00065 4:1–4. The patent repeatedly uses "idle" to specify an MTC whose "run bit is set to '0', and either the wake-up bit or the External WakeUp (XW) bit is set to '1.'" JA00057 Abstract; JA00061 Fig. 4; JA00064 1:55–62, 2:1–3; JA00065 3:63–65, 4:1–19, 4:44–52; JA00066 5:6–11, 5:17–25, 5:33–37, 5:47–55, 5:64–65. The consistent use of the

term in the specification here warrants a narrower construction that is limited to the disclosed embodiments. *See Abbot Labs. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009); *see also American Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1333–34 (Fed. Cir. 2011) (construing "eccentric weight portion" in light of specification); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1327–34 (Fed. Cir. 2009) (construing "graft" and other terms in light of specification).

As a result, TI proposed that the term idle MTC should be construed as an MTC whose clocks are stopped. Because an MTC whose clocks are disabled cannot execute any instructions, TI's proposal implies that such an MTC is not ready to execute instructions. The district court largely adopted TI's proposal.

## B. The District Court's Construction Clarified Ambiguity in the Constructions Proposed by Cradle and TI

When construing the term, the district court correctly observed that "Cradle and TI both propose constructions that could also define the inactive state of the MTC." JA00028. The court further noted that these "two states can be distinguished by the fact that, in the idle state, either the wake-up bit or the External WakeUp bit is set enabling the MTC to automatically wake up in response to a wake-up event." *Id.* As

discussed immediately above, the court's observation was supported by the specification.

To more accurately capture the patentee's definition of an idle MTC, the court incorporated the values of the pertinent bits to the construction. This was not improper. The specification underscores the importance of these bits to the '259 invention: "For *this invention*, bits of particular interest are: the MTC run bit 102; the wake-up bit 90; the external wake-up [XW] bit 92 … ." JA00065 3:63–65 (emphasis added). The aspects that the written description refers to as "this invention" may limit the claim term because "[t]he public is entitled to take the patentee at his word." *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006); *see also Edwards Lifesciences*, 582 F.3d at 1330 ("when the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment.").

Accordingly, the Court should adopt the district court's construction in toto.

## C.    Cradle's Construction is Inconsistent With the Preferred Embodiment

Cradle's proposed construction is flawed because it is inconsistent

with the specification. The proposal implies that the MTC can have on-ly two states: ready to execute instructions (*i.e.*, activated), and not ready to execute instructions (*i.e.*, idle). Under Cradle's proposal, an MTC in the "executing" state will also be in the "idle" state (as defined by Cradle), because such an MTC is "not ready to execute instructions." Br. at 58. According to the specification, however, when an MTC is in the "executing" state, it cannot be in the "idle" state because it has been activated, as depicted in Figure 4. Putting the two together, an "execut-ing" MTC can be both in the "idle" state (under Cradle's proposal) and also *not* in the "idle" state (according to the specification). Viewed in light of the specification, Cradle's construction cannot be correct.

Finally, Cradle resorts to claim differentiation to support its pro-posed construction. It argues that, because other claims refer to setting the run bit, claim 1 does not. Br. at 60–61. But claim differentiation is "not a rigid rule but rather is one of several claim construction tools." *ICU Med., Inc. v. Alaris Med. Sys. Inc.*, 558 F.3d 1368, 1376 (Fed. Cir. 2009). Given the inventor's consistent use of the term in the specifica-tion, claim differentiation must give way. *See Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005).

In the alternative, the Court may choose to focus on the first part of the district court's construction, "a memory transfer controller that is not ready to execute instructions because its clock is stopped." The clause following "i.e." in the district court's construction can be read to state an example of the construction that precedes it. *C.f. Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1326 (Fed. Cir. 2012) (interpreting "i.e." as exemplary, not definitional). Alternatively, the Court may adopt TI's proposed construction for the reasons set forth above.

## V.  TI's OMAP 3 Products Do Not Infringe Under the Internal Clock Gating Strategy

Under any of the proposed constructions and under the district court's construction, the Court has an alternative ground for affirming that TI's chips (OMAP 3 and OMAP 4+) do not infringe under the internal clock gating strategy. *See Glaxo Group Ltd. v. Torpharm, Inc.*, 153 F.3d 1366, 1371–72 (1998) (holding that for reasons of judicial economy, the Federal Circuit may consider alternative grounds for affirmance).

It is undisputed that when a target module uses the internal clock gating strategy, it always keeps one of its internal clock branches (known as the free running clock) enabled so that certain internal modules may respond to incoming commands. JA06316 ¶10; JA06399.

Therefore, the target modules always remain activated because the free running clock within the target module always remains enabled. JA06328–29 ¶53.

Because the free running clock is always enabled, the accused target modules are not "idle" under the district court's construction or under TI's proposed construction. Furthermore, the free running clock enables the accused modules to respond to incoming commands. *Id.* Thus, assuming that the accused modules are capable of executing instructions, they are always ready to execute instructions under Cradle's proposed construction of "idle." *Id.*

## VI.    The District Court Correctly Construed the Disputed Terms in the '049 Patent

The district court issued a combined claim construction and summary judgment opinion. It did not base its summary judgment ruling on the claim constructions of the disputed terms in the '049 patent. Accordingly, if the Court affirms the grant of summary judgment on the grounds discussed above, it need not rule on the disputed claim constructions.

### A.    "A System Bus, the Bus Allowing Only One Bus Transaction in any One Clock Cycle" / "One Bus Transaction"

## The "system bus" limitation:

| Cradle's Proposal | TI's Proposal | District Court's Construction |
|---|---|---|
| A bus that provides serialized access to the semaphore. | A signal path shared by all of the devices that are connected to the path and used for read and/or write transactions among them, in which only one device has use of the path for the entire duration of the transaction. | A signal path shared by all devices that are connected to the path and used for transactions among them, in which only one device has use of the path for the entire transaction. |

## The "one bus transaction" limitation:

| Cradle's Proposal | TI's Proposal | District Court's Construction |
|---|---|---|
| Reading of the semaphore and writing a '1' into the semaphore, e.g., serialized access. | A read and/or write transaction, in which only one device has use of the system bus for the entire duration of the transaction. | A transaction in which only one device has use of the system bus for the entire duration of the transaction. |

To overcome a rejection of the pending claims during prosecution, Cradle cancelled the original claims and drafted a new set of claims "to particularly point out the distinguishing features of the invention." JA00287. In each independent claim, Cradle added limitations requiring a "system bus" that "allow[s] only one bus transaction in any one clock cycle" and that conveys interrupts to processors. JA000282–86. The scope of the claims is thus circumscribed by the concessions that Cradle made to overcome the rejection. *See North American Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1346 (Fed. Cir. 2005).

The constructions adopted by the court reflect these concessions.

As discussed below, Cradle's challenge to the district court's construction raises four issues relating to the nature of the claimed "system bus."

### 1.    The district court correctly held that a "system bus" is shared by all devices that are connected to it and used for transactions among them

The intrinsic evidence compels the conclusion that the "system bus" is shared by all devices that are connected to it.  Notably, Cradle specifically incorporated this concept into the claims—which require the "system bus" to act as the shared path between the processors, the shared resource, and the semaphore circuit.  JA00055 6:52–53; JA00056 8:20–21; JA00281–90.  For example, the preamble of claim 1 requires:

> In a digital system of the type having at least
> *first and second processors*, and *at least one
> shared resource accessible to the processors via a
> system bus*, the bus allowing only one bus transaction in any one clock cycle, *a hardware
> semaphore circuit coupled to said system bus* and
> configured to monitor shared resource accesses by
> said processors.

JA00055 6:50–55 (emphases added).

In addition, other limitations in claims 1 and 6 recite that it is the "system bus" that "couples" the processors to the semaphore circuit and

the shared resource.   JA00055–056 6:57–58; 6:66–67; 8:21–24.   The specification mirrors that arrangement (JA00053 2:66–3:6), and Figure 2 confirms that the "system bus"—depicted with double-ended arrows—is shared by all devices that are connected to it (JA00051).[15]

### 2. By requiring that interrupts be conveyed over the system bus, the district court did not exclude the preferred embodiment

Cradle argues that the district court's construction is flawed because it excludes a disclosed embodiment.  This embodiment is depicted in Figure 2, which Cradle argues shows that interrupts are conveyed to the processor through dedicated interrupt lines (281 and 291) and not through the system bus (210).  Thus, according to Cradle, the system bus must include these dedicated interrupt lines.  Br. at 35–37.  In arguing so, Cradle impermissibly seeks to recapture subject matter that it surrendered during prosecution.

The '049 patent discloses two ways in which interrupt signals can be conveyed from the hardware semaphore circuit to the waiting processors.  *First*, interrupts may be conveyed via dedicated signal lines

---

[15] The extrinsic evidence supports the district court's interpretation that a system bus is a common communication path between components of system.  JA06627–28.

that couple the semaphore circuit directly to each processor. This is depicted as unidirectional arrows 281 and 291 of Figure 2 (JA00051) and as a unidirectional line that is separate from the Data Bus and the Instruction Bus in Figure 4-1 from the provisional application (JA06190, reproduced below, annotated).



Figure 4-1: Quad Architecture

*Second*, interrupts may be conveyed via the system bus, which is depicted as element 210 in Figure 2.[16]  JA00051; JA06182–83 ¶¶31–33.

The original claims did not specify how interrupt signals are

---

[16] One of ordinary skill in the art would understand that interrupt signals can be conveyed over a bus using, for example, a read or write transaction.  JA06602–03 189:22–190:22; JA06578–79 152:6–153:18; JA06635; JA06182 ¶¶32–33.

transmitted from the semaphore circuit to the waiting processors. JA00631–37. When faced with a rejection, Cradle submitted new claims specifying that interrupts are conveyed to the waiting processors *via the system bus*. JA00733–37; JA00055 6:66–67 ("an interrupt generation circuit coupled to the first and second processors via the system bus"); JA00056 8:62–65 ("generating a semaphore interrupt signal for the respective first and second processor and transmitting said interrupt signal thereto over said system bus"). The district court's construction properly reflects the applicant's disclaimer of claim scope. JA00022; *see North American Container*, 415 F.3d at 1346 ("the fact that claims do not cover certain embodiments disclosed in the patent is compelled when narrowing amendments are made in order to gain allowance over prior art"). Cradle surrendered the first manner of conveying interrupts during prosecution.

### 3. The district court correctly held that the "system bus" permits transactions from only one device at a time

Because the bus is a shared path, conflicts arise if two devices access the bus at the same time. To avoid such conflicts, the bus allows only one device to perform a transaction at any instant of time. Both

claims 1 and 6 reflect this property of a bus because each recite without qualification that the claimed "system bus" "allow[s] only one bus transaction in any one clock cycle." JA00055 6:52–53; JA00056 8:20–21. The claims do not limit the term "one bus transaction" in any manner; rather, the term is used to specify a property of the "system bus" itself. Accordingly, it follows that the "system bus" handles transactions from only one device at a time.

At the time of the invention, skilled artisans understood a "bus" to be a shared communication path that grants access to only one device at a time to avoid conflicts. JA06181–82 ¶29. Indeed, the inventor of the '049 patent testified that "the bus itself is a collection of wires that allow only one speaker at a time." JA06574 69:14–18. The extrinsic evidence is consistent. *See* JA06627–28 ("The bus is used for only one transaction at a time between a source (master) and a destination (slave)."); JA06651 (defining bus and noting that "only one device being able to transmit at a given moment."); JA06657; JA06679; JA06701.[17]

---

[17] Cradle's suggestion that TI's expert "agreed" with Cradle's interpretation of a bus mischaracterizes his deposition testimony. Br. at 39–40. In the cited portions, Dr. Hassoun discussed how different masters may use *different busses* at the same time. JA01076–77; JA01088–97.

Case: 14-1193     Document: 85     Page: 77     Filed: 12/19/2014

**4.    The district court correctly held that the "system bus" handles all transactions among the devices connected to the bus**

The claimed "system bus" handles all transactions among the devices that are connected to it.  First, the claims place no qualification on either "system bus" or "bus transaction," thereby indicating that the bus should facilitate *all* transactions.  Second, the fact that the claims expressly require the shared resources to be "accessible to the processors via the system bus" means that the "bus transaction[s]" must at least include the transactions from the processors to the shared resources.  Importantly, the claims define the "system bus" in the context of the processors and the shared resources, not merely in the context of processors and the semaphore circuit.  JA00055–56.  Thus, the claims do not limit the "system bus" to serializing access to the semaphore.

While attacking the adopted construction, Cradle ignores that by permitting only one device to use the bus at a time, the "system bus" inherently serializes all transactions on the bus—not just the transactions between the processor and the hardware semaphore.  During prosecution, Cradle emphasized that the claimed system bus ensures that there is serialized access to the semaphore:

> In the present invention, the hardware sema-
> phore is accessed via a system bus in which only
> one bus transaction can take place in any one
> clock cycle. (The bus system in the present inven-
> tion *effectively* serializes access to the semaphore
> from multiple contenders.)  There is no need for
> arbitrated access to the semaphore in applicant's
> invention.

JA00738–39 (emphasis added).  Because the claimed "system bus" seri-

alizes all transactions, it *effectively* serializes the access to the

semaphore as well.

At the district court level, Cradle's proposed construction for "one

bus transaction" was "reading of the semaphore and writing a '1' into

the semaphore, *e.g.*, serialized access."  JA00118.  It appears that Cra-

dle argues on appeal that "one bus transaction" should be construed to

mean "serialized access to the semaphore."  Br. at 37, 41.  This Court

should reject Cradle's attempt to argue a claim construction position

that it did not present below.  *See Digital-Vending Services Int'l, LLC v.

The Univ. of Phoenix*, 672 F.3d 1270, 1273 (2012) (holding that "a party

may not introduce new claim construction arguments on appeal or alter

the scope of the claim construction positions it took below.").

Cradle also argues that the "one bus transaction" should be lim-

ited *exclusively* to the description in the Background portion of the

specification  Br. at 38–39.  In the Background, however, the patentee simply explained how prior art systems avoided race conditions when accessing a semaphore—*i.e.*, the processor is given sole access to the bus for both the reading and writing of the semaphore.  JA00053 1:25–45. As the district court noted, the mere description of one type of "bus transaction" in the Background does not amount to "a deliberate and clear preference" for interpreting the claim term "one bus transaction" in a manner that is contrary to its plain and ordinary meaning.  *See Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).

Moreover, if adopted, Cradle's proposed construction would significantly broaden the scope of the claims.  Rather than a "system bus" that allows only one bus transaction in any one clock cycle, the claims would cover a "system bus" that serializes access to the semaphore, but otherwise permits numerous transactions to proceed on the "system bus" in the same clock cycle.  Cradle's interpretation cannot be correct because the specification fails to describe such a bus.[18]

---

[18] Cradle prefers to vaguely define "bus" to encompass other interconnect mechanisms within the scope of its claims.  Around the time of the filing of the '049 patent, there were three primary interconnect mechanisms in multiprocessor systems.  JA06707.  Even though "the crossbar

### B.    "Any Processor Requesting Access to the Shared Resource"

| Cradle's Proposal | TI's Proposal | District Court's Construction |
|---|---|---|
| One or some processors requesting access to the shared resource. | All processors requesting access to the shared resource. | All processors requesting access to the shared resource. |

The parties dispute whether the "semaphore interrupt signal" is generated for *all processors* that have requested access to a shared resource, or to *one or some processors*, whenever the shared resource becomes available.  Br. at 41.  In adopting TI's proposal, the district court correctly determined that the claim language itself, along with the other intrinsic evidence, compels the conclusion that "any" means "all." JA00022.

Claim 1 describes an "interrupt generation circuit" that sends an interrupt to "any processor requesting access to the shared resource" whenever the shared resource has just been made available for access. JA00056 7:1–6.  It also specifies that "*each* logic gate circuit [is] configured to generate a semaphore interrupt signal to its corresponding

---

is the antithesis of a bus" (JA06717), Cradle nevertheless equates the "system bus" to the crossbar switch in the accused chips.

processor" whenever the following two conditions are satisfied:

- a shared resource has just been made available for access (the *fourth* state); and

- the corresponding processor has requested access to that shared resource (the *sixth* state).

JA00056 7:21–29, 7:41–46.  The specification teaches the same mechanism.  JA00053 2:33–36; JA00054 4:27–39; *Wireless Agents*, 189 Fed. Appx. at 967 ("as part of the 'Summary of the Invention,' it is 'commensurate with the invention as claimed.'").  Because *each* logic gate circuit must generate an interrupt to its corresponding processor if that processor requests access to the shared resource, the "interrupt generation circuit" must generate an interrupt to *all processors* that have requested access the shared resource.

Dependent claim 3 claims a system with more than two processors, and claims additional interrupt enable cells and logic gate circuits. As depicted in Figure 2, the logic gate circuits will automatically send an interrupt to any processor that requested access to a shared resource when the resource was in use.  Thus "any" in claim 1 must be broad enough to encompass the multiple processors of claim 3.

Cradle wrongly accuses the district court of limiting the claims to

the preferred embodiment. Br. at 42. That is not the case, given that the claims and the specification provide a single, unified definition for the claim term. *See Honeywell Int'l*, 452 F.3d at 1318.

Cradle relies solely on dictionary definitions to advocate that "any" should be limited to "one or some." Br. at 41–43. Cradle ignores that the same dictionary also defines "any" to mean "all." JA00587. By cherry-picking one dictionary definition and ignoring the intrinsic evidence, Cradle attempts to "extend patent protection beyond what should properly be afforded by the inventor's patent." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005).

Cradle admits that it is essential to the invention that all waiting processors receive the interrupt. Br. at 43. Yet Cradle contends that it does not matter which processors receive the interrupt when a shared resource becomes available, so long as interrupts are eventually sent to other waiting processors. *Id.* There is no written description in the specification, however, that describes how a subset of all of the processors that have requested access to the shared resource are identified and notified via the interrupts. Thus, if the claims are to be awarded the scope that Cradle advocates, then the claims lack written descrip-

tion support. *See Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (the written description "must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.").)

This argument, in any event, is a red herring rooted in Cradle's infringement allegations.[19]   The disputed claim term pertains to *which* processors receive the interrupt, not *when* the processors receive the interrupt.   The claim separately defines when the interrupts are sent: "whenever the semaphore cell changes from the second state back to the first state"—*i.e.*, whenever a shared resource becomes available. JA00056 7:3–5, 8:58–65.

C.    **"The Shared Resource is Available / Unavailable for Access" and "The Shared Resource Has Just Been Made Available for Access"**

---

[19]   In TI's DSP chips, each semaphore contains a queue, which tracks the identity of any processor that is waiting to acquire the semaphore and access the shared resource.  JA06281–82 ¶19.  When the semaphore is released, its assigned to the processor at the top of the queue and the processor is notified via an interrupt.  JA06284–85 ¶¶23–26. Eventually, all the processors in the queue are awarded the semaphore and receive the interrupt.

| Cradle's Proposal | TI's Proposal | District Court's Construction |
|---|---|---|
| The shared resource is available for access | The shared resource has not been assigned to a processor. | The shared resource is not in use by a processor and corresponds to a semaphore content of '0'. |
| The shared resource is unavailable for access | The shared resource has been assigned to a processor. | The shared resource is in use by a processor and corresponds to a semaphore content of '1'. |
| The shared resource has just been made available for access | The resource is no longer assigned to a processor. | The shared resource is no longer in use and has been released when a processor changes the content of the hardware semaphore cell to a '0'. |

TI sought construction of the phrase "the shared resource is available for access" because, divorced from the specification, the phrase can have one of two contradictory interpretations:

- the shared resource is available for access by all processors because it has *not been assigned* to (or is *not being used* by) any processor; or

- the shared resource is available for access by only one processor because it *has been assigned* to (or *is being used* by) that processor.

The specification consistently ascribes the first interpretation, which is captured in TI's proposal. Cradle relies upon different interpretations, depending on where the phrase occurs in the claims. The district court eliminated the inconsistency by largely adopting TI's proposed construction.

In the provisional application, Cradle stated that a shared re-

source is "not available" when "it has been assigned" and "the sema-phore bit is set to one."  JA06191.  By implication, a shared resource is "available" when it is not assigned and the semaphore bit is set to zero.  *Id.*  The same concept in reflected in the specification, although the terminology is slightly different:

> Assuming initially the shared resource is *available for access, that is, both the processors are not using the shared resource*, then the content of the semaphore would be a "0", indicating that the shared resource is available for access.

JA00053 1:27–28 (emphasis added); *see also* JA00054 3:65–4:2; JA00055 6:20–24.  The patent equates "available for access" to "not assigned" or "not in use."  It also equates "not available for access" to "assigned" or "in use."  In this respect, the district court's construction mirrors TI's proposal.  By not disputing this part of the construction (Br. at 45 n.15), Cradle implicitly admits that TI's proposal is correct.

Cradle quibbles about the inclusion of the values of the semaphore in the construction.  JA00022–23.  Cradle has little basis to dispute this aspect of the construction, given that Cradle itself argued below that the construction for "one bus transaction" should incorporate the same terminology—*i.e.*, "reading a semaphore a writing a '1' into the sema-

phore." JA00118.

In any event, the district court's construction is fully supported by the specification.  JA00054 3:57–4:3 (a "0" indicates that the shared resource is available for access); JA00054 4:13–17 (a "1" indicates that the shared resource is unavailable for access); *see also* JA00055 5:38–49. Contrary to Cradle's argument, this configuration is not an illustration of the invention or a preferred embodiment.  Br. at 44.  It is the *only* embodiment that is discussed in the specification.  *See Retractable Technologies, Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (affirming claim construction that tethers claims to what the specification indicates the inventor actually invented).  Thus, it was proper for the district court to adopt the construction that aligns with the patent's description of the invention.

### D.    "Cell"

| Cradle's Proposal | TI's Proposal | District Court's Construction |
|---|---|---|
| Memory capable of storing a value. | A portion of one register capable of storing a value. | A portion of one register capable of storing a value. |

The '049 patent recites three types of cells—a semaphore cell, a semaphore interrupt cell, and a semaphore interrupt enable cell—and consistently refers to these cells as portions of corresponding registers.

JA00049.  The specification refers to a "cell" as being part of a register, stating that the registers each include "illustratively" three cells. JA00054 3:7–45; JA00051 Fig 2.  Contrary to Cradle's assertion, "illustratively" here does not suggest that having cells in a register is only an illustration of the invention.  The specification uses "illustratively" to refer to the number of cells in the register.  JA00054 3:79, 3:25–26, 3:43–45.  Claim 2 mentions that the claimed "cells are cells of corresponding registers."  JA00056 7:36–39.  Thus, the adopted construction reflects the consistent description of the term in the '049 patent.

Furthermore, the extrinsic evidence cited by Cradle supports the district court's construction, and contradicts Cradle's proposal. JA00119.  A "cell" is "an elementary unit of storage for data (bit)" or "an elementary unit of storage; for example, binary cell."  Br. at 46.  Each of the three types of claimed cells has only two (*i.e.*, binary) states and can be stored in one "data (bit)" or a "binary cell" that collectively form a register.  JA00054 3:57–4:63.  Cradle, on the other hand, equates "cell" to "memory," which could include millions of bits or binary cells scat-

tered throughout a system.[20]

Cradle resorts to claim differentiation to argue that the adopted construction would eliminate the difference between claim 1 and claim 2. Br. at 47–48. But Cradle ignores that claim 2 also specifies "multiple shared resources" and concomitant structures, whereas claim 1 only requires "one shared resource." The adopted construction does not run afoul of claim differentiation.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment.

Respectfully submitted,

/s/ *Robert T. Haslam*
Robert T. Haslam
Anupam Sharma
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
Telephone: (650) 632-4700
Fax: (650) 632-4800
Email: rhaslam@cov.com

---

[20] Cradle's proposal is driven by its infringement allegations. To find the claimed "semaphore interrupt cell" and the "semaphore interrupt enable cell," Cradle points in each case to two different memories at different physical locations in the accused chips. JA06298–99 ¶¶60–62.

*Counsel for Defendant-Appellee Texas
Instruments Incorporated*

# PROOF OF SERVICE

I HEREBY CERTIFY that on this 19th day of December 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served by electronic delivery on all counsel of record listed below:

| | |
|---|---|
| Paul E. Crawford (#493) | Charles W. Saber |
| The Nemours Building | Salvatore P. Tamburo |
| 1007 North Orange Street | **Dickstein Shapiro LLP** |
| P.O. Box 2207 | 1825 Eye Street NW |
| Wilmington, DE 19899 | Washington, DC 20006 |
| (302) 658-9141 | (202) 420-2200 |
| pcrawford@cblh.com | saberc@dicksteinshapiro.com |
| | tamburos@dicksteinshapiro.com |

/s/ *Robert T. Haslam*

Robert T. Haslam
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
Telephone: (650) 632-4700
Fax: (650) 632-4800
Email: rhaslam@cov.com

*Counsel for Defendant-Appellee Texas Instruments Incorporated*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief of Defendant-Appellee complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and contains 13,891 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

I certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been composed in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Century Schoolbook font.

/s/ *Robert T. Haslam*

Robert T. Haslam
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
Telephone: (650) 632-4700
Fax: (650) 632-4800
Email: rhaslam@cov.com

*Counsel for Defendant-Appellee Texas Instruments Incorporated*